IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO

Criminal Action No. 04-cr-0341-REB

UNITED STATES OF AMERICA,

Plaintiff,

vs.

BRIAN VON BEHREN,

Defendant.
------------------------------------------------------------

                       REPORTER'S TRANSCRIPT
        (Continued Hearing on Revocation of Supervised Release)

------------------------------------------------------------

      Proceedings before the HONORABLE ROBERT E. BLACKBURN,

Judge, United States District Court for the District of

Colorado, commencing at 2:34 p.m., on the 28th day of May,

2014, in Courtroom A-1001, United States Courthouse,

Denver, Colorado.


                            APPEARANCES


      VALERIA SPENCER, Assistant U.S. Attorney, 1225 17th
Street, Suite 700, Denver, Colorado 80202, appearing for
the plaintiff.

      SCOTT VARHOLAK, Attorney at Law, Office of the Federal
Public Defender, 633 Seventeenth Street, Suite 1000,
Denver, Colorado 80202, appearing for the defendant.

                    MARY J. GEORGE, FCRR, CRR, RMR
                  901 19th Street, Denver, Colorado 80294
                  Proceedings Reported by Mechanical Stenography
                     Transcription Produced via Computer

P R O C E E D I N G S

(Call to order of the court at 2:34 p.m.)

THE COURT:  This is case 04 cr 341, identified as United States of America versus Brian Von Behren, defendant.

The matter comes before the Court for continued hearing on the petition, document 54, filed March 14, 2014, and on the defendant's combined objection to incorporation of the RSA, Inc. contract, and to terms of supervised release; and motion to modify conditions of supervised release, document 67, filed April 11, 2014, to which the Government responded in document 70, filed April 25, 2014.

The Government appears by Assistant United States Attorney Valeria Spencer.  Good afternoon.

MS. SPENCER:  Good afternoon, Your Honor.

THE COURT:  The defendant, Mr. Brian Von Behren, is present in person together with his counsel, Scott Varholak.  Good afternoon.

MR. VARHOLAK:  Good afternoon, Your Honor.  Also with me at counsel table is Laura Suelau.  She's a research and writing attorney in my office who provided a lot of help on the research and briefing on this.

THE COURT:  Good afternoon.

MS. SUELAU:  Good afternoon.

THE COURT:  Again present is the supervising

1    probation officer, Walter Vanni.  Good afternoon.

2              PROBATION OFFICER:  Good afternoon, Your Honor.

3              THE COURT:  The matter was last before the Court

4    for hearing on petition for modification on March 21, 2014.

5    At the conclusion of that hearing, the Court granted the

6    petition insofar as it sought imposition of an additional

7    explicit or special condition requiring residence of the

8    defendant in an approved RRC, leaving for another day the

9    propriety of imposing a special condition of supervised

10   release requiring random and periodic searches of the

11   defendant's person and property.

12             The Court also granted leave to the defendant to

13   file the response and objection that he has and to the

14   Government to respond accordingly.

15             Does either party seek leave of the Court to

16   present evidence?  The Government?

17             MS. SPENCER:  No, Your Honor.

18             THE COURT:  The defense?

19             MR. VARHOLAK:  No, Your Honor.  Thank you.

20             THE COURT:  Then argument only.  We have a mixed

21   burden of persuasion, as I see it.  The Government has the

22   burden of persuasion with respect to the petition insofar

23   as it seeks the imposition of the explicit or special

24   condition of a search of the defendant's person and

25   property, and the defendant has the burden of persuasion

1    with respect to its motion to modify the conditions of

2    supervised release, which currently include the extant

3    special condition requiring sex offender and -- evaluation

4    and treatment.

5         If you disagree or object, I'll entertain your

6    objections now.  The Government.

7         MS. SPENCER:  No.  I think Your Honor has outlined

8    it completely accurately.

9         THE COURT:  Or the defense?

10        MR. VARHOLAK:  Your Honor, I think to some extent,

11   because one of our arguments is essentially that this RSA

12   contract is imposing additional conditions beyond the

13   supervised release conditions imposed by this Court, that

14   to that extent the burden of persuasion would fall on the

15   Government.  I'm not sure at the end of the day -- these

16   are legal arguments largely -- I don't think it matters.

17        THE COURT:  Very well.  I'll sort that out

18   eventually but not right now.  I'm going to allow you, Mr.

19   Varholak, to be heard first on the issues raised by and

20   inherent to the petition, your objection, and your motion

21   to modify.

22        MR. VARHOLAK:  Thank you, Your Honor.

23        THE COURT:  You're welcome.

24        MR. VARHOLAK:  Your Honor, initially to clear up

25   one issue, there's a few times in the Government's brief

1   where they cite contract language that differs slightly

2   from what's in our brief.

3           Essentially what happened is when we filed, we

4   were relying on the contract that Mr. Von Behren had signed

5   last time he was in because we didn't have the new contract

6   yet.  There's a few minor changes in the new contract that

7   came out between our filing and the Government's filing.  I

8   don't think they're substantive differences, but for the

9   purposes of my argument I'll rely on the new contract, but

10   that's why there's some misquoting because we weren't

11   relying on the same contract.

12           THE COURT:  Understood.

13           MR. VARHOLAK:  And I'll begin with, I think, one

14   of the biggest issues here, which is the polygraph testing,

15   really expanded to what I just received today, which is a

16   required SOMB sexual history disclosure packet that is

17   essentially a compelled disclosure that is then questioned

18   on polygraph, which is approximately 25 pages, that

19   requires the individual to disclose on each page various

20   levels of criminal activity; mostly sexual, not entirely.

21           But just to give an example, one page lists

22   solicitation via computer, electronic devices, so any

23   sexual contacts or interactions done through the web.  One

24   describes opportunistic sexual rubbing or bumping or

25   touching against strangers.  One is coerced nonviolent

1    sexual contact, et cetera, et cetera, et cetera.

2           And essentially between the required completion of

3    this form and then the polygraph testing on it, what this

4    requirement does is it compels a Fifth Amendment violation.

5    It requires Mr. Von Behren to complete this form,

6    disclosing potential criminal offenses, and be questioned

7    about it on a polygraph, again disclosing potential

8    criminal offenses.  And he's put in a catch-22.  If he

9    says, No, I'm asserting my Fifth Amendment rights, I'm not

10   answering this, he will be booted out of the program and

11   then he will be before Your Honor on a violation for not

12   attending his therapy because he has asserted his Fifth

13   Amendment privilege.

14          Now, the Supreme Court has made clear in *Minnesota*

15   *v. Murphy* that the Fifth Amendment applies to probationers.

16   It don't simply go away because you are on some sort of

17   supervisory status.  And what the Court said was the

18   conditions require a probationer to choose between making

19   incriminating statements and jeopardizing his conditional

20   liberty by remaining silent are impermissible.  And that's

21   exactly what's being done here.

22          If he asserts his Fifth Amendment rights, he will

23   be before Your Honor on a violation petition.  If he

24   doesn't assert his Fifth Amendment rights, he's being

25   compelled to potentially incriminate himself.  This is

1    nearly identical to the two cases I've cited, which are

2    *U.S. v. Antelope* and *U.S. v. Bahr*, both of which held, out

3    of the Ninth Circuit, that this is compelled

4    self-incrimination in violation of the Fifth Amendment.

5            Now, in response, the Government doesn't cite a

6    single case holding that this is okay.  And doesn't even

7    really make an argument that this is somehow not a Fifth

8    Amendment violation.  Instead, they make two arguments.

9    First, they say, well, this is what SOMB -- S-O-M-B, I'll

10   call it SOMB -- requires.  Well, that's all well and good,

11   except that it -- what SOMB is requiring is

12   unconstitutional.  The fact that SOMB requires it doesn't

13   make it okay.

14           Obviously the U.S. Constitution supersedes SOMB

15   regulations.  And if a SOMB provider -- if this Court

16   orders that this cannot be compelled and RSA says -- or

17   some other SOMB provider says, Well, then we won't take Mr.

18   Von Behren, well, then a federal probation office needs to

19   find somebody else to take him; we are not.

20           And I want to make very clear, Mr. Von Behren

21   wants treatment.  He's not objecting to treatment in and of

22   itself.  He wants treatment.  He just doesn't want to be

23   compelled in this unconstitutional manner to incriminate

24   himself.  And that's what this does.

25           There is no requirement that a federal probationer

1    somehow submit to SOMB guidelines.  And if this is

2    unconstitutional, which I maintain that it is, then either

3    RSA or some other treatment provider has to recognize the

4    Court's order and say, Fine, we will take him in and he

5    just won't do this, or we need to find another sexual

6    provider for the federal probationers.

7            Second, the Government argues that it's not ripe.

8    And ripeness -- the question with ripeness is, is the

9    threat real or imaginary or speculative?  *Steffel v.*

10   *Tompson*, which is at 415 U.S. 452, a 1974 Supreme Court

11   case, held that it was not necessary for the petitioner not

12   charged on any crime to first expose himself to actual

13   arrest or prosecution to be entitled to challenge a statute

14   that he claims deters the exercise of his constitutional

15   rights.

16           What happened there, if I remember exactly the

17   facts of it, were you had somebody who's protesting -- I

18   believe it was the Vietnam War.  And he was outside handing

19   out, I believe it was, leaflets saying, This is wrong, this

20   is unconstitutional, we shouldn't be doing this.  And he

21   was threatened on several occasions with criminal trespass.

22   And, in fact, told that if he does it again, he's going to

23   be arrested and prosecuted for criminal trespass.  And he

24   brought a challenge.  And ultimately the Supreme Court said

25   he had standing.  It was ripe.  That he shouldn't have to

1    first distribute the petition, be arrested, and then say

2    you're violating my First Amendment rights.

3         Now, if it were speculative, if it were a

4    situation where this statute's on the book but nobody's

5    ever said -- it's never been prosecuted before, well, that

6    might be a little bit different, but what we have here is

7    Mr. Von Behren already has been given the packet that he

8    has to fulfill.  I believe he's already been given a date

9    to go in for the sexual polygraph test to answer all of

10   these questions and a deadline for this.  And so -- and

11   it's required by RSA.  It's in the RSA manual, itself.   `

12        So we're not talking about a speculative threat

13   that maybe RSA will require this.  RSA is going to require

14   it.  They've already given it to him to fill out, and he's

15   going to be forced to do this.  We shouldn't -- he

16   shouldn't have to first say, I'm refusing this, get booted

17   out of RSA, stand before the Court on a supervised release

18   violation, and then have me argue this exact issue to the

19   Court where if the Court disagrees with me and says, No,

20   there's no Fifth Amendment violation, he faces the

21   potential of going back to jail for asserting his rights.

22   That's -- that's not what the ripeness doctrine is about.

23        And the cases cited by the Government are not on

24   point.  They are two published cases, these are *Zin* and

25   *York*.  *Zin* was on supervised release appeal.  And they said

1    that at that point, it was only hypothetical the

2    incriminating questions will be asked.

3         Here, we know they will be asked.  I have the

4    packet here, which has 25 pages worth of incriminating

5    questions.  Happy to introduce it and give it to the Court.

6    I didn't make copies, I should have, I just got it today.

7    It's filled with incriminating questions.  That's all it

8    is, is incriminating questions.

9         The second case was *York*.  And, again, that was on

10   a supervised release appeal.  And there the Court

11   acknowledged the Fifth Amendment problem with asking a

12   defendant to answer the questions implicating that

13   individual in a crime other than the conviction itself.  So

14   they said if what we're talking about is asking

15   questions -- I can't remember what *York* was, but let's take

16   it to this context, that Mr. Von Behren's already been

17   convicted of the chid-pornography offense.  And *York* said,

18   Well, if you're asking questions about the chid-pornography

19   offense, not a big problem, because he's already been

20   convicted of that offense.

21        But if you're asking him about, Did he do anything

22   else out there? that's a Fifth Amendment problem.  And they

23   avoided the question by saying that they will read the

24   order -- the Court's judgment -- because this was on an

25   initial appeal of the conviction, they said they'll read

1    the judgment to require the defendant to only answer

2    questions, and that his refusal to answer on Fifth

3    Amendment grounds would not constitute revocation because

4    to hold otherwise would be impermissible.

5         So they essentially said, The order's confusing.

6    And so what we're going to say is he has to answer

7    questions related to his probation, but if we're going to

8    read it -- but we're not going to read it as saying, You're

9    required to do essentially what RSA's requiring him to do,

10   because that would be unconstitutional.  And then from

11   there we have two unpublished opinions, which are *Manning*

12   and *Nelson*.  These were both on appeals of the conviction

13   and they simply cite *Zin* without any analysis with what

14   *York* and *Zin* actually said.  And they said this isn't ripe

15   at this point.

16        This is a very different case than *Zin* and *York*.

17   It's as ripe as can be because we know the questions that

18   are going to be asked.  We know they're coming.  We have a

19   date within, I believe, weeks of requiring Mr. Von Behren

20   to do this.  And so it makes no sense to do this all over

21   again in a month or two.

22        In addition to the Fifth Amendment problem, we

23   maintain this is a greater deprivation than necessary on

24   the Fifth Amendment side.  Obviously the Fifth Amendment

25   concerns weigh heavily on Mr. Von Behren's side, and given

1    the limited usefulness and reliability of the polygraph

2    tests themselves, there's limited -- there's limited value

3    to them.

4         The second condition in the packet is this

5    requirement to plead guilty.  I don't know how that doesn't

6    violate the Fifth and Sixth Amendment.  It eventually says

7    that you're required to plead guilty to any offense.

8         And, again, this doesn't really argue that this is

9    somehow constitutional.  Instead, they say this is

10   irrelevant because he's already pled guilty.  But I think

11   this has to be read in the light of what this packet and

12   the polygraph require, which is they require him to not

13   just talk about the offense of conviction that he's been

14   convicted of, but go much, much, much broader to anything

15   he has ever done before.

16        And if that's the case, and if he then comes in

17   and says, I did X, or I did Y, or I did Z, and then -- and,

18   remember, the contract that he signs says:  I instruct

19   RSA -- not, I'm giving up privileges, but I'm actually

20   instructing RSA to turn this into all authorities, to local

21   police, to his probation officer, I think the courts, to

22   everybody else.

23        So if we read it that way, then any statement he

24   makes in the course of this therapy that says, I did

25   something beyond child pornography; I did something else,

1    too.  Then I think this condition says, if you get

2    prosecuted for that after we turn this over to the police,

3    you've got to plead guilty to that, too.

4         Now, I don't know how that's enforceable in a

5    Court or how it plays out, but I'm not about to put at risk

6    some waiver argument, that because he signed that, that

7    somehow he's waived his Sixth Amendment jury trial rights

8    to this stuff.

9         Again, to the greater-than-necessary, I don't see

10   any value, because it goes against the very heart of our

11   constitution, which is that the burden is on the Government

12   to prove a case, and that you have the right to make them

13   prove that to a jury.  Every single time we have a Rule 11

14   proceeding in this court, in any court, in -- we go through

15   that in detail.  And what this contract says is throwing

16   that out.

17        Turning to the arousal assessments, here, again,

18   the deprivation of liberty is greater than necessary.  This

19   device is explained in detail in *U.S. v. McLaurin*, that's

20   M-c-l-a-u-r-i-n, and that's found at 731 F.3d 258, which is

21   a Second Circuit 2013 opinion.

22        And what that case says happens is that you attach

23   a device to the penis, on some occasions you're required to

24   masturbate to collaborate the machine, you then view

25   pornographic images to measure the blood flow to the penis

1    and measure the extent of any erection.  The intrusiveness

2    of such device we maintain violates substantive due

3    process.  As *McLaurin* held, there's no serious doubt that

4    their liberty interests implications are of a high order.

5    This is one of the most private things that you can do.

6    And frankly falls into stark contrast to other conditions

7    of this RSA contract, where I'll turn to in a moment, but

8    he's not even allowed to read sexually oriented or sexually

9    stimulating passages in a book, yet he's required to view

10   pornographic images with a device hooked up to his penis.

11            On the flip side of that -- on the flip side of

12   this great privacy interest that is exposed, there's no

13   real value.  As the *McLaurin* court held, the globe of

14   correctional treatment is directed at conduct, not directed

15   at daydreaming, and that's what this is monitoring.  It's

16   not monitoring, Are you doing something today that is

17   dangerous to somebody?  It's monitoring an -- a reaction

18   that he cannot control.  It's monitoring an involuntary

19   reaction.

20            And if that's what it's monitoring, there's just

21   no real use.  There's no scientific consensus on the

22   reliability of this.  And given that there's no real

23   demonstrated benefit that has been shown for this, and

24   given the extreme privacy interests on Mr. Von Behren's

25   behalf that this goes into, the plethysmograph requirement

 1    should be removed.

 2         Turning next to the dating restrictions and the

 3    significant others' group, paragraph 4 says that

 4    relationships in dating may be completely or partially

 5    restricted until RSA staff determines a particular

 6    situational relationship is safe.  There's simply no

 7    guidance given to anybody about how that would be

 8    administered.

 9         Now, obviously we have no problem with any

10    restrictions hanging -- that Mr. Von Behren cannot date

11    children.  That goes without saying.  Mr. Von Behren

12    doesn't have a problem with an assessment of if this

13    individual that he's dating has children in the home, has,

14    you know, access to children or whatever, with there being

15    monitoring of that.  We understand that concern.  That's

16    legitimate.

17         But this implies, regardless of whether any

18    children are involved or regardless of who the individual

19    on the other side is.  And it leaves complete discretion to

20    RSA, itself, to determine who he can and who he cannot

21    date.

22         He's already been told by RSA that he cannot have

23    a relationship -- an intimate relationship unless his

24    partner attends some individual sessions, regardless of

25    whether or not that partner cares for children.  And,

1     again, our problem is not if there are children involved.

2     We agree, either the probation officer or RSA staff can

3     make sure that that situation is safe.  We don't have any

4     problem with that whatsoever.  This applies to just a

5     blanket discretion being given to RSA to determine who Mr.

6     Von Behren can and who he cannot date.  And this blanket

7     discretion to RSA creates three problems.

8            First, it violates the First Amendment right to

9     free association.  There's no compelling interest here,

10    governmental interest.  There's none that have been

11    asserted.  And, again, to the extent the interest is to

12    assure that there aren't children present in there, the --

13    this Court can fashion a more appropriate restriction that

14    we don't have any objection to on that.

15           Second, it's a greater deprivation than necessary.

16    And, third, it results in impermissible delegation to RSA.

17           The next condition is the day-to-day activities,

18    and condition B states -- says, that Mr. Von Behren must

19    request in advance permission for any activity that would

20    constitute an exception to contract conditions in any

21    activity not approved in advance by the community

22    supervision team.  And two weeks is needed for this

23    permission.

24           Now, the Government argues that this is an

25    exaggeration that this is a nearly complete ban on

activities outside of employment.  But that's simply not true.  He's already been required to submit these plans for going to the pharmacy, for using public restrooms and phones, for going to the bank, and for working as a technician at a car dealership if he's offered that position.  So that's how RSA reads this condition.

He must prepare a safety plan for where he's going, repetitive activities.  RSA and work, those are approved in advance.  He doesn't need permission for those type of repetitive activities that have been approved.  I believe that meeting with me he doesn't need advanced two-week permission for, but virtually everything else, the activities that simply come up in our daily life -- and, again, going to the bank, grocery stores, pharmacies, these nonrepetitive activities, these, at least, RSA is reading fall within this special permission that's needed.

And then you need to submit this two weeks in advance.  And that simply interrupts to such a significant degree any individual's ability to live their life.  You can't always tell, do I need to go to the bank two weeks from now or do I need to make a deposit now because some expense came in that I'm worried I'm going to bounce a check for.  Do I need to go to the pharmacy two weeks down the road or do I need to go now because, you know, I got a rash and I need something to put on it, an over-the-counter

1    type thing.  These -- the restriction here is nearly

2    complete.

3          Again, he's been told he needs permission for the

4    bank, King Soopers, Walmart, dentist, and public restrooms.

5    He's been denied for requests at Walgreens and at the

6    Family Dollar Store.  And when he wanted to apply for a job

7    interview, because that was a nonrepetitive task, it was a

8    new job interview, he was told he needed two weeks' advance

9    notice.  And if the employer's not willing to wait for two

10   weeks for you to get that approval, you're going to lose

11   out on job opportunities and that becomes an employment

12   restriction.

13         And so, again, this condition's problematic for

14   many reasons.  One, it's improper delegation.  It delegates

15   to RSA which activities Mr. Von Behren can engage in.  If

16   he wants to go out to dinner, he needs two weeks' advance

17   notice.  And, second, it's greater than necessary.

18         Again, we don't have a problem with the narrowly

19   tailored condition that limits his access to children, or

20   places children frequent.  We don't have a problem where if

21   this Court were to issue a condition that says -- doing

22   this somewhat off the top of my head, but Mr. Von Behren

23   needs advanced permission from his probation officer to go

24   to any place that is predominantly visited by children, I'm

25   thinking playgrounds, I'm thinking kids' movies, these type

1    of things, that he needs to get permission first.  Okay.  I

2    understand that aspect.

3         But if he wants to go to a restaurant or to

4    Walgreens or to something like that, he shouldn't need two

5    weeks' notice in advance in order to do it.  It's a greater

6    restriction than necessary, and it impinges on the right to

7    travel and association.  And, again it's an occupational

8    restriction to the extent that it applied to job

9    interviews.

10        Next is the ban on sexually stimulating material.

11   And, indeed, this is quite broad and it leaves completely

12   to RSA what falls within this definition.  Mr. Von

13   Behren -- part of his problems when he was within RSA while

14   still a BOP inmate, was that he was reading a sexually

15   oriented nonexplicit passage in an 800-page novel.  I have

16   a novel here that I've been reading myself, it's entitled

17   The Setup Man, and it's basically a middle reliever who

18   becomes a detective.

19        And there's nothing you could tell from looking at

20   the cover of this that it would contain anything sexually

21   explicit.  It was one of the advertised books at Barnes &

22   Noble when I went in there and looked, and it's baseball

23   season, and I thought it looked interesting.  But there's

24   probably 20 pages in here that contain references to sexual

25   situations.  That would be prohibited under the contract.

1            The Government cites cases out of the Fifth and

2       Eighth Circuit, plus two plain-error opinions out of the

3       Ninth Circuit.   The Ninth Circuit restrictions were much

4       more specific.   They specifically referenced sexually

5       explicit conduct as defined under 18 U.S.C. 2256 --

6       2256(2).

7            And, again, we're not saying that there can't be

8       restrictions.   Obviously illegal material he can't view.

9       Child pornography he can't view.   That's not what we're

10      talking about here.   We're talking about the much broader

11      description that is in the RSA contract.   And in contrast

12      to the cases cited by the Government, numerous courts have

13      struck down similar bans, *U.S. v. Atkins*, which is at 743

14      F.3d 176, that's a Seventh Circuit opinion from just this

15      year.   *U.S. v. Goodwin*, 717 F.3d 511, a Seventh Circuit

16      opinion from 2013.   And in the quote from that opinion is

17      that, if read literally, the inclusion of this term could

18      block the defendant from possessing much of the Western

19      Canon or, arguably, even from possessing a slip copy of

20      this opinion.

21            *U.S. v. Antelope*, which was a Ninth Circuit

22      opinion, not on a plain-error standard, which was at 395

23      F.3d 1128, *U.S. v. Loy*, which is a Third Circuit opinion at

24      237 F.3d 251, all of those struck down very similar

25      conditions.

1          And it's the vagueness of this condition that

2    renders it unconstitutional on both First Amendment and due

3    process grounds.  There's no showing here where the line

4    is.  Obviously it prohibits child pornography, we're not

5    disputing that.  It also prohibits adult pornography.  It

6    prohibits nudity.  I think Orange is the New Black, which

7    is an Emmy-nominated television show on Show Time, I think

8    was Emmy nominated the most popular show on Show Time.

9    That has nudity.  That would be prohibited under this.  The

10    book 50 Shades of Gray, which I don't know how many

11    thousands of copies it's sold, would be prohibited.  Girl

12    with a Dragon Tattoo, which is a mystery book that has sold

13    thousands and became a movie, that has a rape scene in it.

14    That would be prohibited.  Marvin Gay songs, Sexual

15    Healing, is certainly sexually explicit.  I think that

16    would be prohibited.  PG-13 movies.  A Bible.  I don't know

17    where the line is on any of this.  And I know the

18    Government's going to get a chance to speak, I've just

19    given 10 or 11 examples, maybe they can answer where the

20    line is on this.  But I don't know if he is reading Girl

21    With a Dragon Tattoo, or if he's reading -- if he's

22    listening to the album, Marvin Gay's Sexual Healing,

23    whether that violates.  And he can't be expected to know

24    that.

25          If I don't know it, and I doubt the Government

1     knows it, he can't be expected to know it either.  And this

2     is the exact problem with this.  It is vague and violates

3     the First Amendment.

4          Turning to the ban on the Internet, the new

5     version is slightly different than the version we had.  The

6     version we had outright prohibited any Internet usage.  The

7     new version now says that it's prohibited unless approved

8     in advance.  But that doesn't really protect the challenge

9     here, because it defers all decisions as to what Internet

10    usage Mr. Von Behren can use to RSA staff.  And, of course,

11    RSA can simply disapprove any such condition.  They can

12    say, No, we're not allowing you to use the Internet because

13    you were convicted of an Internet case back in the day, so,

14    no, we're not allowing you to.

15         As outlined in my brief, courts have routinely

16    rejected these type of restrictions.  They are a greater

17    deprivation than necessary.  It's an impermissible

18    occupational restriction.  All of Mr. Von Behren's prior

19    jobs, prior to going to jail, were in the customer-service

20    area.  RSA and his probation officer have already denied

21    him two jobs because of this restriction.  One was a call

22    center, because it had Internet access, one was a data

23    entry, because the computer -- because it had a computer.

24    Didn't have Internet access but it had a computer at the

25    data-entry center, so he was denied permission to work that

1    job.  And was told he couldn't interview at a car

2    dealership because of the Internet use.

3          And so as the Tenth Circuit has held, these type

4    of occupational restrictions are held to a very high

5    scrutiny, and here the Government hasn't met that scrutiny.

6          Again, we don't have problems with a more limited

7    restriction.  Obviously he can't view child pornography on

8    the Internet.  That's -- there's no question about that.

9    But the restriction in place now is -- actually says to

10   RSA, you can decide to completely prohibit any Internet

11   use, and that's an impermissible delegation to RSA, and the

12   broad language violates the First Amendment rights to free

13   speech and association and the due process rights.

14          It's so broad that it's unclear exactly what it

15   applies to.  I think it would apply to a cell phone,

16   certainly a smart phone.  Probably would apply to a

17   video-game system.  And that's simply a broader ban than is

18   necessary.

19          The ban on alcohol, again, this is a condition

20   that says there should be no drug and alcohol abuse.  This

21   Court initially, when it went through, was given the option

22   of imposing that and it didn't because there was no history

23   of drug or alcohol abuse by Mr. Von Behren.  Despite the

24   fact that this Court didn't impose that, it gets

25   essentially bootstrapped in through the RSA contract.

1          Now, the Government's argument on that is, well,

2     this could be a disinhibitor.  Alcohol can be -- and I'm

3     not arguing drug use here, I should be clear.  Obviously

4     he's not permitted to use drugs, period, so we're talking

5     alcohol consumption here.  And the Government's argument

6     is, well, this could be a disinhibitor and it may make him

7     to make poor choices.

8          That could be said about any single criminal

9     activity we have.  Somebody who's a felon in possession,

10     they've obviously made a poor choice in being a felon, and

11     have a gun after they serve their time and get out, they

12     get wasted, they -- or use alcohol.  We're not asking that

13     he be permitted to use alcohol to excess.  We're saying

14     that if he goes out to a restaurant, he's allowed to have a

15     glass of wine with dinner.

16          Same thing can be said about the felon in

17     possession, they go out, they have two drinks, and they

18     said, Well, you know what, maybe I will have a couple, or

19     somebody who's selling drugs says, Well, maybe I will use

20     drugs.  That can be said about any criminal activity.  It

21     doesn't mean that they get to impose a condition that says

22     you can't do this, and you certainly can't delegate that

23     decision to RSA to make.  And, again, we're not -- we don't

24     have a problem with the more limited condition.  Don't

25     drink alcohol to excess, that's fine.  We don't have a

1    problem with that condition.  We're just asking that the

2    complete ban that is found through RSA's contract be

3    lifted.

4         The next is the no contact condition.  And as

5    cited in my brief, the Courts have held that the first

6    amendment right to association is violated when there's a

7    prohibition of contact with family members unless there's a

8    compelling Government interest.  Here, what has happened is

9    there's been a delegation to the treatment provider as to

10   when or even if Mr. Von Behren can have contact with his

11   minor sister.  And there's nothing in the contract that

12   says that permission must ever be given.  And it's Mr. Von

13   Behren's understanding that it takes 12 months to go

14   through the approval process in order to get the okay that

15   he would need in order to see his minor sister.

16        What we're asking for is a more narrowly tailored

17   condition.  We don't have a problem that any contact with

18   his minor sister be with other adult supervision.  His dad

19   is in the courtroom today, he's been at every hearing so

20   far.  We don't have a problem with the condition that says

21   somebody like that must monitor that type of contact.  We

22   understand the concerns.  But to place an outright

23   prohibition or to delegate to RSA who, when, and if Mr. Von

24   Behren can see his minor sister violates the First

25   Amendment rights to association and it's an improper

1    delegation, and it's greater than necessary.

2            Turning briefly to the two proposed modifications

3    of the Government, the first is proposed modification

4    No. 2, which is that he successfully complete the

5    treatment.  Our basic concerns with this are the things

6    outlined that I've already talked about, and that it takes

7    three and half years to work through the program.  And Mr.

8    Von Behren's concern is if the condition is read as "and

9    successfully complete," and he's done two years and 11

10   months and he's not done, that he's then technically in

11   violation of this condition because he hasn't completed

12   within the supervised release violation period, and that he

13   can be brought in violation.

14           If that's not how this is being read, then I've

15   got less concerns over that, other than it being said that

16   he complete this treatment program with all the objections

17   that I'm making towards this particular treatment program.

18           It also defers the scope of the Internet usage to

19   the probation officer, which has the same problems that

20   I've already discussed herein, which is essentially it

21   delegates to the probation officer when and if he can use

22   the Internet.

23           Now, the Government cites to the *Walser* opinion,

24   which was a plain-error case.  And there the Tenth Circuit

25   said that it was questionable whether the condition imposed

1   a greater restriction than necessary because it deferred to

2   the probation officer, and that the probation officer could

3   simply unreasonably prevent Internet usage, but it was

4   never dealt with in the district court level.  This was

5   raised for the first time on appeal and they said, So it's

6   not plain error.

7           So I think the fact that they at least suggested

8   that could be a problem shows that the *Walser* opinion is

9   far from a binding opinion on this Court.

10          Proposed modification No. 3 is a search condition.

11  And Mike shot down a very similar condition as vague, that

12  it could apply to a search of work and public computers.

13  And if it applied to a work computer, then it's an

14  occupational restriction, and that the Court would need to

15  find that such -- is the minimum restriction absolutely

16  necessary.

17          And so for all of these reasons, Your Honor, I ask

18  that the Court sustain my objections to essentially the RSA

19  contract imposing a bunch of new conditions on his

20  supervised release, and sustain and not impose the new

21  conditions by the probation department.

22          THE COURT:  Counsel, thank you.  But before you

23  leave the podium, it occurs to me that there is evidential

24  utility in admitting the operative RSA contract --

25          MR. VARHOLAK:  There is, Your Honor --

```
 1              THE COURT:  -- and the -- and the other document
 2    to which you referred early on in your argument to the
 3    Court.
 4              MR. VARHOLAK:  There is.  And the RSA contract, I
 5    believe, is attached as an exhibit to the Government's, and
 6    I move it admitted.  I will provide this to the courtroom
 7    deputy.  I ask that copies be made for the Government.  I
 8    should have done it beforehand, but I literally got it
 9    about an hour before and I didn't think of it, so . . .
10              THE COURT:  Leave for us to make copies is
11    granted.
12              Now, Ms. Spencer, any objection to the admission
13    of those two documents?
14              MS. SPENCER:  Your Honor, as to the RSA contract,
15    I did include that as an attachment to filing No. 70 under
16    restriction because it did include Mr. Von Behren's
17    personal information.  The Court granted that.  I haven't
18    actually seen this other document, so I don't have an
19    objection per se, but I do object to learned counsel not
20    providing copies to me so that I could peruse it.  I have
21    absolutely no ability to make any argument on it at this
22    point, but I think it probably is pertinent to this hearing
23    today.
24              MR. VARHOLAK:  And --
25              THE COURT:  Before we leave today, we'll provide
```

1    you with that opportunity.

2            MS. SPENCER:  Thank you.

3            THE COURT:  As a matter of fact, if you'd like a

4    reasonable, albeit brief, opportunity at this time to

5    peruse it, I'll grant your request to do so.

6            MS. SPENCER:  Thank you.  I would so request.

7            THE COURT:  Very well.  And we'll be at ease for

8    the reasonable, albeit brief, time for Ms. Spencer to

9    review this document.

10           Madam Clerk, if you'll make that available to Ms.

11   Spencer.  Thank you.

12           COURTROOM DEPUTY:  Do you want me to make copies

13   of it now or just let her use this one?

14           THE COURT:  No, we're -- later, in the interest of

15   time.  Thank you.

16           COURTROOM DEPUTY:  Okay.

17      (Pause.)

18           MS. SPENCER:  Thank you, Your Honor.  I appreciate

19   the time.  I'm not surprised by the information and I think

20   I've been able to absorb enough of it so I could make some

21   argument to you.  I'm ready.

22           THE COURT:  Very well.  Well, let me inquire.  Do

23   you object to the admission of this document in evidence

24   for the limited purpose of these proceedings?

25           MS. SPENCER:  I do not.

1          THE COURT:  And since you have the document, would

2     you identify it more specifically by citing its title, if

3     any, please.

4          MS. SPENCER:  It is called the SOMB Sexual History

5     Disclosure Packet, and thereafter is a 27-page packet.

6          THE COURT:  Very well.

7          MS. SPENCER:  I would like to hold on to it for

8     the portion of my argument and then return it to the clerk

9     for copies.

10          THE COURT:  And you may.  And you may make

11     argument to the Court.

12          MS. SPENCER:  Thank you.

13          THE COURT:  You're welcome.

14          MS. SPENCER:  Your Honor, this matter came on

15     initially because of probation filing a motion for

16     modification of conditions of supervised release.  In 2005

17     this Court had ordered some specific conditions of

18     supervised release, which included participation in an

19     approved program of sex offender evaluation and treatment,

20     which also stated that that may include polygraph,

21     plethysmograph, and ABLE examinations as directed by the

22     probation officer.

23          That specific condition also included that the

24     defendant shall comply with the rules and restrictions

25     specified by the treatment agency.  So all of that was part

of the language of the initial supervised release
conditions, with the exception of part of the first
sentence. It stated: The defendant shall participate in
an approved program of sex offender evaluation and
treatment. The modification is to add "and successfully
complete" language, so that it reads: The defendant shall
participate in and successfully complete an approved
program of sex offender evaluation and treatment.

And I want to speak about that piece first. In
terms of the modification of conditions, the Court does
have authority to do that, even when there isn't something
that has occurred or some evidentiary reason for doing so.

In this instance, the probation officer, through
Mr. Vanni, has suggested some modifications to comport with
the best practices that is now known in this district. And
this specific condition of successfully completing is
standard language now, and certainly following the Tenth
Circuit language from the *Metzener* case, which advised that
perhaps some more precise use of language was in order
given the fight that occurred over the participation-only
language.

Modifications, just as any other conditions of
supervised release, do require that those modifications are
reasonably related to the offense and impose no greater
deprivation of liberty than is necessary to complete those

 1    conditions under the probation department.  And in this

 2    case, successfully completing certainly falls within that.

 3         I already cited to the *Metzener* case, that's 584

 4    F.3d 928.  The Tenth Circuit in 2009 had the opportunity to

 5    review a district court case where Metzener had come to

 6    court on the issue of whether or not he had actually

 7    participated in and what did that mean.  Simply going to

 8    the program and sitting there and doing absolutely nothing,

 9    was that participation?  Did he need to successfully

10    complete, that is, to have the treatment provider say he's

11    done all the things that we required of him and, therefore,

12    he gets his gold star?

13         I don't think it goes too far to say that the

14    Tenth Circuit took the district courts to task and said,

15    You know what you need to do is craft some specific terms

16    so that the defendant will understand what "participate"

17    means.  And they specifically talked about the language in

18    citing the Eighth Circuit, that's *United States v.*

19    *Kreitinger*, K-r-e-i-t-i-n-g-e-r, at 576 F.3d 500, again,

20    Eighth Circuit in 2009, that used the language "participate

21    in and successfully complete a treatment program," that

22    that -- they said, We therefore strongly encourage district

23    courts to be more specific as to the amount of

24    participation they require when imposing a term of

25    supervised release, and whether they are, in fact,

1    requiring successful completion of such a program.

2              It is not a stretch, then, that probation would be

3    asking Your Honor to include that "successful completion"

4    language.  It is not enough to just participate in when

5    that fuzziness of that language leaves everyone wondering

6    what that participation might look like.

7              This case brings that to a complete head.  We've

8    heard Mr. Varholak go through all of the important and

9    salient RSA contract conditions into the minutiae of each

10   one, and what does this term mean and what does that term

11   mean, and how does it apply, and how is the defendant to

12   know whether it applies to him?  So it is critical that we

13   use precise language in these supervised release conditions

14   and include that "successfully complete."

15             Is that important that he successfully complete?

16   I would posit that it is.  The reasons that we have

17   somebody on supervised release are two-fold, and one of

18   those, it goes without saying, is to protect the public.

19   And the other is to integrate the defendant back into

20   community in a safe and appropriate way.

21             And so to just let him participate in whatever way

22   he feels does not leave the public with this feeling that

23   they are being -- that there's a containment approach and

24   that they are being kept safe from sexual offenders who are

25   now in community.  And it does leave the concern of there

1    has been no prevention of further criminal activity as this

2    defendant begins to integrate back into society.  So I'd

3    ask the Court to certainly grant that specific condition.

4           I'll talk about the other conditions that were

5    already in play from 2005 as I talk about some of these RSA

6    conditions that are being challenged by the defense.

7           The next condition that has been asked to be added

8    is that the defendant shall submit his person, any

9    property, house, residence, vehicle, papers, computer,

10   other electronic communications or data storage devices or

11   media and effects to search at any time with or without a

12   warrant by any law enforcement or probation officer with

13   reasonable suspicion concerning a violation of a condition

14   of supervised release or unlawful conduct by the person and

15   by any probation officer in the lawful discharge of the

16   officer's supervision functions.

17          And then there's a semicolon and the next

18   condition -- they really are two separate conditions, and

19   that first one I read to Your Honor is the exact language

20   of 3583(d) under Title 18.  And defense is challenging that

21   and saying that there's some unconstitutional problems with

22   it, and I'm not really seeing what those are.  It

23   specifically says that these submissions of searches have

24   to be done when there's reasonable suspicion concerning a

25   violation of a condition of supervised release.

1          As busy as Mr. Vanni is, I can't imagine that he

2     would want to do anything less than reasonable suspicion

3     running around submitting everybody to searches of

4     everything at any time.  And so this specifically talks

5     about having that reasonable suspicion in order to search

6     all those different types of media, places, et cetera.

7          One of the arguments that I heard that was made by

8     Mr. Varholak is that, well, that includes computers that

9     might be part of the employer.  And I think that that's an

10    argument that needs to be addressed.  And that's part of

11    the RSA contractor, any SOMB provider that would be

12    providing sex-offender treatment that they are working hand

13    in glove with the defendant as they search for employment.

14    And part of that work with the employer is that they

15    understand who it is they're hiring, that they understand

16    they have a sex offender within their business and what

17    that means for them.  And that includes that they may have

18    their computer searched that is being used by the

19    defendant.

20         And so is that a hurdle to employment?  Yes.  Is

21    it necessary?  Yes.  Is it reasonably related to the

22    offense?  Absolutely.

23         In Mr. Von Behren's case, to refer back to his

24    initial sentence in this case in that PSI, he was using the

25    computer to access child pornography; he was using the

1    Internet for his criminal behavior.  And so limitations on

2    allowing him access to the computer and the Internet are

3    completely related to his offense conduct.  And so it is

4    important that that additional condition be added.  And, as

5    I said, it's already gone through the process of becoming

6    part of a statutory law, 3583(d).

7         The second section is:  That the defendant shall

8    allow the probation office to -- excuse me, probation

9    officer to install software/hardware designed to monitor

10   computer activities on any computer the defendant is

11   authorized by the probation officer to use.

12        I'm going to stop there so we can parse some of

13   that apart.  So the defendant is required to allow

14   probation to install hardware as probation sees as

15   necessary on any computer, including work computer, and

16   that is any computer the defendant has been authorized to

17   use.  And so there are limitations, as we're going to talk

18   about, in the RSA contract about what computers the

19   defendant may use.

20        So the defendant down the road, he's living in an

21   apartment, he's allowed to have a computer there, and the

22   probation officer wants to have some eyes on that, and that

23   includes the installation of some software to track what

24   the defendant's doing.

25        Why is that?  It allows the defendant the Internet

access that Mr. Varholak insists that he needs while also

giving confidence to the probation department that the

defendant is not using the Internet access inappropriately.

So it allows what the defendant wants to do while allowing

some comfort and protection to the public and to others

that the defendant is not using it inappropriately.

So that software, as the language goes on in the

condition, may record any and all activity on the computer,

including the capture of key strokes, application

information, importantly Internet-use history, e-mail

correspondence, and chat conversations.  Again, part and

parcel of Mr. Von Behren's underlying offense, when he was

online in e-mail and chat communications with other

like-minded sex offenders trolling for pictures of children

being sexually abused.

It goes on to say:  A notice will be placed on the

computer at the time of installation to warn others of the

existence of the monitoring software on the computer.  So

that we're not feeling that we're doing something in a

subterfuge and that people are not aware, if you're going

to use this computer for whatever reasons you may be using

it, you may be subject to the same conditions that the

defendant is, that is, somebody's going to be monitoring

the software -- through software what it is you're doing on

there.

1          The defendant shall not attempt to remove, tamper

2     with, reverse engineer, or in any way circumvent the

3     software or hardware -- pretty obvious language about

4     that -- so that it's not defeated, so that the purpose of

5     installing that software and/or hardware can complete its

6     purpose.

7          These conditions that are requested to be modified

8     to the already existing conditions of supervised release

9     are reasonably related and completely related to the

10    underlying offense conduct and impose no greater

11    deprivation of liberty than that is necessary.

12         I've already gone through those specific

13    conditions and will ask the Court to allow that

14    modification to add those in.

15         I'd note  -- and just because they're being used

16    now in this district does not necessarily complete the

17    argument, but it is important to note that these are

18    standard conditions that are asked for and sought, and are

19    signed off by this Court and by this district in the sex

20    offender cases that are brought by my office.

21         So these are, at this point, what we would call

22    standard conditions, even though they're modifications

23    today.

24         In terms of the objection to the incorporation of

25    the RSA contract into the terms of supervised release, Mr.

1    Varholak starts off by saying that Mr. Von Behren is

2    wanting to do sex-offender treatment, and then goes forward

3    and objects to every single component of the sex-offender

4    treatment that RSA, Inc., has in its terms of contract.

5         So while I believe that he wants to do some sort

6    of sex-offender treatment, I believe he wants to do it

7    under his own -- his own rules, that he wants to do things

8    the way he wants to do things.  And that's fairly standard

9    for sex offenders.  I would posit that's fairly standard

10   for any addict:  I don't want to do it because it's going

11   to be hard.

12        And so we have to have conditions in place to

13   force that hard work to begin, to force that cognitive

14   behavioral therapy to go forward.  If left to our own

15   devices then we may not do the things that are tough that

16   someone else has to impose, and that is exactly what RSA

17   stands in loco parentis, if you will, to make sure that Mr.

18   Von Behren goes through the tough work that is necessary

19   to be successful in society and to keep the public safe.

20        As I already used the term, it's a containment

21   approach that RSA has.  I'm using RSA to stand in for any

22   treatment provider that is under the Sex Offender

23   Management Board within Colorado, so any approved provider,

24   which is what the federal probation department uses, would

25   have these conditions that are being challenged.

1        So it's not that RSA, Inc., is the bad guy here.

2   This is the standard contract conditions that any SOMB

3   provider would have within the treatment contract that they

4   have with any of their clients.

5        As I noted already, the purpose of the SOMB

6   treatment is containment, protecting the public, while

7   simultaneously rehabilitating the client.  As Mr. Varholak

8   noted, that is not a single-year process, that does take

9   some time.

10       One of the things that I attached to my response

11  was attachment B, sexually explicit material as contraband

12  for convicted sex offenders that Dr. Tanner wrote.  I

13  attached it in terms of the sexually explicit material that

14  I think it's very interesting reading in terms of the whole

15  cognitive behavioral therapy model that's used for sex

16  offenders and the reasons that we need to understand why

17  there are these conditions in place and these restrictions;

18  not just for the sexually explicit material, but for other

19  conditions as well.  And so I refer to that at the

20  outset as sort of an umbrella for a lot of these conditions

21  that are being sought in this case.

22       Mr. Varholak didn't address but he had started off

23  in his written response -- or his written motion, excuse

24  me, an objection that this contract that RSA has put

25  together is an adhesion contract and, therefore, I'm not

1    sure what the conclusion is there.  It isn't two parties
2    equal to the table coming and signing the agreement.  It is
3    an agreement that is required for all offenders.  It is not
4    a buffet and it is not a menu in which the client can
5    choose, well, I'll do these things but not these others.
6    It is to be read as a whole piece.

7           And so that's a very important thing to understand
8    in looking at this, that we can't just cut apart various
9    pieces, and he doesn't have to do this but he can do that.
10   You know, this is not a cafeteria, the contract needs to be
11   read as a whole.

12          As I noted at the outset, one of the original
13   conditions imposed by the Court was that the defendant
14   shall comply with the rules and restrictions specified by
15   the treatment agency.  And that's exactly what we have here
16   in this contract.  And the defendant is asking this Court
17   really to modify that condition that he not have to comply
18   with the rules and conditions interposed and specified by
19   the treatment agency, that he should get to pick and choose
20   what those are.

21          I disagree that these rise to the level of
22   constitutional violations, and by cloaking himself and
23   claiming that it's a constitutional violation he,
24   therefore, says these can be batted down because they are
25   such violations that the Court can dismiss those out of

1    hand, and I disagree that they rise to that level.

2            In terms of the specific objections, I do want to

3    talk about the polygraph and sexual-arousal assessments,

4    but I'm going to pass on those and talk about some of these

5    other ones that I think that are a little quicker and

6    easier to go through.

7            In terms of one of the paragraphs in the RSA

8    contract, it speaks of the defendant needing to plead

9    guilty to his offense.  Mr. Varholak spreads that out to be

10   that he has to plead guilty in any offense that might have

11   been disclosed in a polygraph, or that might come up, and

12   that simply is not the way that language reads.

13           There doesn't need to be any expansive reading,

14   there needs to be a careful reading of the language that is

15   specifically in there and it talks about the offense, that

16   is, the offense that got the defendant there.

17           The language is put in there because there are

18   instances where pre-plea some clients begin their

19   sex-offender treatment, so that when they come to the

20   court, they've already got under their belt some of this.

21   That is the instance where it requires if you've been

22   charged, you have an offense, you haven't gotten there yet,

23   that you do need to plead guilty before treatment can

24   continue.

25           Mr. Von Behren pled guilty in 2005, so that is

simply not an issue before this Court and that's why the --
why I had dismissed that argument rather quickly.

The next argument that the defense raises is the
dating restriction saying that it impinges on his freedom
of association.  And, again, the argument being made is so
broad-brushed saying that he can't date anybody, that this
is just so restrictive, and that's not what it reads.  And
that's what most of this contract is like.  It talks about
baby steps, if you will.  At the outset of beginning an
intimate relationship that RSA needs to be notified, they
need to make sure this is going to be an appropriate
relationship.

And, again, I would refer the Court to the article
by Dr. Tanner that talks about the way that sex offenders
think is not the way that we think, and so that cognitive
piece is very important.  It's important that RSA knows who
the datee is going to be so that that person can be alerted
about who it is that they're endeavoring to date with.

If this relationship is going to continue forward,
then there's an opportunity for that person, in this case
for Mr. Von Behren, to come to some individual sessions and
understand and facilitate Mr. Von Behren being in a
relationship and what that may mean.

It's not about whether or not the person has
children, although that certainly is paramount and RSA

1    wants to know that, it's making sure that the relationship

2    is appropriate.  It's not a complete ban by any stretch.

3    It is not a restriction on association.  It doesn't say you

4    cannot, it says that steps have to be followed.  Steps must

5    be followed in each one of these specific provisions of

6    what needs to be done.  And it flows into the next one, the

7    safety plans.

8         Mr. Varholak had some instances of different plans

9    that had to be put into place, for instance, for Mr. Von

10   Behren to go to the Dollar Store.  I certainly wasn't

11   surprised to hear that he needed a safety plan to go to the

12   Dollar Store.  I've been there myself and there's lots of

13   families there.  The purpose of a safety plan is not to

14   prevent the defendant from going places in public, it's to

15   make sure that he has thought through the various scenarios

16   with his treatment team of what could happen at these

17   places when he encounters children who may be sexual

18   triggers for him.

19        He may encounter children that he is developing

20   fantasies about; that's inappropriate.  So the safety plan

21   is:  What are you going to do if you see those types of

22   situations?  What are you going to do if that happens?  Are

23   you going to go down a different aisle, are you going to

24   wait, you're going to go a different day or time?  How are

25   you going to handle it?  That's what a safety plan is.  It

isn't an outright rejection you can't go there, although there are certainly some, and they're specifically listed, you cannot go to child center places.  Are you going to Elitch's?  No.  Are you going to go to a water park during the summer?  No.  So there are specific places where he's not going to be allowed to go.

Do we say to an alcoholic you should go hang out in a liquor store?  No.  It's the same sort of thing.  You need to remove you from that source of your addiction.  But the safety plan is you're in community now and we need to help you with your cognitive behavioral therapy to understand when you're in situations that are new or different for you, how are you going to handle that?  That's what the safety plans are.  It's not for everything.  It's for some specifics.  And does it need to be in advance?  Is that a new way of thinking?  It absolutely is.  I need to think what I may be doing down the road so that I can think through that, come up with a plan, work with my treatment team to come up with some scenarios and some decision-making.

And that should be a quicker process for Mr. Von Behren as he gets comfortable with this and begins to understand what those are, and what those triggers are, and what safety plans may need to be in place to help minimize those.  None of those rise to the level of constitutional

1   deprivation.

2          In terms of the sexually stimulating material,

3   this is where I specifically provided the Dr. Tanner

4   article because it goes through some specifics about why

5   legal material for nonsex offenders may be mysterious to

6   us, why that would be a problem for a sex offender to look

7   at.

8          And the sexual history disclosure packet leans

9   towards that as well.  What I found interesting in here is

10  that this sexual history disclosure packet is only used in

11  part for a polygraph test.  The rest of it is used for the

12  treatment team.  And what's it used for?  It's used to

13  understand who the offender is in front of that treatment

14  team and what the best avenues of treatment are.

15         In going through these things about different

16  sexual interests and sexual deviancy, it helps to

17  understand and target what a safety plan might look like,

18  it helps to identify and target whether sexually explicit

19  material is an issue.

20         One of the things that Dr. Tanner cites as to a

21  study that the sex offenders for children are not

22  exclusive, that there are often victims who are adults, and

23  vice versa, so we can't pigeon-hole.  And that's what this

24  sexual history packet is to do.

25         It says to fill out the first pages 4 through 25.

1    And actually what it is is the first page is A through V,

2    letters A through V as in Victor, with different types of

3    sexual contacts, deviancy, to note, is that an issue?

4    After age 18, did you have sexual contact with anyone under

5    age 15.  Yes or no?  The number of persons, number of

6    times, and last time.  Then there's a follow-up page.  So

7    if you've answered that yes, then you go to page 4 to list

8    some of the specifics about that.  If you answered no, you

9    don't fill out that page.

10        So the first page is the summary and you go

11   through and fill all that out.  And then as -- if and as

12   necessary, you fill out the detail pages afterwards.  And,

13   again, that's to drill down to what are the needs in that

14   what I found surprising in Dr. Tanner's article is says it

15   takes up to two years to even drill down to exactly what

16   those needs and issues are for a sex offender.

17        So this is not a one-shot process, this is a

18   living document, if you will, that's constantly used.  Then

19   after you fill out those pages, it says to fill out

20   those -- that first set, and that's pages -- page 3 is a

21   summary, and then as needed the follow-up pages, and then

22   you get to page 26, and this is a different set of the

23   sexual history of other behaviors.  Same sort of thing,

24   this is more about deviancy:  So do you have necrophilia,

25   that is, sexual contact with dead animals or people, yes or

1    no.  Self-mutilation.  Use of feces for sexual purposes.

2    This really gets into the deviancy area.  Again, yes or no.

3    Frequency or total number and last time.

4            So if you've answered no, then you're done.  If

5    you answered yes, then you need to have the separate pages

6    to fill out that specific information, again, addressing

7    those specific needs for treatment.

8            Then there's a sexual contact form.  Mr. Varholak

9    referred to this.  Have you rubbed or touched a person's

10   breast or chest area over clothing?  And going through that

11   and filling that information out.  That does not have

12   separate pages to be attached to it.

13           What it says at the very beginning in instructing

14   the offender on how to fill this out, is to bring this with

15   you to your polygraph exam, and it says:  But your examiner

16   may not need it, but it's better to have it if they need it

17   than to have them need it and you not have it.  You know,

18   one of those things, bring all your information with you

19   just in case it's going to be needed.  So this is not the

20   working document for the polygraph.  This is the working

21   document for treatment for the whole RSA treatment.

22           When you get back to the contract, itself, it

23   talks about the specific types of treatment that may be

24   needed to develop an individualized treatment plan because

25   not everyone is the same.  In fact, no one is the same and

1    that we need to make sure that this sexual disclosure is
2    used within that.

3        Is the sexual history disclosure used in a
4    polygraph?  It says maybe, maybe not.  It certainly may be
5    referred to by the examiner.  If the sexual history
6    polygraph is coming up as deceptive, they might want to go
7    back to some of those issues and see what was answered.
8    It's like going into the doctor and not telling him all of
9    your symptoms so when he diagnoses, he doesn't diagnose
10   fully because he's not aware of everything.

11       The sexual disclosure history packet is the same
12   way.  I need to know everything about you so I can have the
13   appropriate treatment and so we can address the right needs
14   so we can keep the public protected.

15       If RSA doesn't know that Mr. Von Behren is
16   sexually interested in some other specific category than
17   they know from his PSI, then they're not protecting the
18   public in the way that they are required to do so and they
19   are not giving him the treatment that is necessary for him
20   to succeed, and it's those sorts of deficits that get you
21   back into court.  That's where the violations arise.

22       And so I kind of drifted off my sexually explicit
23   material into the sexual history disclosure packet, but the
24   sexually explicit material goes towards that as well.

25       The prohibition on allowing Mr. Von Behren to have

1    access to that sexually stimulating materials is so that

2    they are dealing with the sex offender as they know him to

3    be and not be exposing him to things that can be taken

4    inappropriately.

5           One of the things that Dr. Tanner talks about with

6    the sexually stimulating materials is the way it bolsters

7    fantasy sex, is the way that it bolsters these ideas that

8    the sex offenders have about sex that are not based in

9    reality, and so those things are just being used to bolster

10   their belief system instead of the cognitive behavioral

11   therapy which will detach away from those cognitions.

12          You know, it's the idea of an adult sex offender

13   seeing a girl in shorts and thinking, She wants to have sex

14   with me, when, in fact, it's hot weather and she's wearing

15   shorts.  That's the cognitive dissidence that needs to be

16   corrected.  That's the problem with sexually stimulating

17   materials is they can be used inappropriately by sex

18   offenders.

19          Mr. Varholak is -- in his objection, is

20   specifically talking about reading materials as being a

21   problem.  I thought it was interesting he noted 50 Shades

22   of Gray as possibly being a sexually stimulating material

23   and my understanding is that's all it is, that it is

24   pornography, so I don't think that's the example that he

25   wants to ride into court with.

1        My reaction in terms of him listing Father of the

2   Bride and the Bible as being sexually stimulating material,

3   maybe, but I -- that's not the way that it's written in

4   that language.  And I -- I understand making an argument

5   and taking it to the absurdity to show how overbroad it is,

6   but I think it falls apart here.  I -- when you read the

7   restriction, I don't think that it reads as broadly as he

8   does.

9        He challenged the Government to stand up and say

10  where the line is.  I can't, of course, remember the name

11  of the justice who said, you know, I can't describe it but

12  I know it when I see it.  You know, it's sort of that same

13  sort of thing in terms of the sexually stimulating

14  materials.

15       And it isn't just preventing him from seeing

16  children, it is specifically as to legal materials of adult

17  sexually stimulating materials, and I don't see that

18  there's any real deprivation there.

19       It is reasonably related to the offense.  And I

20  refer back to the expert -- I'm not an expert in this --

21  but Dr. Tanner certainly gives some compelling arguments

22  about how that deprivation is necessary and it is related

23  to offenses -- and I say this cautiously, even with child

24  sex offenders.

25       The ban on the Internet I've talked about a little

1    bit in terms of the modification of supervised release

2    conditions.  It is not a wholesale ban, period; it, again,

3    is the same sort of language that RSA has, it's the baby

4    steps that gets us into this plan doesn't need to be

5    complete, you know, we can talk about it.

6            Are you going to be in a job that requires some

7    Internet access?  And, frankly, we're heading into a world

8    where that is required in so many jobs, that ability to

9    access the Internet or the necessity in jobs to access the

10   Internet.  And so that's why there is the monitoring

11   software, that's why they're coming up with these

12   additional modifications.  So long as probation is

13   satisfied they can keep some eyes on and know that the

14   defendant is behaving appropriately, then there can be some

15   Internet use.

16           But to allow it on day 1, here, have a smart

17   phone, knock yourself out, is the same analogy I had, you

18   know, to say to an alcoholic, Are you thirsty?  Well, head

19   on over to Happy Liquors.  That's not what we should do.

20   If you're thirsty, maybe we should start with some bottle

21   of water.  Let's start with baby steps.

22           But to expose the defendant to the very tool that

23   he used to engage in criminal behavior and to access child

24   pornography is to set him up for failure.  And so those

25   limitations are appropriate.

1          It reminds me of my kids whining that everybody

2    has it, everybody has a smart phone so I have to, too.

3    Well, that's just not true.  And there is deprivation.  I

4    want to be very clear, these are deprivations.  The

5    requirement is that the deprivation is no greater than

6    necessary.  The deprivation of liberty is no greater than

7    necessary, and the language continues.  It's not saying

8    that there shouldn't be any deprivation.  And so that ban

9    on the Internet at the outset is appropriate as well.

10         The alcohol and drugs section, there's an argument

11   from the defense that, you know, he should be allowed.

12   What we see are conditions in other cases which is don't

13   drink alcohol to excess.  And we won't even talk about the

14   drugs, that's not an issue here.

15         I had read his combined objection to be more about

16   the objection disallowing the defendant from frequenting

17   establishments whose primary purpose was the serving of

18   alcohol, such as a bar, as opposed to restaurant, and his

19   quibbling with the specificity of that and how is he

20   supposed to know?  I found that to be a specious argument

21   because how are you going to know.  Well, you know when a

22   bar is a bar and you know when a restaurant is a

23   restaurant, so that's playing with words.

24         Today his argument was more about the absolute

25   deprivation of use of alcohol, and I do believe that's

1    reasonably related to the offense, even without indication

2    here that Mr. Von Behren has a substance abuse issue.

3    We're not asking that he be required to do Breathalyzers or

4    drop UAs for probation, which would have been requested if

5    that had been an issue.  It's part of the RSA contract.

6    And it just needs to be in place as they go through in

7    working with this containment and the behavioral

8    modifications.

9         Somebody who is drinking even to moderation is not

10   a good candidate for continuing that difficult intellectual

11   work and that difficult work on themselves in modifying

12   their behavior.  I don't believe it is a constitutional

13   violation.  And, as I said, it's part and parcel of the

14   contract and so piecing out some of these things is going

15   to be very tricky.  Again, it isn't, well, then it can't be

16   RSA, it's going to have to be someone else.  That's a

17   problem.  That's a problem here in Colorado.

18        The no-contact provision is such an important one

19   that it has its own separate page of the no contact.  It's

20   included within the treatment contract, but it's also

21   included so the defendant understands what the no contact

22   is.

23        Mr. Varholak says, you know, the parents are

24   willing to stand in, and they will be the adult supervision

25   so that Mr. Von Behren can have contact with his minor

1    stepsister.  That's completely allowable under the

2    contract, so long as the steps are followed.  It requires

3    that the parents go through some classes with RSA so that

4    they understand what it is they're undertaking and what

5    that supervision actually means.

6          You know, it's okay to say, Well, I'll supervise

7    your kids, and I'm going to be upstairs and the kids are

8    going to be downstairs; that's not what it means.  So there

9    are class requirements and there are requirements that Mr.

10   Von Behren go through a child-risk assessment.

11         The SOMB providers in this state have dealt with

12   thousands of sex offenders who are parents and so they have

13   minor children, who are from families that have minor

14   children around them, who have whatever situation there is

15   that there are going to be minor children in their lives,

16   so it is not a complete forever until you're done with this

17   prohibition, it is a baby steps prohibition.

18         It is no contact at the outset, and then

19   there's -- there are assessments that must be gone through

20   first and then there have to be some allocations of who is

21   going to provide that supervision.  It is not going to be

22   that Mr. Von Behren is going to be alone with a minor

23   child.  There is going to be appropriate supervision as RSA

24   has administered those classes and that verification that

25   those people are now certified and willing to undertake the

risk and safety to the public in allowing that contact.

Again, it's, I got my driver's license, let me go to the Indy 500.  Not so fast.  You got your driver's license or you're old enough to get your permit and now you have to have an adult in the car with you as you get enough hours in.  You have to learn how to drive during the day and you have to learn how to drive at night and you have to have somebody helping you to do that.

Mr. Von Behren's in that situation now.  He has a permit and he needs to take the steps one at a time.

These provisions are wholly appropriate when we're talking about sex offenders in the community.  And this no-contact provision with minors, when we're talking about a defendant who is sexually interested in children, that's as related to the offense as it gets.

And that -- I said this isn't about a buffet, and so I'm not saying any of these are negotiable, but that's the real deal breaker, that is not going to change, that has to be in place.  There is no treatment provider, whether SOMB or otherwise, who's going to say, Go right ahead.  There's no indication he's touched his stepsister.  No, I don't think there is any indication of that.  I don't know because he hasn't filled out the special assessment packet, so the treatment team does not know what his special needs are and it is not time to have contact.

1          His contact is broad.  It says you are not

2     reaching through the telephone, through mails.  That

3     contact is not just face-to-face contact, but any contact,

4     third-party contact.  Let's keep that distance, let's keep

5     that separation.  It's a black line until the steps have

6     been followed.  And they can be, they can be, they're in

7     place and they can specifically be written out about what

8     has to be done.

9          Those are the objections that take me back to the

10    polygraph and the arousal assessments.  In terms of the

11    arousal assessments, that, again, is part of the specific

12    condition that's already in place.  May include polygraph,

13    plethysmograph, and ABLE examinations as directed by the

14    probation officer.

15         And in terms of the arousal assessments, in the

16    contract, itself, that talks about that that may be needed

17    and there's other type of assessments that may not be so

18    intrusive as the penile implants are with the

19    plethysmograph.  I don't think implant is the right word.

20         Is it intrusive?  Yes.  But is that deprivation of

21    liberty?  Is it greater than what's necessary?  Mr.

22    Varholak pooh-poohs whether it's really valid, whether it

23    really provides any information.  He argues that they're

24    looking at pictures of pornography for the arousal

25    assessment, but they're not allowed to look at it

1    otherwise.  Yes.  And that's a very contained situation.

2          In those arousal assessments, they are not looking

3    at pictures of child pornography, but they're looking at

4    pictures of children, they're not pornographic pictures.

5    So those assessments are to see what the arousal is to, and

6    so they are not pornographic pictures of children ever, and

7    whether they're pornographic pictures of adults, I don't

8    even believe that they are.  And so that argument may not

9    even hold here.  But even if they are, it's in a contained

10   environment to understand who the offender is.

11         These assessments are not done for the purpose of

12   humiliating or offending the offender; they're for the

13   purpose of providing the appropriate treatment.

14         And, as I said, the arousal assessments include a

15   full panoply of types of treatment and testing that's done

16   that does not always include plethysmograph.  But I would

17   ask the Court to leave that into place.

18         The final piece is the polygraph and that is

19   the -- one of the most difficult pieces because there --

20   the courts are all over the place on this, as Your Honor is

21   very well aware, in terms of whether or not the defendant

22   is compelled to answer these questions that may incriminate

23   him, Fifth Amendment issues, and then the compulsion is

24   because of the result that may happen.

25         Mr. Varholak says, well -- you know, he sort of

1    does it as a ipso facto, this is a foregone conclusion,

2    he's going to refuse to take the polygraph, they're going

3    to terminate him, and they'll notify probation, probation

4    is then going to come in front of the Court and he's going

5    to be incarcerated.

6         That's up to you.  That's not up to all of us to

7    make that decision.  And so that may happen, but it may not

8    happen.  And so -- and I'm not trying to minimize the

9    compulsion, but I am objecting to this linear this-is-

10   what's-going-to-happen situation for Mr. Von Behren.

11        I understand that he is not completing the sexual

12   history disclosure packet and he is not willing to undergo

13   the sexual history polygraph unless and until the Court

14   orders him to do so and so we are, in fact, at the

15   crossroads, that he is not willing to do so, and it is an

16   issue for RSA.

17        Polygraphs are not allowed in court, we all know

18   that.  But that does not mean that they're not an effective

19   tool in treatment.  Mr. Varholak sort of pooh-poohs it

20   about whether or not they're actually effective.  And they

21   have been used for years now in the sex-offender arena and

22   they do find them to be quite useful.

23        I can tell you as a practitioner, defense counsel

24   runs to me asking for the client to take a polygraph if

25   they think it's going to help their clients, so it can be

1    used as a sword and a shield, in fact.  And they want to

2    use it when it may help their client, and then they talk

3    about the -- that it's not useful at all when they don't

4    want their client to have to do that.

5         Getting back to the issue of compulsion:  I will

6    tell the Court I do have some concerns, the acknowledgment

7    of nonconfidentiality and waiver of confidentiality,

8    privilege, and right of privacy, this is the one-page

9    document that is part of the RSA contract, it's a

10   stand-alone, does talk about reporting any information,

11   including from polygraphs, to appropriate authorities and

12   that can include law enforcement.  And so that's the

13   compulsion problem.  That's exactly where we come to the

14   issue that it's not just being thrown out of the treatment

15   agency for failure to take a poly, it's being compelled,

16   giving the disclosure information, that then can be turned

17   over to law enforcement for their purposes.

18        That's the issue that Mr. Varholak is raising

19   about the immunity.  And I know that there have been, not

20   in Colorado because that's not the SOMB standard, but there

21   have been providers that do provide that immunity.  They do

22   have to take the polygraph, they do have to be truthful to

23   stay in treatment, but we're not going to turn that

24   information over.  The use immunity, the *Kastigar* immunity,

25   as we call it in the court situation, that allows that.

1          I'm not authorized on behalf of RSA to say, Hey,

2     take that one out, but I do see that that is the -- that is

3     the possibility here.  It is important enough that he do

4     his polygraphs, and it is a requirement that he do that

5     with RSA, or with any SOMB provider -- approved provider

6     here in Colorado that those polygraphs must continue.

7          How that information is used to outsiders I think

8     is the issue before the Court.  How it's used within RSA

9     and how they use it to provide treatment and to make sure

10    the defendant is being honest in his treatment, again, the

11    full diagnosis requires the full disclosure of the truthful

12    facts, that that is -- that's the heart of it.  That's

13    where the piece is important, and most important is that

14    the polygraph be done for use of RSA; not that it be used

15    for other law enforcement purposes.

16         And that -- I think that's -- I don't think it's

17    dancing on the head of a pin, but I think that may be where

18    the issue is and I don't have an easy answer for Your

19    Honor.  I think that is the toughest of these issues.

20         I believe I've covered all of the objections that

21    the defense has to RSA.  And I've certainly covered the

22    motion to modify the conditions of supervised release.

23         Does Your Honor have any other questions for me or

24    believe that I have missed anything in my lengthy argument

25    today?

1          THE COURT:  Counsel, neither.  Thank you.

2          MS. SPENCER:  Thank you very much.  I'll leave the

3     disclosure packet up here in case Mr. Varholak needs it in

4     his rebuttal and I will sit down.  Thank you.

5          THE COURT:  Counsel, thank you.

6          Brief rebuttal, Mr. Varholak.

7          MR. VARHOLAK:  And I will be very brief, Your

8     Honor because I think that between all the trees that have

9     been killed over this issue and now the hours spent, I

10    think both sides have addressed it well.

11         The polygraph issue, I think the Government's last

12    argument nailed it on the head, which is while I may not

13    agree with, I can understand the argument, that we need to

14    know what things need to be dealt with within treatment.

15         The Government used the example of the doctor.

16    And that's absolutely correct, that if I'm going in to see

17    my doctor and I've got some condition and I'm not telling

18    him everything that I'm doing, he can't effectively treat

19    me.  The problem is I have a privacy with that doctor, and

20    that doctor's prohibited from then turning around and

21    giving everything I say to the world, and here it's the

22    exact opposite of that.  And I don't think there is a

23    court -- and this is between myself and Ms. Suelau's

24    research -- who has upheld this type of condition, the

25    disclosure with the polygraph, without *Kastigard* immunity.

1     And that's a real problem here.

2          And I'm authorized to tell the Court, if given

3     immunity for statements made, Mr. Von Behren's willing to

4     do this; but without that immunity, if he says something,

5     it can be turned in to the authorities.  And this isn't

6     hypothetical, I've represented a client who was prosecuted

7     because while on supervised release, he made statements

8     about things that he did.  It wasn't within the context of

9     RSA, it was to his probation officer, but it was very

10    similar.  And so it's not a hypothetical problem.

11         On the dating restrictions, just briefly, the

12    problem here, again, is that it's making sure that the

13    dating is appropriate, that defers the issue to RSA as to

14    what they deem to be appropriate.  And, again, the question

15    is not are there children involved?  The question is, it

16    gives complete deferral to RSA to decide, well, this person

17    has tattoos, so, therefore, I'm not letting him date them.

18    Or this person, you know, works at a bar, and, therefore,

19    I'm not giving him permission, and it completely defers

20    that issue to RSA.

21         The day-to-day activities, again, the examples

22    given by the Government, Elitch's, I can't remember the

23    other ones, but ones where kids were around, we don't have

24    a problem with that.  The Court can make a more limited

25    restriction that says you cannot frequent places that are

1    primarily attended by children.  We don't have a problem

2    with that.  But it can be more narrowly tailored than

3    what's in here.

4         Being on sexually stimulating material, again, the

5    problem with this is between the two of us here who have

6    done this work for -- I think Ms. Spencer longer than I,

7    but myself at least more than a decade, and Ms. Spencer, I

8    don't know, longer than that, both of us with specialties

9    in this area, and Mr. Vanni didn't testify today, but his

10   specialty, none of us can define what crosses that line.

11        And the best example I gave, I think, is Marvin

12   Gay's Sexual Healing.  That's a popular song.  That's on

13   the radio all the time.  It's sexually stimulating.  And

14   this refers to audio, visual, reading, all of that stuff.

15   And so the question is:  How does he make that decision

16   whether he will go ahead and go buy a Marvin Gay album or

17   not?  He can't make that decision because we don't know

18   what that means.  It's not the example given by the Supreme

19   Court that pornography and what's obscene:  I know it when

20   I see it.  That's a much, much different line than what

21   we're talking about here.

22        Finally -- almost finally, the no-contact

23   condition, again the younger person driving a car and

24   taking baby steps, but driving a car, there's no

25   constitutional right.  We're not talking about the

1    constitutional right to association.  And there's no

2    guarantee that RSA's ever going to approve these baby

3    steps.  They -- the entire decision is deferred to RSA as

4    to what he can or cannot do.

5         And then, finally, on the issue of the monitoring

6    system, Mr. Von Behren has no objection to monitoring

7    equipment, the key stroke, those referrals, on a home

8    computer.  He doesn't -- he doesn't object to that.  The

9    problem is that this is broader.  It applies to work where

10   there may be employers who don't want that type of thing on

11   their computer, and then it acts as a work restriction; and

12   devices that you might not be able to put this on, a cell

13   phone.  I don't know -- I don't think you can put that type

14   of monitoring software on a cell phone, so he may not be

15   able to have one.  That's the bigger concern.

16        As far as a computer, if he's authorized to have a

17   computer in his home with Internet access, he doesn't

18   object to having the monitoring software.

19        And that's all.  Thank you, Your Honor.

20        THE COURT:  Counsel, thank you.  While you're at

21   the podium, answer one question.

22        MR. VARHOLAK:  Sure.

23        THE COURT:  When is Mr. Von Behren scheduled to

24   complete this questionnaire and/or submit to a polygraph or

25   other examination?

1       MR. VARHOLAK:  Let me check with him.  I know it

2  was supposed to be before today and then they postponed it

3  for today's hearing.  Let me see if it's been rescheduled.

4       He's been told by his therapist to turn it in once

5  this Court makes a decision on the issue, so I think we're

6  safely deferred until --

7       THE COURT:  That's fine.

8       MR. VARHOLAK:  -- the Court reaches a decision on

9  the issue.

10       THE COURT:  Thank you.

11       MR. VARHOLAK:  Thank you.

12       THE COURT:  Whether I write on it or rule from the

13  bench, which I'm not going to do this afternoon, we need to

14  set this matter for the next -- the next proceeding at

15  which the Court will either impose vel non additional

16  conditions of supervised release.

17       Rather than me to fecklessly identify a date and

18  time, only to discover that it is conflicted, counsel I'm

19  going to ask you to contact my judicial assistant on

20  Tuesday, June 3, at 10:00 a.m. to set this matter for

21  further proceedings.

22       Can and will you do that, then?  The Government?

23       MS. SPENCER:  Yes, Your Honor.

24       THE COURT:  The defense?

25       MR. VARHOLAK:  Yes, Your Honor.  I have another

1   setting conference, but it's in here at that same exact

2   time, so I'll just be on the phone twice, so that works.

3              THE COURT:  Well, then perhaps I should shift this

4   to 10:15 a.m.

5              MR. VARHOLAK:  That's fine.

6              THE COURT:  10:15 a.m. on the 3d.

7              Mr. Vanni, can you be involved in that setting as

8   well?

9              PROBATION OFFICER:  Yes, Your Honor.

10             THE COURT:  Very well.  Then we'll proceed on that

11  basis.  Otherwise, the matter is under advisement.

12             Discerning no further business ripe for

13  consideration, please close the record.  We are in recess.

14             Madam Clerk, please declare the recess of the

15  Court.

16             COURTROOM DEPUTY:  All rise.

17        (Proceedings concluded at 4:08 p.m.)

18

19                         **INDEX**

20   Item                                          PAGE

21   ARGUMENT:      Mr. Varholak                    4
                    Ms. Spencer                    30
22                  Mr. Varholak                   62

23

24

25                  *      *      *      *      *

1                    REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6        Dated at Denver, Colorado, this 10th day of March,

7   2015.

8

9

10

11

12                    MARY J. GEORGE, FCRR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25