1      IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 04-CR-00341-REB

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    BRIAN VON BEHREN,

8         Defendant.

9    _____

10                   **REPORTER'S TRANSCRIPT**
     (Petition and Order for Issuance of Summons Due to Violations
11                     of Supervised Release)

12   _____

13          Proceedings before the HONORABLE ROBERT E. BLACKBURN,

14   Judge, United States District Court for the District of

15   Colorado, occurring at 10:12 a.m., on the 21st day of March,

16   2014, in Courtroom A1001, United States Courthouse, Denver,

17   Colorado.

18

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
         Produced via Computer by Tracy Weir, 901 19th Street,
25        Room A258, Denver, Colorado, 80294, (303) 298-1207

2

1          **APPEARANCES**

2          VALERIA SPENCER, Assistant U.S. Attorney, 1225 17th

3   Street, Suite 700, Denver, Colorado, 80202, appearing for the

4   plaintiff.

5          SCOTT VARHOLAK, Assistant Federal Public Defender ,

6   633 17th Street, 10th Floor, Denver, Colorado, 80202, appearing

7   for the defendant.

8                    *   *   *   *   *

9          **PROCEEDINGS**

10          (In open court at 10:12.)

11          *THE COURT:*  Good morning, and thank you.  Please be

12   seated.

13          This is case 04-cr-00341, identified as United States

14   of America versus Brian Von Behren, defendant.

15          The matter comes before the Court set for hearing and

16   consideration on the Petition and Order for Issuance of Summons

17   Due to Violations of Supervised Release, which is tantamount to

18   a petition, or motion, to modify conditions of supervised

19   release, document 54, filed on March 14, 2014.  And the

20   defendant's Motion to Limit Scope of March 21 hearing, document

21   58, filed March 19, 2014.

22          The Government appears by assistant United States

23   attorney, Valeria Spencer.  Good morning in open court.

24          *MS. SPENCER:*  Good morning, Your Honor.

25          *THE COURT:*  Mr. Brian Von Behren appears in person,

1   together with his attorney, Scott Varholak.

2           *MR. VARHOLAK:*  Good morning, Your Honor.

3           *THE COURT:*  The supervising probation officer,

4   Mr. Walter Vanni, is also present.  Good morning.

5           *MR. VANNI:*  Good morning, Your Honor.

6           *THE COURT:*  The record should next reflect prior to

7   commencement of these proceedings on the record in open court,

8   I conferred informally but importantly with counsel in

9   chambers.

10          During our colloquy in chambers, the Court reviewed or

11  rehearsed the rather rapid evolution of these proceedings, its

12  construction of the relief requested by the probation

13  department, and the relief requested by the defendant in his

14  motion to limit the scope of this hearing.

15          Mr. Varholak, I return to you to inquire.  Does

16  Mr. Von Behren demand or waive any formal advisement of rights

17  by the Court in the context of this proceeding?

18          *MR. VARHOLAK:*  We will waive, Your Honor.

19          *THE COURT:*  And does he demand or waive any

20  arraignment; that is, a reading of the proposed matters?

21          *MR. VARHOLAK:*  We will waive.  He's been provided.

22          *THE COURT:*  Very well.  Now, as I explained to

23  counsel, focusing on the defendant's motion to limit scope of

24  March 21 hearing, I do not read or construe that as tantamount

25  to the defendant's motion to modify conditions of supervised

1   release.  That should be reduced, of course, eventually, to a

2   discrete motion dedicated to those important matters.

3       Very well.  Because the Government has the burden with

4   respect to these proposed modifications, I permit the

5   Government to proceed.  Ms. Spencer.

6       MS. SPENCER:  Your Honor, if I might inquire, are we

7   going forward with the actual hearing, then, or are we in

8   limitation?

9       THE COURT:  Well, we're in no man's land somewhere in

10  mid-position there.

11      MS. SPENCER:  All right.

12      THE COURT:  My preference, Ms. Spencer, and you may

13  have an objection, is for us today, given the relatively rapid

14  evolution and progression of these important matters, is to

15  focus now on the proposed additional special condition

16  requiring placement in an RRC.

17      MS. SPENCER:  All right.  I just wanted to make sure I

18  understood the playing field.  My position was I wanted to go

19  forward with the full hearing.  I understand the Court's

20  position.  It really is condition one, if you will, which is

21  the request that he be placed in the residential reentry center

22  as opposed to allowed in the community.

23      THE COURT:  Very well.

24      MS. SPENCER:  With that understanding, I would ask

25  that Mr. Walter Vanni be called to the stand to be sworn.

1          *THE COURT:*  Excuse me.

2          *MR. VARHOLAK:*  I have Mr. Peebles, my investigator,

3  here today.  He may testify today, but I ask he be an advisory

4  witness and be seated.

5          *THE COURT:*  Any objection?

6          *MS. SPENCER:*  No, Your Honor.

7          *THE COURT:*  Leave is granted for him to come forward

8  and be seated at defense counsel table.

9          Mr. Vanni, would you step forward to this open area in

10  front of my bench to be sworn.  I thank you.  I'm going to ask

11  you to step into this open area in front of my bench.  Thank

12  you.  Please raise your right hand.

13     (**WALTER VANNI** was sworn.)

14          *THE WITNESS:*  Yes, Your Honor.

15          *THE COURT:*  Thank you.  Please be seated in that

16  witness stand.

17          *MS. SPENCER:*  May I proceed?

18          *THE COURT:*  You may.

19          *MS. SPENCER:*  Thank you.

20                        **DIRECT EXAMINATION**

21  *BY MS. SPENCER:*

22  *Q*   Would you state your name for the record and spell your

23  last name for the record.

24  *A*   Walter Vanni, V-A-N-N-I.

25  *Q*   What do you do for a living?

1    *A*    A United States probation officer for the District of

2    Colorado.

3    *Q*    Tell us about your years of experience in probation.

4    *A*    Prior to being with the feds, federal government three

5    years ago, I worked for seven years for the 17th Judicial

6    District in Adams and Broomfield county probation.

7    *Q*    As part of your probation supervisory responsibilities, did

8    that include supervising sex offenders?

9    *A*    It did.   For the past 19 months with my current department,

10   I've been supervising sex offenders.   Prior to that in Adams

11   County I supervised sex offenders -- sex offender intensive

12   supervision probation.   I did that for over four years.

13   *Q*    Have you had occasion to prepare to supervise a person by

14   the name of Brian Von Behren?

15   *A*    I was in contact with Brian Von Behren while he was a BOP

16   inmate at Independence House.   Also was involved in staffings

17   at the treatment agency he was attending prior to being

18   regressed back to Bureau of Prisons.

19   *Q*    Do you see him in the courtroom today?

20   *A*    I do.

21   *Q*    Can you point him out for the Court and identify a piece of

22   clothing, please.

23   *A*    He is currently wearing a brown blazer on the right-hand

24   side of defense counsel.

25        *MS. SPENCER:*  I would ask the Court to reflect

1    Mr. Vanni has identified the person of the defendant.

2              *THE COURT:*  That would be the other right-hand side.

3              *THE WITNESS:*  The left-hand side, Your Honor.

4              *THE COURT:*  Leave is granted subject, of course, to

5    cross-examination.

6              *MR. VARHOLAK:*  No, Your Honor.

7    *Q*   (By Ms. Spencer) You indicated you first had contact with

8    Mr. Von Behren when he was in Independence House.  Can you

9    explain the transitioning done from BOP into Independence House

10   and the timing of that?

11   *A*   A defendant is transitioned to a halfway house as a BOP

12   inmate four to five months prior to his mandatory release.  He

13   was sent to Independence House.  At that time, the Bureau of

14   Prisons referred him to a sex offender treatment agency.  I met

15   with Mr. Von Behren, and we had a face-to-face and discussed,

16   once he was on a term of supervised release, what that will

17   look like and I was going to be his supervising officer and I

18   would be a part of the containment team we have in place while

19   he's being supervised in the community.

20   *Q*   So while he was at Independence House, did he have rules

21   that he had to follow with Independence House?

22   *A*   Correct.

23   *Q*   And he had rules he needed to follow with the sex offender

24   treatment program; is that correct?

25   *A*   Once he signed treatment contracts, he had to follow

1  through with the rules of the treatment contract.

2  *Q*    And do the two interplay with each other?  By that, I mean,

3  do the rules of Independence House require he comply with the

4  other conditions and the conditions of sex offender program

5  require he comply with conditions of Independence House so

6  everything is working in a piece?

7  *A*    Yes.  Again, it is a containment team that they have in

8  place that would include a case manager at the halfway house,

9  the therapist at the treatment agency, any polygrapher he's

10 seeing for polygraph testing, and eventually once the term of

11 supervised release would begin, the probation officer is the

12 lead of that team.

13 *Q*    While in he was at Independence House and the transition

14 from Bureau of Prisons, how did he do on sex offender

15 treatment?

16 *A*    Repeat the question.  I'm sorry.

17 *Q*    I'm sorry.  While he was at Independence House during the

18 transition period, how did he do with his sex offender

19 treatment plan?

20 *A*    If you could give me one second, please.

21 *Q*    Yes.

22       (Pause in proceedings.)

23       *MR. VARHOLAK:*  Your Honor, it appears Mr. Vanni is

24 referring to something.  I don't know that I have a copy of

25 that.  I request a copy.

 1           THE COURT:  Mr. Vanni, to what have you referred or

 2    accessed in response to Ms. Spencer's last question?

 3           THE WITNESS:  I was going to view the unsuccessful

 4    termination from RSA.

 5           THE COURT:  Is that the title of the document?  Are

 6    you looking at some report?

 7           THE WITNESS:  Unsuccessful discharge report.

 8           MR. VARHOLAK:  I don't have a copy of that.  I would

 9    request a copy of it.

10           THE COURT:  Well, I'll give you an opportunity to view

11    it prior to cross-examination.

12           MR. VARHOLAK:  Thank you, Your Honor.

13           THE COURT:  But, for now, it appears that the document

14    is limited in scope and used for refreshing recollection under

15    Rule 612, but I know not.

16           Ms. Spencer.

17           MS. SPENCER:  You are accurate.  I'm only asking him

18    to refresh his recollection so he can answer my question, which

19    is pending.

20           THE COURT:  Very well.

21    A    Mr. Von Behren began sex offender treatment on September 11

22    when he signed contracts.  During that time period, the

23    therapist and also the case manager working at the halfway

24    house discussed his violation behavior that he was engaging in

25    while in sex offender treatment.

1           The apparent pattern of behavior that was seen while

2    he was in treatment and also a pattern of behavior that was

3    seen while he was in the Bureau of Prisons completing the sex

4    offender treatment portion, is that he would focus on

5    challenging the treatment contracts and protocol or group

6    instead of being open to the process.

7           He was willingly and knowingly violating the rules and

8    regulations of the treatment contracts, created a pattern of

9    noncompliance with following the rules while creating a pattern

10   of dishonesty and secret keeping in order to avoid potential

11   consequences.

12          The behaviors that he was engaging in placed him at a

13   higher risk to engage in further lapse behaviors or relapse

14   behaviors; therefore, placing him at a higher risk to the

15   community.  He already is in a halfway house in treatment

16   engaging in these behaviors.

17          They felt his prognosis was poor at that time, and due

18   to his disregard for the rules, his accountability and honesty,

19   instead of focusing on self-serving behaviors and not the

20   potential impact on others and his distortions at the time by

21   his decision making when offending, they felt that due to that

22   noncompliance and his unwillingness to effectively engage in

23   treatment service, he was viewed as nonamenable to treatment at

24   that time.

25          Therefore, it was recommended that he be placed at a

 1    higher level containment such as a secured facility to ensure

 2    community safety.

 3         That is when they sent the unsuccessful discharge.

 4    That is when he was rejected from the halfway house and

 5    regressed back to the Bureau of Prisons.

 6         In the recommendation from RSA, they stated upon

 7    release Mr. Von Behren should return to Independence House in

 8    order to be in compliance with Sex Offender Management Board

 9    standards requiring clients who are unsuccessfully discharged

10    to return to a higher level of containment in the community.

11    Additionally, it was recommended that this case be reviewed for

12    potential tracking services and increased therapeutic services

13    for further -- to further increase his treatment.

14         In a nutshell, it was resistance and a lack of

15    willingness to follow through with the rules and regulations

16    engaging in violation behavior such as having unapproved use of

17    the internet, accessing Facebook, using e-mail accounts for

18    personal reasons, going to unapproved locations while in the

19    community, and keeping secrets from his community supervision

20    team.

21    Q   (By Ms. Spencer) Let me unpack some of the things you said.

22    One mention you made in talking about how he did not perform

23    well, you mentioned something about his treatment while in the

24    Bureau of Prisons.  Have you, as his probation officer

25    supervising him, had access to how he did while in treatment in

1  the Bureau of Prisons?

2  *A*   The document I am reviewing now is from the Federal

3  Correctional Institution in Seagoville, Texas.  This is his

4  treatment summary during the one year of sex offender treatment

5  he completed.

6  *Q*   Let me interrupt and ask if he had sex offender specific

7  treatment while in prison?

8  *A*   Right.  For one year he was in nonresidential sex offender

9  treatment in Seagoville, Texas.

10 *Q*   This summary report you're talking about gives us some

11 insight how he did in sex offender treatment while in prison;

12 is that accurate?

13 *A*   It basically mirrors the same pattern of behavior he was

14 engaging in at halfway house and RSA.

15 *Q*   Well, that got right to the answer I was going to ask you,

16 which is how did he do while in prison in treatment?

17 *A*   The therapist that worked with him identified the same

18 problem behaviors, resistiveness; specifically, they talked

19 about his institutional behavior and several incident reports

20 during his term of incarceration, his refusing to obey orders,

21 assaulting another inmate, providing false statements.  It

22 looks like while in the treatment process he placed an order

23 for a book that was entitled "Promiscuities: The Secret

24 Struggle for Womanhood."  The description of the book was, they

25 followed a group of adolescent girls as they become aware of

1    their sexuality and of what our culture tells them being female

2    means and draws on her own experiences and those of her friends

3    to reveal coming of age secrets, sexual games, forbidden

4    crushes, losses of virginity, and rites of initiation.

5           In looking at the psychological testing they did as

6    far as personality assessment inventories and other sex

7    offender assessments, they discuss his response indicated

8    significant problems with admitting to common shortcomings.  He

9    described himself as being reluctant to admit to viewing

10   himself as having faults.  He had difficulties with identifying

11   problem areas for himself, and an assessment that assesses

12   motivation for treatment, the test result suggests poor

13   motivation for change because he reported little interest in

14   change.

15          Over the course of the program at Seagoville,

16   treatment staff noted poor motivation for change, having

17   difficulties with insight into his behavior, and evidenced

18   significant difficulties in allowing himself to be vulnerable

19   in his role as a client.  He consistently challenged treatment

20   ideas and concepts in a manner that suggested use of

21   intellectualization and an unwillingness to view the treatment

22   staff as knowledgeable.

23          In another assessment they talk about some problem

24   areas as far as his poor problem solving skills, sexual

25   preoccupation, and deviant sexual interests.  He was able to --

1   the defendant was able to identify obstacles he needs to

2   overcome but had difficulty generating a variety of solutions.

3          The defendant tends to overuse logic and intellectual

4   approaches to problem solving to the detriment of generating

5   reasonable and practicable solutions.

6   Q   Let me stop you there, Mr. Vanni.  Seagoville,

7   S-E-G-A-V-I-L-L-E.  Is that the right town?

8   A   S-E-A-G-O-V-I-L-L-E, Texas.

9   Q   Thank you.  Coming back to the discharge from RSA, when was

10  he formally discharged from RSA?

11  A   January 28, 2014.

12  Q   You indicated in the discharge that RSA recommended a

13  higher level of containment which would mean to me regressing

14  to prison; is that correct?

15  A   At that time, due to his lack of amenability to treatment

16  and for community safety, they recommended that he be placed in

17  a secured facility and after his release from a secured

18  facility, that he would be placed at Independence House to have

19  a higher level of containment to address the failures that he

20  engaged in, the problematic behavior he engaged in while at the

21  halfway house and RSA setting at that time.

22  Q   How do we define secured facility as they recommended?

23  A   A prison or jail.

24  Q   All right.  What is Independence House's role during that

25  process of discharge from sex offender treatment?  Do they

1   weigh in or because of the discharge he's done at the halfway

2   house?

3   A   Right.  At that time, that information is provided back to

4   the Bureau of Prisons and due to the unsuccessful discharge of

5   treatment, that violation, the BOP code that they assess he is

6   regressed back to the Bureau of Prisons for that reason.

7   Q   Are you aware whether Mr. Von Behren had any problems at

8   Independence House itself, separate from sex offender

9   treatment, when he was at that reentry center?

10  A   While at the halfway house and speaking with his case

11  manager and other staff that were there, you know, Mr. Von

12  Behren had an unapproved electronic device.  He would

13  externalize blame with having that electronic device as far as

14  staff.  Security staff allowed him to bring it in.  Why can't

15  he have the internet device.  Discussions about whether or not

16  he was able to, as a compromise at the halfway house and RSA

17  came up with, to block the hard wire ports for internet access.

18  Those weren't done as he said they were.

19          He was secretive, dishonest while at the halfway

20  house, and from what I gathered if he received an incident

21  report of some sort, would challenge that process by writing a

22  response in length to justify his behaviors and why there

23  should be no consequences for those behaviors.

24  Q   Separate from RSA, did Independence House take any steps to

25  have Mr. Von Behren discharged -- I'm not sure what the right

1   term is -- terminated from living at Independence House?

2   A    Could you rephrase the question.

3   Q    I'm sure I could say it better.  Did Independence House

4   take any steps to throw him out of their facility?

5   A    Yes.  Well --

6   Q    Separate from RSA.

7   A    They're working as a containment team.  When they meet as a

8   team, they discuss his progress, his regression, violation

9   behaviors, treatment plan.  So once he was unsuccessfully

10  terminated from the sex offender treatment program, that is

11  when Independence House needed to notify the Bureau of Prisons

12  to regress back to the Bureau of Prisons.

13  Q    Have you spoken with Independence House about Mr. Von

14  Behren returning to residence there?

15  A    I have.

16  Q    And what is their response?

17  A    They are willing to accept him into the halfway house.

18  There is currently bed space available today.  I have spoke

19  with the liaison we work with who refers to the halfway house,

20  and she has that referral in place if that is what the judge

21  orders.  She would just need a copy of the judge's order to

22  send to Independence House so then they can process him this

23  afternoon.

24  Q    Why are you asking that Mr. Von Behren reside in a

25  residential reentry center for a period of up to 180 days as

1  your modification requests?  Why are you seeking that?

2  *A*   This would be in his best interest as far as being

3  successful and having the ability to be in the community.  He

4  is in need of the structure of a halfway house.  He is in need

5  of the structure -- high level of structure of a treatment

6  agency that can give him the structure that an RSA can't.

7       He has shown us, and this pattern of behavior has gone

8  on for years while in the Bureau of Prisons and again at RSA in

9  the halfway house, that he is unwilling to follow through with

10  the rules and regulations which places him at a higher risk in

11  the community.

12       The structure he can receive in the halfway house, my

13  ability to appropriately supervise him in the community, and

14  what is paramount; again, community safety is what we're

15  looking at.  For him to be able to gain the knowledge, gain the

16  skills, internalize those skills, identify his red flags, his

17  trigger, identify when he's in a sexual abuse cycle, pull

18  himself out of that cycle by using adaptive coping responses so

19  hopefully he never reoffends again, all those things can happen

20  with a structure he needs in place.

21       To say a sex offender who has been in treatment in a

22  halfway house should not be released to the community and live

23  in temporary housing without the structure that a halfway house

24  can give him and without my ability to appropriately supervise

25  him due to that temporary housing poses a significant risk to

1   the community and, basically, will allow him more opportunity

2   to potentially engage in violation behavior.

3          In looking at an offender's needs, the probation

4   department, who works with multiple agencies, multiple

5   therapists across the board, who's worked with multiple

6   offenders, understands treatment matching and knows what is the

7   best fit for the offender.  I'm not trying to toot my own horn

8   right now, but what I am saying is that of any person sitting

9   in this courtroom right now, if anyone knows what will be the

10  best treatment match for Mr. Von Behren, it would be myself.

11         Knowing where he needs to match in treatment, knowing

12  what his needs are, knowing what his risks are, knowing what he

13  can receive while being in the halfway house, while being at

14  RSA is what we're looking for as far as giving him the tools he

15  needs to be successful but also ensuring community safety.

16  Q   You mentioned RSA, and you told us from the discharge

17  summary that they were recommending when he came out from the

18  secure facility, that he go back to Independence House and

19  reenter treatment.  To unpack those, will RSA receive him as a

20  treatment client if he's not in a halfway house?

21  A   At this time, he will not be able to be accepted into the

22  agency unless he is brought back at what they call the higher

23  level of containment of where he was previously at when he was

24  unsuccessfully terminated.

25         So, in other words, if you have a defendant who is

1   living in the community and they are unsuccessfully terminated

2   from treatment, a treatment agency will bring that person back

3   at a higher level of containment that would be what we call a

4   SLA, a shared living arrangement, which is the highest level of

5   containment we have in community.  They were in the community

6   living by themselves or maybe with family or friends.  Then

7   they need to go into a higher level of containment, which would

8   be the SLA.

9         If the defendant was in the SLA when unsuccessfully

10  terminated from treatment, he needs to be brought back at a

11  higher level of containment, a higher level of containment

12  while living in a shared living arrangement.  The highest level

13  of therapeutic containment we have would be a halfway house

14  placement.

15        Once in a halfway house, if the defendant is

16  unsuccessfully terminated from treatment, that is when they

17  feel that he poses such a risk to the community that he needs

18  to be removed and placed in a secure facility.

19        At this time, because the defendant was already in a

20  halfway house engaging in the behaviors, violation behaviors he

21  was, and was unsuccessfully terminated from treatment, he needs

22  to go back into a halfway house, and we need to look at

23  additional behavioral monitoring and therapeutic interventions.

24  That could be something additional within the treatment process

25  as far as tracking in the community or additional study halls

WALTER VANNI – Direct

1   at the treatment agency so there's more contacts there.

2        That has to be the addition to the bare minimum of the

3   halfway house placement.

4   Q   Now, I know that RSA is a Sex Offender Management Board

5   certified treatment agency.  So they have to comply with the

6   Sex Offender Management Board guidelines, correct?

7   A   Correct.

8   Q   You had supplied me with some of those guidelines,

9   including 5.213, which I can tell you we talked about back in

10  chambers, that includes unsuccessful termination language

11  you're discussing.  But it says that the new treatment program

12  and case management arrangement will provide greater behavioral

13  monitoring and increased treatment in the areas the sex

14  offender failed in in the previous program.  It talks about the

15  use of SLA, shared living arrangement, you mentioned.  It

16  doesn't say higher level of containment, that sort of term of

17  art that you're using.

18       Where is the requirement that there has to be that

19  higher level of containment?  Is that somehow included in that

20  greater behavior monitoring and increased treatment?

21  A   Yes.  I mean, with the standards, they are constantly

22  updated due to research and evidence-based practices, and they

23  amend the standards over the years.  So the, if you will, for

24  lack of a better word right now, old school language that was

25  in the standards discussed a higher level of containment, the

 1  wording has changed and the understanding is the same that

 2  we're looking at, like you said, provide greater behavioral

 3  monitoring and increased treatment in the areas the sex

 4  offender failed in the previous program, is the common language

 5  that is used among treatment agencies, among probation

 6  departments of higher level of containment.

 7  Q   I know I asked this, but I just want to be clear in my head

 8  that RSA is requiring the halfway house placement for Mr. Von

 9  Behren in order to accept him into treatment; is that correct?

10  A   That is correct.

11  Q   And why are we only talking about RSA and not other

12  treatment providers as possibilities, others who might take him

13  without the halfway house requirement?

14  A   Again, the standard and guidelines read the greater

15  behavioral monitoring and increased treatment at the areas, but

16  it's also what the probation department feels would be the most

17  appropriate and best course of action in order to ensure the

18  defendant's success but also to keep in mind community safety.

19         In my opinion, he, at this time, would be considered a

20  high risk offender due to his failures in treatment, his

21  pattern of behavior for many, many years, his deviancy, and his

22  lack of insight into his behavior, his unwillingness to

23  participate in treatment.

24         Because of those things and because specifically this

25  being, say, a recedent distribution of child pornography case,

1  RSA has groups that are specific for offenders so, in other

2  words, if you refer to other agencies in the metro area, they

3  will have hands-on offenders sitting with internet offenders.

4  RSA breaks those groups down into you have a hands-on offender,

5  you have what you call an older adolescent group, OAG, they

6  have an OGG, older gentlemen group for people 60 and above.

7  They have what they call a SAIG group, which is sexually

8  abusive images group, which would be specific to Mr. Von

9  Behren.  They also have, in addition, multiple groups that can

10 assist with his violation behavior.

11        If he engages in certain behaviors where he needs

12 graduated sanctions instead of, obviously, terminated

13 unsuccessfully, coming back in front of the judge for

14 termination, we use these sections in treatment.  They have

15 these groups, they have the resources as far as what they call

16 a phone bank and tracking program where they have the ability

17 to have covert trackers in the community ensure that Mr. Von

18 Behren is following through with his weekly schedule and going

19 to the places he needs to be in the community.

20        In my experience with working with all of the agencies

21 while in the state in the metro area and with a majority of all

22 the therapists at that time -- and, granted there are more

23 therapists now that are SOP approved -- I can sit here and

24 confidently tell you and I think we would receive disagreement,

25 obviously, from the public defender's office, but I can

1    honestly tell you the RSA is considered the upper echelon when

2    it comes to services that we can provide offenders in the

3    community especially when we're looking at a person who has

4    engaged in violation behavior already and has been

5    unsuccessfully discharged.

6            If we had somebody else sitting at this table and we

7    were treatment matching who didn't engage in violation

8    behavior, who wasn't unsuccessfully discharged from treatment,

9    who wasn't regressed to Bureau of Prisons, and who did not have

10   the deviancy we currently see in the assessments I've received,

11   then, yes, we could look at the other agencies that may be out

12   there that are willing to accept Mr. Von Behren without clearly

13   understanding the referral packet I would need to send them

14   that shows all of his violation behavior, his failures, the

15   recommendations of a sex offender treatment agency already,

16   evaluations I have.

17           Those agencies are not appropriate where we're at

18   right now.  If he was -- if he transitioned straight from the

19   Bureau of Prisons and then came into my office, we could have a

20   different conversation, but because of the history we have seen

21   already, my referral, and unless ordered otherwise by the

22   judge, will only be to RSA due to my knowledge and expertise in

23   the field and my understanding clearly what is best for his

24   success and community safety.

25           *MS. SPENCER:*  Thank you, Mr. Vanni.  I have no further

WALTER VANNI - Direct

 1   questions.

 2           Thank you, Your Honor.

 3           THE COURT:  You're welcome, Counsel.

 4           MS. SPENCER:  Your Honor, before cross, may I view the

 5   items he relied upon?

 6           THE COURT:  You may, with your assistance, Madam

 7   Clerk.

 8           Mr. Vanni, if you would provide Ms. Finney the report

 9   upon which you have relied in your testimony.

10           MR. VARHOLAK:  I believe there were two.

11           THE COURT:  Very well.  Madam Clerk, please tender

12   those documents to Mr. Varholak.  We'll be at ease.

13       (Pause in proceedings.)

14           THE COURT:  Counsel, excuse me.

15           Mr. Vanni, for now, you may stand down and return to

16   your seat.

17           MR. VARHOLAK:  I've almost completed.

18           THE COURT:  I have a matter that requires my attention

19   elsewhere at 11:00 a.m.  I guesstimate that I will need

20   approximately 20 minutes for that meeting.  I respectfully

21   request we be in recess until approximately 11:20 or as soon

22   thereafter as the Court may return, but before I enter such an

23   order for your convenience, I inquire.  Will that be reasonably

24   convenient for you?  Ms. Spencer?

25           MS. SPENCER:  That's fine, Your Honor.

1          *THE COURT:*  Mr. Varholak?

2          *MR. VARHOLAK:*  That's fine.

3          *THE COURT:*  Mr. Von Behren.

4          *THE DEFENDANT:*  Yes.

5          *THE COURT:*  Mr. Vanni?

6          *MR. VANNI:*  Yes.

7          *THE COURT:*  Then we're in recess until 11:20 or as

8   soon thereafter as the Court becomes available.  Thank you.

9       (Recess taken from 10:57 a.m. to 11:30 a.m.)

10         *THE COURT:*  Thank you.  Ladies and gentlemen, please

11  be seated.

12         Again, let me express my appreciation and gratitude to

13  the parties and counsel for your forbearance.  I appreciate it.

14  Let us resume this important hearing.

15         Mr. Vanni, would you be so kind as to come forward and

16  resume your seat in the witness stand.  Mr. Varholak, you may

17  be at the ready.

18         *MR. VARHOLAK:*  Thank you.

19         *THE COURT:*  You're welcome.  Cross-examination for

20  Mr. Von Behren.

21         *MR. VARHOLAK:*  Thank you.

22                         **CROSS-EXAMINATION**

23  *BY MR. VARHOLAK:*

24  *Q*   Good morning, Officer Vanni.

25  *A*   Good morning.

1    *Q*    Do you think treatment does anything?

2    *A*    Yes.

3    *Q*    Sex offender treatment?

4    *A*    Yes.

5    *Q*    There's a purpose to it?

6    *A*    Absolutely.

7    *Q*    And you think that if it does something, I'm assuming that

8    somebody who goes through treatment would be more able to

9    comply after having completed that treatment?  I worded that

10   terribly.  Let me try again.

11          If treatment does something, then we expect that

12   somebody who has gone through treatment is more able to control

13   their urges, right?

14   *A*    Could you rephrase that again.  I'm sorry.

15   *Q*    Sure.  If treatment does something, if it's productive --

16   *A*    Right.

17   *Q*    -- we would expect somebody who has been through sex

18   offender treatment to be able to more control their urges

19   having gone through that treatment, right?

20   *A*    Not all cases, but yes.

21   *Q*    But that's the idea behind treatment, right, is to give

22   them the tools to control their urges?

23   *A*    The idea of treatment, sex offender specific, is a

24   containment model to include giving them the tools they need

25   but also to ensure community safety.

WALTER VANNI - Cross

1  Q   Okay.  But one of the things that treatment is designed to

2  accomplish is to give individuals like Mr. Von Behren who has

3  been convicted of a sex case; in this case, child pornography,

4  the tools to control those urges, right?

5  A   That is one of the reasons for sex offender treatment, yes.

6  Q   Okay.  So now let's turn to the Bureau of Prisons treatment

7  that he went through.  And you went through in great detail

8  with the Court a number of violations that Mr. Von Behren had

9  while in the Bureau of Prisons, correct?

10 A   Correct.

11 Q   And I think you had said -- I don't have the transcript --

12 but I think you said those violations occurred while he was in

13 treatment, didn't you?

14 A   I don't recall -- while he was in prison, you're saying?

15 Q   Correct.

16 A   Yes.

17 Q   So it's your opinion -- it's your belief that the

18 violations that you discussed with the Court were violations

19 Mr. Von Behren had while in treatment at the Bureau of Prisons?

20 A   Not all of the violations.  I'm not sure if the ones we

21 discussed as far as his assaulting another inmate and things

22 like that happened while he was in treatment.

23 Q   Well, let's go through the violations.  For these

24 violations, you were relying upon the treatment summary that I

25 now have a copy of, correct?

1    *A*    From BOP?

2    *Q*    Correct.

3    *A*    Yes.

4    *Q*    Because you, obviously, weren't in BOP with Mr. Von Behren.

5    In fact, you probably hadn't met him until shortly before his

6    release, correct?

7    *A*    I met him in the halfway house.

8    *Q*    Okay.  So what you were relying on for your testimony

9    earlier today was this report, correct?

10   *A*    Yes.

11   *Q*    Okay.  So let's go through the various violations that

12   supposedly occurred while in treatment.  Before we get there,

13   do you have a copy of the report with you?

14   *A*    Yes.

15   *Q*    If you look on the very first page of the report -- I think

16   it's the very first page.  Yes, it is.  It says, "When he

17   enrolled in this program" -- it's the first paragraph, maybe

18   five lines down.  You see that?

19   *A*    I believe so.

20   *Q*    Okay.  That date is March 23, 2012, correct?

21   *A*    Yes.

22   *Q*    And this treatment program, by the way, was voluntary,

23   correct?

24   *A*    Yes, nonresidential voluntary treatment.

25   *Q*    Okay.  So he didn't have to go to this?

WALTER VANNI - Cross

1   A   Correct.

2   Q   But he did on his own volition, right?

3   A   That's what it appears.

4   Q   Right.  That began on March 23, 2012, correct?

5   A   Correct.

6   Q   Now, let's go through those violations that supposedly

7   occurred while in treatment.  If you can turn for these

8   violations to page 4.  It says, "Institutional Behavior."  Do

9   you see that?

10  A   Correct.

11  Q   Let's go through each of them.  The refusing to obey an

12  order and possessing a nonhazardous tool, that occurred in

13  2005, correct?

14  A   Correct.  This is under institutional behavior, not sex

15  offender treatment, correct?

16  Q   That's right.  I'm walking you through the violations.

17  That one occurred in 2005?

18  A   Correct.

19  Q   That was one of the ones you mentioned?

20  A   Correct.

21  Q   And, again, that would have been before he began treatment?

22  A   Absolutely.

23  Q   The next one is -- the next one is assaulting without

24  serious injury.  This involved hitting another inmate?

25  A   Punching an inmate in the jaw.

WALTER VANNI – Cross

1  Q  Right.  That occurred in 2006?

2  A  Yes.

3  Q  Again, before treatment?

4  A  That's correct.

5  Q  The next one is 2009, refusing to obey an order.  Do you

6  see that?

7  A  I do.

8  Q  Again, before treatment?

9  A  Uh-huh.

10  Q  And then the one that you spent quite a bit of time on was

11  this book about "Promiscuities:  The Secret Struggle for

12  Womanhood"?

13  A  Correct.

14  Q  That was December 2011?

15  A  Correct.

16  Q  Before treatment?

17  A  Correct.

18  Q  Okay.  So now let's talk about the treatment, and the

19  problems that you discussed while in treatment that are

20  outlined in here is that he was reluctant to admit that he has

21  faults.  That is one of them, right?

22  A  That is what the report reads.

23  Q  Okay.  Have you ever had problems struggling to admit your

24  own faults?

25          MS. SPENCER:  Objection; relevance.

WALTER VANNI - Cross

1           *THE COURT:*  Sustained.

2    Q    (By Mr. Varholak)  Let's turn to the next one.  Use of

3    intellectualization.  That was one of the problems, right?

4    A    In the report, yes.

5    Q    And which you testified about, right?

6    A    That I read from the report, yes.

7    Q    Right.  This says he overuses logic, right?

8    A    Correct.

9    Q    So, in other words, the problem here is that he thinks too

10   much?

11   A    No.

12   Q    That's -- overusing logic is thinking.  Would you agree

13   with me?

14   A    I don't know.

15   Q    Okay.  And while at BOP he went through a couple stages.

16   He successfully completed Phase One of treatment, right?

17   A    Correct.

18   Q    He was not hostile to his treatment provider?  If you're

19   wondering, if you look on page 11, very first sentence, first

20   full sentence.  It says he wasn't overtly hostile.

21   Presentation was confrontational, not overtly hostile, correct?

22   A    Correct.

23   Q    He participated -- in fact, with intimacy skills his

24   participation was deemed average.  Do you see that?

25   A    For that one module, yes.

WALTER VANNI - Cross

1   *Q*   He attended group, right?

2   *A*   I don't know.

3   *Q*   Okay.  Well, if you'll look at again page 11, fourth full

4   paragraph down.  Talks about him attending group classes?

5   *A*   Yes.

6   *Q*   And he attended all of those sessions?

7   *A*   Yes.

8   *Q*   And it says he participated actively by giving feedback to

9   group members, right?

10  *A*   For this one module, yes.

11  *Q*   Okay.  And it says at times he wasn't helpful because he

12  was assisting group members to justify their harmful behaviors.

13  Do you see that?

14  *A*   Correct.

15  *Q*   But other times his comments were accurate, articulate, and

16  helpful, right?

17  *A*   In that module, yes.

18  *Q*   Okay.  He was open and honest about the facts that put him

19  in prison, right?

20  *A*   I don't know.

21  *Q*   Well, if you look --

22         *MR. VARHOLAK:*  Court's indulgence for one moment.

23         (Pause in proceedings.)

24  Q    (By Mr. Varholak)  If you look on page 4.  He was

25  questioned by them about the child pornography, and he went

1   through everything about it, right, talked to them about it?

2   A   Again, I don't know where you're referring to.

3   Q   Sure.  Page 4, very beginning.  Says he was asked about his

4   offense during his assessment.  Do you see that?

5   A   Which paragraph?  I'm sorry.

6   Q   Very first paragraph, very top of the page.

7   A   So you're asking a question as to him?

8   Q   Sure.  He was asked during his intake about his offense and

9   what he had done, right?

10  A   He was asked, yes.

11  Q   And he told them.  He said when he began viewing child

12  pornography and what was on his computer, right?

13  A   A brief description, yes.

14  Q   Well, what we have in here is a brief description, but you

15  don't know exactly how much he told the treatment person on

16  intake, do you?

17  A   From what it tells me on page 1 I would.

18  Q   Which is what?

19  A   That each participant is expected to disclose and discuss

20  the major components of his offending behavior but thorough

21  analysis of the behavior is typically not done.

22  Q   Okay.  Is there any indication on page 4 here that he lied

23  about what he did?

24  A   I don't know.

25  Q   Look.  I mean, this is what you're relying on when you

1    testified at length on direct about how poorly he had done in

2    BOP treatment, right, is this document?

3    *A*    I used this document to align a pattern of behavior through

4    the assessments which, unfortunately, I did not get to the

5    entire assessments after I had to spell the Bureau of Prisons's

6    name.  So there was a lot of information not provided, and the

7    pieces you're picking and choosing, unfortunately -- again, I

8    guess when Ms. Spencer gets up we'll discuss it then.  There is

9    a lot of information that has not been presented with the

10   treatment aspect, and I was going through the historic aspect

11   of the Bureau of Prisons with his institutional adjustment

12   first.

13   *Q*    Okay.  Now, if you can answer the question I asked, which

14   was, when you testified about that at length, this was the

15   document you were relying on for that testimony, correct?

16   *A*    Specifically around what?

17   *Q*    About his treatment at BOP.

18   *A*    I did use this document, yes.

19   *Q*    Okay.  You're aware that he pled guilty to the offense of

20   child pornography, right?

21   *A*    I do not know.  I would assume unless there was a trial.  I

22   don't know.

23   *Q*    Okay.  So prior -- so in discussing your treatment plan for

24   Mr. Von Behren, you didn't know whether he pled guilty or went

25   to trial on the charges?

WALTER VANNI - Cross

1    *A*    I would have to review the PSI.

2    *Q*    Well, I'm asking you, did you do that?

3    *A*    I reviewed the PSI, yes.

4    *Q*    So do you know whether he pled guilty or went to trial?

5    *A*    I do not recall at this time.  I know the case went to

6    appeal, so I'm not too sure.

7    *Q*    Okay.  So you don't know whether he accepted responsibility

8    before Judge Blackburn eight years ago, or whenever it was, or

9    whether he went to trial and denied it?  You don't know?

10   *A*    I would have to look at the PSI to see if the acceptance of

11   responsibility is there.

12   *Q*    But as of today you don't know the answer?

13   *A*    I don't recall the answer.

14   *Q*    Okay.  This BOP report gives treatment recommendations,

15   right?

16   *A*    Yes.

17   *Q*    And I think it lists six of them, right?

18   *A*    Correct.

19   *Q*    Not one of them says he should go to a halfway house, does

20   it?

21   *A*    One second, please.

22   *Q*    Sure.  Take your time.

23        (Pause in proceedings.)

24   *A*    It does not specify a halfway house placement while in the

25   Bureau of Prisons.

WALTER VANNI - Cross

1  *Q*  Well, this was completed as he finished Bureau of Prisons

2  treatment, right?

3  *A*  Prior to his failure in RSA, yes.

4  *Q*  So when you qualified what you said when you said it

5  doesn't recommend halfway house treatment while in BOP, this

6  isn't talking about while in BOP.  This is talking about when

7  released from BOP, right?  If you need help answering that,

8  look at No. 6.  That should be able to help you answer.

9  *A*  These recommendations, when I read the first paragraph,

10  talk about his continued treatment.  So continued treatment to

11  me would be once transitioning from BOP to the halfway house as

12  an inmate and then being released from -- as inmate status to

13  term of supervised release as continuity of treatment.  The No.

14  6 you're referring to talks about additional program that has

15  to do with vocational and educational training but has nothing

16  to do with sex offender specific training.

17  *Q*  When released to his community.  Do you see that?

18  *A*  Says to assist him with successful reentry to his

19  community.

20  *Q*  Correct.  And, again, this was completed after he had

21  already finished his BOP treatment, right?

22  *A*  It looks like he completed treatment on the 25th of

23  March 2013.  This report was written two days later on the

24  27th of March.

25  *Q*  Okay.  So, again, this report was completed after he

WALTER VANNI - Cross

1    finished his BOP treatment?

2    *A*    Correct.

3    *Q*    In fact, he did successfully complete that treatment,

4    right?  I'll point you to the last page, the second line on the

5    last page.  It says, "He was, nonetheless, able to moderate

6    these issues enough to be able to complete treatment."  Do you

7    see that?

8    *A*    That's on page what?  I'm sorry.

9    *Q*    Page 13, the second line.

10   *A*    Okay.  Yes.

11   *Q*    It says, "He was, nonetheless, able to moderate these

12   issues enough to be able to complete treatment," correct?

13   *A*    Specific to that paragraph, yes.

14   *Q*    Which is the sex offender treatment, right?  That's what

15   this whole thing is talking about, right, is his sex offender

16   treatment while in BOP?

17   *A*    That paragraph discusses, yes, it appears to be treatment

18   and staff interaction.

19   *Q*    Okay.  And, again, with respect to treatment and staff

20   interaction, it says, "He was, nonetheless, able to moderate

21   these issues," and these issues being a defensive attitude, and

22   not to be able to complete treatment, right?

23   *A*    From the Bureau of Prisons, yes.

24   *Q*    Okay.  Yes.  Thank you.  Now, let's turn to the halfway

25   house.  Again, at the halfway house when he initially goes

WALTER VANNI - Cross

1  in -- and this was on September 5, 2013, correct?

2  A    Incorrect.

3  Q    What day did he go in?

4  A    August 27, 2013.

5  Q    Okay.  September 5, 2013, he has his initial intake, right?

6  A    He has his initial -- I'm sorry?  What?

7  Q    Intake.

8  A    I do not know when his intake was with his case manager.

9  Q    Okay.  I've now turned to the RSA report.  If you look on

10  the first page, the last full paragraph, it says, "At the time

11  of his intake on September 5, 2013, correct?

12  A    This was his intake with RSA, not the halfway house.

13  Q    I apologize.  I'm referring to his intake with RSA.

14  A    Okay.

15  Q    Is now September 5, 2013.

16  A    Okay.

17  Q    Again, he told them he had collected child pornography and

18  when he began and ages, correct?

19  A    Correct.

20  Q    Okay.  And let's talk about the specific violations that we

21  have.  And the reasons for discharge are detailed up at the

22  very top of this page 1, correct?

23  A    Yes.

24  Q    Okay.  The first one is unapproved use of the internet?

25  A    Correct.  Yes.

1   *Q*   Okay.  Now, you're aware, of course, of the conditions of

2   his supervised release, right?

3   *A*   Correct.

4   *Q*   The second special condition that Judge Blackburn imposed

5   in 2005, I believe it was, was that he notify the probation

6   officer of all internet access devices?

7   *A*   Correct.

8   *Q*   Okay.  And permit unannounced examinations of the data on

9   the computer, right?

10  *A*   Correct.

11  *Q*   Other internet devices?

12  *A*   Correct.

13  *Q*   Essentially, a search -- it's a search condition of the

14  computer, essentially, and the internet, right?

15  *A*   It's a condition to ensure that the information is

16  presented to the treatment team of what kind of electronic

17  devices he's using with the ability to search, as you said,

18  through the internet capable devices.

19  *Q*   Now, there's nothing in here that says he needs to notify

20  you every time he uses the internet, is there?

21  *A*   I guess I don't understand your question because these

22  conditions don't apply while a BOP inmate and while at RSA.

23  *Q*   That's fair enough, but if we begin today, now he's on

24  supervised release beginning today, correct?

25  *A*   Correct.

1   *Q*   Okay.  This condition that would apply today doesn't

2   prohibit him from using the internet, does it?

3   *A*   It does not, no.

4   *Q*   Okay.  The second is accessing Facebook.  Again, turning to

5   the supervised release condition that applies today, there's

6   nothing in there that would prohibit him from accessing

7   Facebook?

8   *A*   Not today, no.

9   *Q*   Okay.  Using an e-mail for personal reasons.  That's a

10  third violation, right?

11  *A*   Correct.

12  *Q*   And, again, that wouldn't be prohibited by the supervised

13  release condition Judge Blackburn imposed, would it?

14  *A*   It would not, but it would conflict with the first

15  condition he imposed.

16  *Q*   Before we go there, let's talk for a moment about what this

17  violation was.  This violation was he sent an e-mail to his

18  parents, right?

19  *A*   That's what I'm reading, yes.

20  *Q*   Okay.  Turning to the fourth violation, this is possessing

21  a Christmas card with his minor age sister's signature on the

22  card?

23  *A*   Correct.

24  *Q*   Okay.  So the violation of No. 4 for booting him out is he

25  happened to have a Christmas card that his sister had written

1    to him, and he kept it?

2    A    The reason why he was booted out of treatment was due to

3    his lack of amenability, the totality of the circumstances, not

4    one specific violation.

5    Q    Well, and I'm going through the violations one by one.

6    This particular violation is he had a Christmas card that

7    had -- that his sister had written to him inside?

8    A    Correct.

9    Q    Okay.  The fifth one is going to unapproved locations.  Do

10   you see that?

11   A    Correct.

12   Q    Now, are you aware of what -- that was one occurrence of

13   that, right?

14   A    I would have to review additional paperwork.  I believe it

15   was more than one occurrence.

16   Q    But you're not sure what those occurrences are?

17   A    I don't recall at this time, no.

18   Q    Is it possible that one was going -- let me ask this

19   question.  If he was working -- was he working at the time

20   while he was in the halfway house?

21   A    He had a job for a short period of time, and then he was

22   unemployed the remainder of the time.

23   Q    If he was working and went to the restroom at work, would

24   that violate the conditions of RSA?

25   A    If he was using the restroom at work?

1   Q   Right.

2   A   No.

3   Q   Okay.  Then the sixth one that's listed here is keeping it

4   a secret from his community supervision team.  Do you see that?

5   A   Correct.

6   Q   Now, he did tell them -- that's how this all came to light

7   is because he told them about these violations, right?

8   A   These violations came to light while he was taking a

9   polygraph.

10  Q   Okay.  So he did tell them about these violations?

11  A   He did not tell treatment.  He told the polygrapher.

12  Q   Okay.  About the violations?

13  A   That he kept a secret from treatment until he took his

14  polygraph.

15  Q   And it was because of these violations that, as you

16  mentioned, he was regressed out of RSA, out of treatment, and

17  sent back to Bureau of Prisons?

18  A   Correct.

19  Q   Okay.  And that was at the recommendation, at least in

20  part, of Amber Gulley, his treatment coordinator?

21  A   That was a team decision.

22  Q   Okay.  And she's part of that team?

23  A   She is part of the team.

24  Q   Okay.  And -- I'll just ask you.  Who is all on this team

25  that you're referring to?

1  *A*   While he was at RSA?

2  *Q*   Prior, correct.

3  *A*   It was his case manager at the halfway house.

4  *Q*   Okay.

5  *A*   Amber Gulley.

6  *Q*   Okay.

7  *A*   The entire team at RSA because she has a staff with her

8  entire team for decision making, and the polygrapher.  Once he

9  began supervised release, then probation will be part of the

10  team and take lead in that team.

11  *Q*   Okay.  But you weren't part of the team back when he was at

12  the halfway house?

13  *A*   I was involved at the monthly staffings we have when we

14  discuss every offender that is at the halfway house that is in

15  treatment.  I was sitting at the table with myself, my other

16  fellow officer who also works similar cases.  We were present

17  at the staffings.

18  *Q*   Okay.  So would you consider yourself part of the team or

19  no?

20  *A*   I would say as far as final decision making, no.

21  *Q*   Okay.  Would that have been ultimately Ms. Gulley -- and I

22  don't mean -- if she has a title like a Ph.D, I don't mean to

23  be insulting by calling her Ms. Gulley.  I'm honestly not

24  certain.  Would that have been her who is the ultimate decision

25  maker that you just referred to?

1  *A*  No.  Again, it's a team approach.  So, I mean, it has to be

2  a conversation with what is going on at the halfway house that

3  is relayed from his case manager and what is going on by his

4  group therapists who are not Amber because she's his individual

5  therapist and all of them collaborating and, again, the 20 some

6  odd therapists they have at RSA meeting once a week to staff

7  every case they have at the treatment agency.

8  *Q*  Okay.  So let's talk about some of these people.  The case

9  manager.  Does the case manager have any advanced degrees in

10  sex offender treatment or psychotherapy or anything of that

11  nature?

12  *A*  Yes.

13       *MS. SPENCER:*  Your Honor, objection to relevance.

14  I've been patient.  I'm not sure where this is headed.  I

15  thought we were talking about current placement before we get

16  to a full hearing on that issue.

17       *MR. VARHOLAK:*  This goes to that issue.  I'll speed it

18  along.

19       *THE COURT:*  Very well.  I'll sustain the objection, in

20  part, and overrule it, in part, on the promise of expediency.

21       *MR. VARHOLAK:*  I will be quick.

22  Q   (By Mr. Varholak)  Let's focus on Ms. Gulley because she's

23  the one who wrote this report.  You talked on direct

24  examination about all of the positive things that you see in

25  RSA, correct?

1    A    Correct.

2    Q    Okay.  And I'm assuming Ms. Gulley would be one of those

3    positive things?

4    A    Correct.

5    Q    You consider her to be very good at what she does?

6    A    Correct.

7    Q    Okay.  And she had quite a bit of interaction with Mr. Von

8    Behren because, like you said, she was his individual treatment

9    provider?

10   A    She was his individual treatment provider, yes.

11   Q    I'm assuming because she was Mr. Von Behren's individual

12   treatment provider and because you have a lot of respect for

13   her, you would respect her opinion as to what to do with

14   Mr. Von Behren, correct?

15   A    I would listen to what she was presenting, and then decide

16   whether or not that was an appropriate decision made among the

17   whole treatment team.

18   Q    But you would give some credence to what she had to say,

19   I'm assuming, right?

20   A    I don't know what you mean by that.

21   Q    Would you give some weight, some value to what she had to

22   say about it?

23   A    About what specifically?

24   Q    About what should happen with Mr. Von Behren.

25   A    Again, that's not her sole decision.  It was a decision of

1   her whole team.

2   Q    That's not the question I'm asking.  What I'm asking is, if

3   she came in and gave a proposal as to what should happen to

4   Mr. Von Behren, would you either, A, listen to it and give it

5   some value or, B, simply ignore what she had to say?

6   A    I would never ignore anything anyone has to say.

7   Q    So would you give it some value?

8   A    Because I know it has been discussed with 20 some odd

9   therapists, of course, I would because they're the

10  professionals.

11  Q    Thank you.  So let's take a look at what she does

12  recommend.  If you turn to page 3 and if you go down four lines

13  up from the bottom.  Do you see where I am?

14  A    Correct.

15  Q    She says he should return to Independence House, and that's

16  what you talked about earlier, right?

17  A    Right.

18  Q    And her rationale is it would be -- it's needed to be in

19  compliance with the Sex Offender Management Board standards

20  requiring clients who are unsuccessfully discharged to return

21  to a higher level of containment in the community.  That's what

22  she wrote?

23  A    Correct.

24  Q    Okay.  So that's her rationale, that's her explanation for

25  Independence House, right?

1    *A*    Not the sole, no.

2    *Q*    Well, that's the reason she provides in this report,

3    correct?

4    *A*    Right, but in conversation with the treatment team there is

5    everything else that I discussed when I testified for the

6    reason why he needs to be in the halfway house, that being one

7    element that she provided.

8    *Q*    Okay.  And then if you turn to page 4 it says, "It is

9    further recommended upon release that Mr. Von Behren return to

10   treatment with a Sex Offender Management Board approved

11   provider as they will have the necessary training to address

12   Mr. Von Behren's needs," correct?

13   *A*    Correct.

14   *Q*    No where in here does it say he needs to return to RSA,

15   correct?

16   *A*    No, they don't.  They wouldn't write that.

17   *Q*    In fact, she says any Sex Offender Management Board

18   provider could deal with his needs?

19   *A*    If they have the ability to afford him the level of

20   containment that he is currently in need of.

21          *THE COURT:*  Counsel, excuse the interruption.  I

22   apologize if I have robbed you of momentum or a possible

23   gotcha-moment.  We have arrived at the noon hour for today.

24          Thus, I inquire.  Can we resume on the record this

25   afternoon at 1:15 p.m. to complete and conclude this hearing?

1        *MS. SPENCER:*  Yes, Your Honor.

2        *THE COURT:*  Mr. Varholak?

3        *MR. VARHOLAK:*  I can.

4        *THE COURT:*  Mr. Vanni?

5        *THE WITNESS:*  Yes.

6        *THE COURT:*  Let's precisely do that.  Mr. Varholak, at

7   your convenience, you may be seated.  Mr. Vanni, you may stand

8   down and return to your seat as well.  Thank you.

9        Very well.  The hearing in this matter is continued

10  until 1:15 p.m.  Until then, the Court is in recess.

11       Madam Clerk, please declare the recess of the Court.

12     (Recess taken from 12:02 p.m. to 1:20 p.m.)

13       *THE COURT:*  Good afternoon.  Thank you.  Please be

14  seated.

15       We resume on the record in open court in case

16  04-cr-00341.

17       Mr. Vanni, once again, would you take a seat in our

18  witness stand, please, and thank you.

19       Mr. Varholak, you may be at the ready.

20       *MR. VARHOLAK:*  Thank you.

21       *THE COURT:*  You're welcome.

22       Counsel.

23  *Q*   (By Mr. Varholak) Mr. Vanni, one last issue with respect to

24  the halfway house and Mr. Von Behren's time there.  Ms. Spencer

25  asked you about violations of the halfway house rules

WALTER VANNI – Cross

1    specifically as opposed to RSA rules.  I think it was in that

2    discussion that you said he would challenge certain write-ups

3    he received.  Am I recollecting accurately your direct

4    examination?

5    *A*    That was information provided to me by his case manager.

6    *Q*    Okay.  Essentially, he did get a write-up, and he would

7    challenge it within the halfway house?

8    *A*    That is my understanding when speaking with the case

9    manager.

10   *Q*    Are you aware whether that halfway house actually has

11   procedures for individuals who are charged with a violation to

12   challenge those violations?

13   *A*    I believe they did.

14   *Q*    Okay.  So, in fact, they're permitted to bring challenges

15   to violations within the halfway house's own procedures?

16   *A*    I believe so.

17   *Q*    Okay.  The last thing I want to talk about is this

18   guideline Ms. Spencer asked you about and that I've asked you a

19   little bit about.  This is from the SOMB guidelines, correct,

20   the Sex Offender Management Board guidelines?

21   *A*    Specifically what guideline?

22   *Q*    She mentioned 5.213.  That's 5.213 of the Sex Offender

23   Management Board guideline, correct?

24   *A*    That is a guideline.

25   *Q*    Produced by the Sex Offender Management Board?

1    *A*    Correct.

2    *Q*    And you had mentioned that these guidelines are

3    continuously updated?

4    *A*    Correct.

5    *Q*    Okay.  But when asked about 5.213 -- I'll ask it.  What it

6    says in here mentions that if you're unsuccessfully terminated

7    and you go back in, you should be at, quote, a greater

8    behavioral monitoring and increased treatment in the areas of

9    the sex offender -- that the sex offender failed in the

10   previous program.  That's what that section actually says,

11   right?

12   *A*    Correct.

13   *Q*    Okay.  And it doesn't say anything in there about custody

14   being high?

15   *A*    Custody level?

16   *Q*    Correct.  So halfway house or SLA or jail or -- it doesn't

17   mention any of those, does it?

18   *A*    It does discuss SLA.

19   *Q*    You're right.  What it says about SLA is it says the use of

20   SLA may be an appropriate option in this scenario, right?

21   *A*    If they were living in the community on their own as an

22   increased level of treatment going into the SLA.

23   *Q*    Where does it say that?

24   *A*    What do you mean "where does it say that"?

25   *Q*    I quoted what it says, which is, "The use of an SLA may be

1    an option in this scenario," period.  That's what it says?

2    A    Because in order for them to be placed in a program, that

3    arrangement, they have to provide greater behavioral monitoring

4    and increased level of treatment, an example being an SLA.

5    Q    Correct, but it makes no mention of an increased custody or

6    increased containment level or any of those terms, does it?

7    A    In every situation where a defendant is going to be

8    discharged unsuccessfully on treatment, an offender is going to

9    be brought back at a high level of containment.  One example is

10   if they're in the community on their own or living with family

11   and friends, that increased level could be an SLA.

12   Q    Well, that's what you're saying, but that's not the words

13   in this, right?

14   A    No.  It's not spelled out verbatim what I just said.

15   Q    These guidelines are pretty detailed, aren't they?  Chapter

16   5 alone is 113 pages, right?

17   A    I don't know how many exact pages.

18   Q    I guess -- I'm subtracting wrong.  It's 40 some pages.

19   These aren't just short -- a short guideline.  They're very

20   detailed.  Would you agree with that?

21   A    I would say that that small paragraph involves a lot of

22   information brought forth by the containment team.

23   Q    So it's your understanding that that small paragraph, which

24   is the one that you're relying on, requires if you are violated

25   at a halfway house, that you return at a higher level of

WALTER VANNI - Cross

1    security?

2    A    That is my personal opinion also.

3    Q    Okay.  But are you saying that's what this requires?

4    That's my question.

5    A    I am saying that in my experience treatment agencies have

6    expressed to me that they need to be brought back at -- the

7    words they use -- "a higher level of containment."  The way

8    they sum it up now is greater behavioral monitoring and

9    increased treatment.

10   Q    Okay.  But my question is, are you saying that is required

11   by guideline 5.213?  Yes or no?

12   A    I am saying it is required by guideline 5.213 as a

13   guideline, yes.

14   Q    Okay.  Now, we talked a lot about containment.  Have you

15   ever read the definitional level -- the definitional term of

16   containment within the SOMB guidelines?

17   A    I have.

18   Q    It makes no mention of facility, does it?

19   A    Of what?  I'm sorry.

20   Q    Of facility such as halfway house or SLA or prison, or any

21   of those.

22   A    Well, there is differences within the standards that do

23   talk about supervision while in the community, supervision

24   while in SLA, supervision while in Department of Corrections or

25   custody.

1    *Q*   Sure.  But the actual term "containment approach" as

2    defined by SOMB makes no mention of halfway house or SLA or

3    prison, does it?  I've got it here if you'd like to read it.

4    *A*   Sure.  I'll read it.

5          *MR. VARHOLAK:*  May I approach, Your Honor?

6          *THE COURT:*  Thank you.  You may.

7          Madam Clerk, your assistance.

8          *THE WITNESS:*  Thank you very much.

9      (Pause in proceedings.)

10         *THE WITNESS:*  Would you like me to read it?

11   Q    (By Mr. Varholak)  Read it to yourself.

12     (Pause in proceedings.)

13   *A*   Okay.

14   *Q*   That makes no mention of halfway house or SLA or prison or

15   any of those things, does it?

16   *A*   Specifically, it talks about the use of external control

17   measures, which would be placement into those places.

18   *Q*   That's your understanding of what external control means?

19   *A*   Correct.

20   *Q*   And so when it says, "A method of case management and

21   treatment, it seeks to hold offenders accountable through the

22   combined use of offender's internal controls and external

23   control measures" -- then there's a parentheses -- "(such as

24   the use of the polygraph and relapse prevention plans)" -- you

25   don't think external control measures means polygraphs and

WALTER VANNI - Cross

1   relapse prevention plans.  You think it means halfway house and

2   prison and SLA?

3   A   I think it means all of them.  That's why it says "such

4   as."

5   Q   Okay.  Of course, Mr. Von Behren was at the halfway house

6   when he was regressed out of there, correct?

7   A   Could I get a glass of water?

8   Q   Sure.  Absolutely.

9   A   I'm sorry.  One more time.

10  Q   So Mr. Von Behren was in a halfway house when he got

11  regressed out of there?

12  A   Correct.

13  Q   He got regressed to a higher security level, which was

14  prison?

15  A   Correct.

16  Q   And now he's being released to a halfway house that would

17  be the same level of security he was in previously.  It

18  wouldn't be a higher level?

19  A   That's why it would be, like I said, additional behavioral

20  monitoring or treatment expectations, something similar to a

21  phone bank or a tracking process or additional study halls,

22  face-to-face contacts within the therapeutic process,

23  additional groups, if need be, specific to the behaviors that

24  he failed in prior.  That could be the addition to the halfway

25  house that makes that the higher level of containment.

1   *Q*   Right.  So there would be additional treatment options

2   provided to him, right?

3   *A*   As long as you have the bare minimum of halfway house

4   placement in a case, yes.

5   *Q*   You mention RSA won't take him back.  Did you -- I know I

6   read the report.  Since he's been back into the prison and

7   getting ready to come back out, have you actually spoken to RSA

8   to see if they would take him?

9   *A*   I have actually had conversations with Amber Gulley, his

10  primary therapist, and recently as of yesterday, because we had

11  our RSA staffings, I spoke with the clinical director of RSA,

12  Missy Gerski, who relayed the same information to me.

13  *Q*   They said they will not take him back unless he's in a

14  halfway house?

15  *A*   And I also inquired about the other agencies and what that

16  will look like.  Again, the clinical director expressed to me

17  that other clinical directors in the metro area will review the

18  information that's provided in my referral packet, and he will

19  need to be placed at the level of containment of a halfway

20  house to receive treatment once they have all the information

21  in front of them.

22  *Q*   That's what RSA told you.  Did you talk to other treatment

23  providers?

24  *A*   In my experience, in the multiple times I've had to go

25  through this process, clinical directors from multiple agencies

 1   in the area have said the same thing to me.

 2   Q   So the answer would be no?

 3   A   Have I spoke to somebody yesterday or recently?

 4   Q   Have you spoken to any other treatment provider anywhere in

 5   the Denver metro area about accepting Mr. Von Behren?

 6   A   No.

 7   Q   Okay.  And how many SOMBs are there in the Denver metro

 8   area?

 9   A   That meet the level and need that the offender needs?

10   Q   Just SOMBs.

11   A   There are multiple.  I wouldn't know how many off the top

12   of my head.  I would have to go to the website to see approved

13   providers.

14   Q   Many more than RSA?

15   A   More than RSA, yes.

16   Q   Finally, you mentioned that, in your opinion, your plan is

17   in the best interest of Mr. Von Behren and his success, right?

18   A   Absolutely.

19   Q   Okay.  And you would agree with me that the best chance for

20   Mr. Von Behren and, frankly, the public itself would be

21   successful completion of an SOMB -- some sort of sex offender

22   treatment?

23   A   That's part of the success.

24   Q   His best chance would be him completing such a program,

25   right?

1   *A*   That is part of his best chance of success.

2   *Q*   I get that it's not complete, but would he have a better

3   chance of succeeding if he completed a sex offender treatment

4   program or if he didn't complete a sex offender treatment

5   program?

6   *A*   Your definition of success is what?

7   *Q*   What's best for him, what's best for the community.

8   *A*   Unfortunately, I don't have a crystal ball and I can't

9   predict what Mr. Von Behren will do in the future.  I can tell

10  you that his pattern of behavior speaks volumes as far as what

11  he may or may not do.  Again, I do not know what he will do in

12  the future.

13  *Q*   I'm not asking you to predict the future.  What I'm asking

14  is, in your opinion -- you said you're the best one in this

15  room to possibly know what's best for --

16  *A*   That's not what I said.

17  *Q*   Okay.  In your opinion, with all of your expertise, does he

18  have a better chance of success if he has completed a sex

19  offender treatment program or if he has not completed a sex

20  offender program?

21  *A*   If he is able to internalize the tools that are given to

22  him and has appropriate relapse prevention plans in place and

23  has demonstrated those behaviors, he is at a better chance of

24  reducing his risk in the future to recidivate.

25  *Q*   If he goes through a sex offender treatment program?

WALTER VANNI – Cross

1  *A*   Absolutely.

2  *Q*   Okay.  And we know that he completed a BOP program, right?

3  Talked about that earlier?

4  *A*   He completed the portion of the BOP treatment program,

5  correct.

6  *Q*   Okay.  And he failed at the RSA program, right?

7  *A*   Correct.

8       *MR. VARHOLAK:*  Nothing further.

9       *THE COURT:*  Ms. Spencer, redirect examination.

10       *MS. SPENCER:*  Thank you, Your Honor.

11       *THE COURT:*  You're welcome.

12                    **REDIRECT EXAMINATION**

13  *BY MS. SPENCER:*

14  *Q*   Mr. Vanni, you spoke to Mr. Varholak about a referral

15  packet you put together on an offender for treatment providers

16  to analyze so that they understand what the client might look

17  like.  What is contained in the referral packet that you're

18  speaking of?

19  *A*   Specifically, I would provide the PSI, the evaluation from

20  the Bureau of Prisons, the unsuccessful discharge from RSA

21  treatment, and any other collateral information that I may have

22  from his time within the RSA program and the halfway house

23  placement.

24       I would also sit down and speak with the treatment

25  agency so I can give them additional information in order for

1    them to appropriately assess what is in the best interest, as

2    far as appropriate treatment plan, to ensure both community

3    safety and offender rehabilitation.

4    *Q*    In terms of the guideline 5.213 that I asked you about on

5    direct and you were asked about on cross-examination, you have

6    told the Court that you would interpret that to mean or include

7    a higher level of containment as part of the behavioral

8    treatment that needs to be increased.  Am I saying that right?

9    *A*    Myself and sex offender agencies that I work with, yes,

10   interpret it that way.

11   *Q*    I think you already addressed this, but I just want to

12   clarify.  Who is it that chooses the appropriate treatment

13   provider for an offender in the District of Colorado?

14   *A*    In the District of Colorado, per the order of the Court,

15   the defendant shall participate in an approved program of sex

16   offender evaluation and treatment as directed by the probation

17   officer.

18          When I look at appropriate treatment matching, my

19   responsibility as a supervision officer is to make referrals

20   for the evaluation and treatment, and I need to consider which

21   provider will best meet the offender's treatment and evaluation

22   needs and the needs of safety of the community.  Factors I take

23   into consideration are the intensity of treatment needs,

24   specialized offender needs, and also the continuity of care.

25   *Q*    So the short answer is pursuant to the Court order of that

1   special condition, the probation officer is the one who makes

2   that determination?

3   *A*   Correct.

4   *Q*   Do you take into account if the offender tells you a

5   program that he wants to go to or agency that he thinks would

6   be a good fit?

7   *A*   I take everything into account that is presented to me.

8   *Q*   So the answer is yes?

9   *A*   Correct.

10  *Q*   In terms of what you were reading of the special conditions

11  in this case, that also includes the language that the

12  defendant shall comply with the rules and restrictions

13  specified by the treatment agency.  That's correct as well?

14  *A*   Correct.

15  *Q*   So when Mr. Varholak was asking you about the violations

16  listed by RSA, they all fall within that ambit of special

17  condition No. 1; is that correct?

18  *A*   Yes, because that is violations of the treatment contract

19  per every SOMB provider in the State of Colorado.

20  *Q*   I want to look at the RSA report with you again as

21  Mr. Varholak did.  Do you still have that in front of you?

22  *A*   I do.

23  *Q*   On the first page the violations Mr. Varholak went through

24  them, but he skipped over violation No. 3 as they were listed.

25  What is violation No. 3?

1    *A*   Using e-mail account for personal reasons.

2    *Q*   No.  The one about reading books that contain sexually

3    stimulating material.  On the very first page.  I should say

4    it's the reasons for discharge, the short letter page,

5    Mr. Vanni.

6         *MS. SPENCER:*  These are the exhibit lists that you

7    used with him.  Don't interrupt me.

8    Q    (By Ms. Spencer)  Mr. Vanni, do you see that?

9    *A*   I apologize.  I do not.  Is it the initial --

10   *Q*   It is the initial, yes.

11   *A*   I, unfortunately, don't have that in front of me.

12   *Q*   I'll go through them with you.  Mr. Varholak indicated No.

13   1 was the e-mail account, and No. 2 -- excuse me.  Number 1 was

14   Facebook.  Number 2 was e-mail.  Number 4 was having the

15   Christmas card from his sister.  Number 3 was reading books

16   that contain sexually stimulating material.

17        *MR. VARHOLAK:*  Your Honor, I think Ms. Spencer has a

18   different document than I had.

19        *THE COURT:*  Counsel, would you quickly compare notes

20   in the interest of efficiency.  Thank you.

21        *THE WITNESS:*  I can clarify to the Court --

22        *THE COURT:*  Just a moment, Mr. Vanni.

23     (Pause in proceedings.)

24        *MR. VARHOLAK:*  I don't have the document that

25   Ms. Spencer is referring to.  She says I skipped over it.  I

1    don't have that document.

2            *THE COURT:*  Duly noted, but redirect examination may

3    resume.

4            *MS. SPENCER:*  Thank you.

5            *THE COURT:*  You're welcome.

6    Q    (By Ms. Spencer)  Additionally, on the conclusions that

7    start on page 3 into page 4 where RSA is recommending that upon

8    release, Mr. Von Behren should return to the Independence

9    House, Mr. Varholak skipped over some of the language there as

10   well.  In addition to the Independence House, they're also

11   asking for potential tracking services and increased

12   therapeutic services as well, correct, Mr. Vanni?

13   *A*    Which is matching the guideline in the standards.

14   *Q*    And that's what you've already talked about, the tracking

15   that they have that's available at RSA?

16   *A*    Correct.

17   *Q*    All right.  Mr. Varholak didn't finish the sentence either

18   on, "It's further recommended that Mr. Von Behren return to

19   treatment with a Sex Offender Management Board approved

20   provider as they will have the necessary training in order to

21   address Mr. Von Behren's needs both in relation to his history

22   of engaging in sexually abusive behaviors and his history of

23   manipulation."

24           Mr. Vanni, those caveats at the end about his needs

25   to -- the history of engaging in sexually abusive behavior and

1   his history of manipulation, do you look at those things in

2   terms of looking at the best provider fit, the match that

3   Mr. Von Behren needs for his treatment providing?

4   *A*   Absolutely.

5           *MS. SPENCER:*  I have nothing further.

6           *THE COURT:*  Mr. Vanni, for now, you may stand down and

7   return to your seat.

8           *THE WITNESS:*  Thank you.

9           *THE COURT:*  You're welcome.

10          Further evidence by the Government, Ms. Spencer?

11          *MS. SPENCER:*  None.  Thank you, Your Honor.  The

12  People rest.

13          *THE COURT:*  Evidence for the defense, Mr. Varholak.

14          *MR. VARHOLAK:*  Thank you.  I call Sam Peebles.

15          *THE COURT:*  Very well.  Sir, if you'll raise your

16  right hand to be sworn.

17      (**SAM PEEBLES** was sworn.)

18          *THE WITNESS:*  Yes, sir.

19          *THE COURT:*  Thank you.  Please be seated in that

20  witness stand.

21                       **DIRECT EXAMINATION**

22  *BY MR. VARHOLAK:*

23  *Q*   Good afternoon.  Mr. Peebles, would you spell the last name

24  for the record.

25  *A*   Yes.  It's P-E-E-B-L-E-S.

SAM PEEBLES - Direct

1    Q    Mr. Peebles, how are you employed?

2    A    Investigator with the public defender's office in Denver.

3    Q    As part of your duty -- how long have you been an

4    investigator?

5    A    16 years all total.  15 years with this office.

6    Q    Okay.  Where were you before that?

7    A    Pensacola, Florida.

8    Q    As part of your duties as an investigator, did you conduct

9    an investigation in this particular case?

10   A    Yes, sir.

11   Q    And as part of that investigation, did you contact anybody

12   at the Sex Offender Management Board?

13   A    Yes, sir.

14   Q    Was that Kathy Rodriguez?

15   A    Yes, sir.

16   Q    Who is she?

17   A    She's the adult standards and community notification

18   coordinator.

19   Q    And when you spoke to her, did you mention to her -- strike

20   that.  Did you show her anything from the Government's response

21   in this case that addresses SOMB standards?

22   A    I did not show her anything, no, sir.

23   Q    Did you read anything to her?

24   A    Yes, sir.

25   Q    Your conversation with her, was it in person or over the

SAM PEEBLES - Direct

1    phone?

2    A    Over the phone.

3    Q    In particular, did you ask her about the sentence that

4    says, "Under the SOMB guidelines, any client receiving

5    treatment who was unsuccessfully discharged from treatment and

6    then returned to community-based supervision must reenter

7    treatment at a higher level of containment in the community"?

8    A    Yes, sir.

9    Q    What did she say about that?

10   A    She first said that was Rule 5.213 of their guideline.

11   Q    So the same one we've been talking about here?

12   A    Yes, sir.

13   Q    What did she say about that Rule 5.213?

14   A    She said that it meant that the person who failed in

15   treatment would return to a more intensive treatment.

16   Q    Okay.

17   A    She said it was talking about treatment.  Then she said it

18   was specific to treatment, not supervision.

19   Q    Okay.  And did she say that they'd have to return to a

20   higher custody level?

21   A    No, she did not.

22   Q    Did you ask her that question?

23   A    We discussed it, and she said if the person had been in a

24   halfway house, they couldn't return to a higher level because

25   when you get out of prison there wasn't a higher level.

SAM PEEBLES - Direct

1    *Q*    Okay.

2    *A*    In her understanding.

3    *Q*    Okay.  She's with the board itself.

4    *A*    Yes, sir.  That's how I got to her.

5    *Q*    So just so I'm sure, she was saying this 5.213 was dealing

6    with treatment, not custody?

7    *A*    Yes, sir.  That's what she said.

8    *Q*    Okay.  Did you talk to any SOMB provider, people who

9    provides SOMB services?

10    *A*    Yes, sir.

11    *Q*    Was their reading of this that -- did you ask them, if you

12    violate at a halfway house and go to prison and violate

13    treatment while in a halfway house and go to prison and they

14    get back out, did they say you had to automatically go to the

15    halfway house?

16    *A*    No.  They did not say you had to automatically go to a

17    halfway house.

18    *Q*    How did they explain how they chose where you went?

19    *A*    They would have a process.  They called it either a

20    staffing or an intake.

21    *Q*    And, based on that, they determine where the person should

22    go?

23    *A*    Yes, sir.

24    *Q*    But it wasn't automatic they have to go to the halfway

25    house?

1    *A*    No, sir.

2            *MR. VARHOLAK:*  I have nothing further.

3            *THE COURT:*  Cross-examination for the Government,

4    Ms. Spencer.

5            *MS. SPENCER:*  Thank you, Your Honor.

6            *THE COURT:*  You're welcome.

7                        **CROSS-EXAMINATION**

8    *BY MS. SPENCER:*

9    *Q*    Mr. Peebles.

10   *A*    Yes, ma'am.

11   *Q*    When you spoke with the SOMB providers -- let me ask first.

12   How many different providers did you speak with?

13   *A*    I spoke with six different people, six different

14   counselors.  They were at five different providers.  I spoke to

15   two at the same provider.  I received two phone messages, and I

16   left six other requests for people to call me back.

17   *Q*    So how many people did you actually get to ask questions

18   of?

19   *A*    Six.

20   *Q*    All right.  When you spoke with these six various

21   counselors, did you go through with them any of the specifics

22   of Mr. Von Behren's case?

23   *A*    I generally told them it was a person who was convicted of

24   child pornography, a sexual offense involving child

25   pornography.  The person was sent to prison.  They served

SAM PEEBLES - Cross

1    approximately eight years.  They were released to a halfway

2    house and also required to get treatment.  They violated the

3    conditions of the release, were sent back to prison for a

4    shorter period of time, and now were about to be released

5    again.  That was generally, not word for word, but generally

6    the background I give.

7    Q   You didn't give them the discharge papers from RSA?

8    A   No, ma'am.

9    Q   Didn't give them a treatment summary from Bureau of

10   Prisons?

11   A   No, ma'am.

12   Q   You didn't confer with Mr. Vanni and get any other

13   information from him to pass along to these the counselors to

14   give you any conclusions?

15   A   No, ma'am.

16   Q   In fact, the conclusions they gave you were, per their

17   protocol, they would have to do a staffing or intake to go

18   through the process to determine if it was an appropriate fit?

19   A   Correct.

20   Q   Did they tell you how long that process would take?

21   A   No, ma'am.

22   Q   Did you ask them if they could do something on a quick

23   turnaround?

24   A   I'm sorry.  No, ma'am, I didn't ask.

25            MS. SPENCER:  I have no further questions.  Thank you.

1          *THE COURT:*  Redirect examination, Mr. Varholak.

2          *MR. VARHOLAK:*  Just briefly.

3                          **REDIRECT EXAMINATION**

4   *BY MR. VARHOLAK:*

5   *Q*   Mr. Peebles, the reports Ms. Spencer was talking about, did

6   you have any of those?

7   *A*   No, sir.

8   *Q*   You weren't withholding any information.  You just didn't

9   have them?

10  *A*   I didn't have them.

11         *MR. VARHOLAK:*  Okay.  Thank you.

12         *THE COURT:*  Mr. Peebles, you may stand down and return

13  to your seat.

14         *THE WITNESS:*  Thank you.

15         *THE COURT:*  You're welcome.

16         Argument on the limited issue whether the Court should

17  impose as an additional explicit or special condition of

18  supervised release the requirement that Mr. Von Behren be

19  placed in an appropriate RRC, Independence House, for up to 180

20  days.

21         The Government, Ms. Spencer.

22         *MS. SPENCER:*  Thank you, Your Honor.

23         Thank you for reminding me to limit my remarks to just

24  the halfway house.  I know we got far afield today in the

25  testimony.

1        I think it was important to get a feel for what was

2   happening before and the treatment providers and their analysis

3   of the situation when we're talking about the appropriate

4   placement for this interim time period.

5        The special condition that has been asked by probation

6   officer Vanni is for the residential reentry center.  I think

7   Mr. Vanni was very clear in his testimony it's for two reasons.

8   It's not just because he believes RSA says that's a

9   requirement -- and certainly there's some room here for

10  argument about that -- but also because as the probation

11  officer in this case and having full access to all the

12  information, he finds that to be the best and most appropriate

13  placement for the defendant in this case.

14       It is necessary to have the appropriate supervision

15  for Mr. Von Behren as he comes back into community.  We need to

16  look at the statutory reasons and 3583(d) talks about that

17  modification of supervised release and talks about looking at

18  the 3553(2) factors, including protecting the public, deterring

19  criminal conduct, and referring the defendant for treatment.  I

20  think that's what fits into this situation here.

21       The defendant, as he was transitioning out of the

22  Bureau of Prisons, as is typical of their program, puts them

23  into a halfway house to ease them back into community.  The

24  defendant failed.  To now say with that failure that when the

25  defendant returned to prison he should just walk out and be

1  back in community is in direct contradiction to what the Court

2  was trying to do with the conditions that were ordered for

3  supervised release.  It leaves the defendant in community

4  without the appropriate support he needs to be successful.

5  That is directly related to special condition No. 1 as it

6  stands that he participate in an approved program of sex

7  offender evaluation and treatment as directed by probation and

8  comply with the rules and restrictions specified by that

9  treatment agency.  It is all those things rolled together.

10      To get back to the purposes of the halfway house, I

11  would respectfully suggest that containment is not a greater

12  deprivation of liberty than reasonably necessary for those

13  provisions under 3553(2).  The second reason Mr. Vanni talked

14  about the need for the halfway house goes back to special

15  condition of No. 1, complying with the rules and conditions

16  specified by the treatment agency.

17      The treatment agency in this case is RSA.  Mr. Vanni

18  has talked about his analysis and his review of this case and

19  that that is the appropriate placement for Mr. Von Behren for

20  his needs so that he can successfully complete and stay in

21  community for that sex offender treatment program.

22      With RSA, they are requiring -- and whether it's their

23  reading of 5.213 or their interpretation or someone else's --

24  they are saying that is what they want.  They are calling it a

25  higher level of containment.  We can call it increased

1  behavioral consequence.  They are asking for increase in the

2  behavior side with the tracking services and appropriate

3  increased therapeutic services which they have in place, the

4  specific programs Mr. Vanni talked about.  The two really go

5  hand in glove.

6        I haven't heard that there's been any look into what

7  it is that Mr. Von Behren would be doing going into community.

8  I know back in chambers there has been reference he would go

9  into some temporary situation, perhaps in a hotel.  That raises

10  some red flags certainly for the government in terms of safety

11  to the community, and Mr. Vanni specifically talked in his

12  testimony about his ability to supervise somebody who is in

13  some sort of hotel setting as being inadequate.

14        We need to be careful we're throwing around the

15  different providers and treatment agencies and whether they're

16  able to take Mr. Von Behren or not.  We don't have an answer

17  for that right now.  What we have an answer for today is there

18  is bed space in Independence House and RSA is willing to do an

19  intake and take Mr. Von Behren back.  Those two fit hand in

20  glove.

21        We don't know how long it would take treatment

22  providers to do an intake.  It isn't up to the treatment

23  providers.  It isn't up to the defense.  It is up to the

24  probation officer ultimately to make that decision as ordered

25  by this Court as directed by the probation officer.  That's who

1   decides the approved program of sex offender evaluation.

2         So I feel like I'm talking a little bit in a circle,

3   but I really do think it is a completed circle.  That is why

4   Independence House is appropriate, not just for the sex

5   offender treatment but as the appropriate next step for Mr. Von

6   Behren being released from prison just this morning from FCI

7   Englewood to go back into community starting at the halfway

8   house for up to 180 days.

9         Hopefully, we'll be back in here in front of Your

10  Honor in terms of the additional special conditions and maybe

11  that's an appropriate time to review.  It gives the defendant a

12  chance to prove to all of us he's ready to go into community

13  with that next step out of the halfway house.

14        At this juncture, I think it is completely appropriate

15  to add that special condition on for the halfway house as

16  appropriately and reasonably requested by the probation officer

17  in this case.

18        Does the Court have any questions?

19        *THE COURT:*  Counsel, I do not.  Thank you.

20        *MS. SPENCER:*  Thank you.

21        *MR. VARHOLAK:*  Thank you, Your Honor.

22        *THE COURT:*  You're welcome.

23        *MR. VARHOLAK:*  Your Honor, we have an individual who

24  when he was first before Your Honor eight years ago, or

25  whatever it was now, nine years ago maybe, had no prior record.

1    His criminal history category was I, zero history points.  He

2    went into prison, did his time.  He voluntarily went into the

3    treatment program they have in the Bureau of Prisons.  It

4    wasn't a requirement.  As far as I know, he didn't get time off

5    of it beyond the good time he could receive anyways.  Yet, he

6    went in.

7           So the idea he was just absolutely resistant to

8    treatment I think is belied by that very fact that he went to

9    it when he didn't have to.

10          He goes in.  What do he know about the BOP treatment?

11   He wasn't perfect.  I'm not standing before the Court saying

12   that this BOP report was a glowing success of the best person

13   to ever go through BOP treatment.  He questioned some things.

14   I don't know that's wrong, but he questioned some of the

15   things.

16          But he completed it and did participate in the

17   treatment and did the treatment, and all of the violations that

18   were talked about, the most disturbing one I think, given his

19   conviction, is this book that was referred to were all before

20   he began treatment.

21          So he goes in and he does that treatment.  He gets out

22   and he goes to RSA.  That doesn't go very well.

23          Now, we can debate the seriousness or not seriousness

24   of the violations.  Again, there may be one more out there

25   that -- I think what happened from glancing briefly at

1    Ms. Spencer's document is there might have been two reports,

2    one dated January 28 and one dated February 5.  I have the

3    February 5 one which may have one thing different.

4            In any event, I went through what the various

5    violations are.  You can debate how serious they are.  It's not

6    him going out and harming kids or touching kids or anything

7    like that.  One was a Christmas card from his sister and

8    keeping it.  But he gets regressed.  They say, You didn't do

9    well enough, and send him back.

10           Well, if he completed -- successfully completed one

11   program, we know he can do it.  The other one he didn't do well

12   in.  It doesn't seem to make a great deal of sense to have him

13   go back to the same exact one.

14           There are other programs out there that will take him.

15   If after evaluation they say, hey, he has to be in a halfway

16   house, then I'm in a different position and different argument

17   because then no place will take him unless he's in a halfway

18   house and the Court has ordered the sex offender treatment.  We

19   don't know that because his packet hasn't been given to

20   anybody.  I didn't have it.  I got these documents today, as

21   the Court knows.  I didn't have these.  I didn't even know they

22   existed until today.

23           But there's nothing else that really indicates that

24   this person needs to go to a halfway house other than RSA is

25   requiring it.

 1          Now, I agree with Ms. Spencer.  Maybe they're reading
 2   this differently than SOMB or maybe this is what -- how they
 3   read it.  I don't think it's actually required under SOMB.  I
 4   think the people we've spoken, to including the person on the
 5   board, says it's not.  I take Mr. Vanni for his word that RSA
 6   says they won't take him back without it.

 7          Well, there are other treatment providers out there
 8   who can treat Mr. Von Behren, and the only reason that was
 9   really articulated beyond Mr. Vanni's gut instinct as to what
10   is best for him as to why this halfway house is needed is it's
11   what RSA requires.  I submit that reason in and of itself is
12   not sufficient to justify the much more restrictive conditions
13   that the halfway house brings.

14          So I ask the Court to not impose it and order the
15   probation office to look into other treatment providers that
16   may not require it.  If we can't find one, again, maybe I'm in
17   a different position at that point.  Thank you.

18          *THE COURT:*  Counsel, thank you.

19          Because I contemplate and anticipate additional
20   pleadings and hearings, before I enter findings of fact,
21   conclusions of law, and orders, Mr. Varholak, it is my
22   understanding that the defendant intends, as soon as
23   practicable, to file his own motion to modify conditions of
24   supervised release.  Does that continue to be his position?

25          *MR. VARHOLAK:*  I don't know whether I'd call it a

1   modification of supervised release or objection to certain

2   conditions imposed by RSA.  Yes, I do intend to file that.

3           I want to make clear for the record I don't want

4   Mr. Von Behren to not sign -- whatever agency he has to go to

5   to not sign it because he'll be in violation and we'll be back

6   on a violation instead of modification.

7           I just want to make sure in signing that agreement to

8   not be in violation we're not somehow waiving our objections to

9   the issue.

10          THE COURT:  You are not given the unique procedural

11  posture of these proceedings.

12          MR. VARHOLAK:  Thank you.  I'm on vacation next week.

13  I appreciate the Court moving this hearing today so I wasn't

14  coming back from Washington, D.C.  If I could maybe have, I

15  don't know, three to four weeks to file my additional

16  objection -- or whatever it's called.

17          THE COURT:  By April 11.

18          MR. VARHOLAK:  That will work.  Yes, thank you.

19          THE COURT:  Very well.

20          What would be a reasonable time thereafter,

21  Ms. Spencer, for the Government and, Mr. Vanni, for the

22  probation department, to file responses?  And you two may

23  confer.  We'll be at ease as you do.

24          MS. SPENCER:  Thank you.

25          (Pause in proceedings.)

1    *THE COURT:*  Ms. Spencer.

2         *MS. SPENCER:*  I don't have a short answer.  I have a

3    partial short answer.  I'm asking for two weeks.  The rest of

4    that answer is Mr. Vanni is concerned if your ruling today is

5    to let Mr. Von Behren back into community, then he wants things

6    more speeded up and a shorter time frame to get things back in

7    front of Your Honor.

8         *THE COURT:*  Let's see how things sort out.

9         *MS. SPENCER:*  We're asking for two weeks.

10        *THE COURT:*  I presume no objection by the defense.

11        *MR. VARHOLAK:*  No.

12        *THE COURT:*  That would make the Government and

13   probation responses due April 18 this year.

14        *MS. SPENCER:*  That only gives us one week.

15        *THE COURT:*  Excuse me.  How about the 25th, April

16   25th?

17        *MS. SPENCER:*  Thank you.

18        *THE COURT:*  And for hearing issues raised by and

19   inherent related to the papers, let me offer Tuesday, May 13,

20   at 10:00 a.m.

21        *MS. SPENCER:*  The Government can accept that.

22        *THE COURT:*  Mr. Varholak.

23        *MR. VARHOLAK:*  That's fine.

24        *THE COURT:*  Mr. Vanni.

25        *MR. VANNI:*  That's fine, Your Honor.

1        *THE COURT:*  Thank you.

2        (Pause in proceedings.)

3        *THE COURT:*  Before the Court is the petition of the

4   probation department, document 54, which seeks modification of

5   extant conditions of supervised release, including the

6   explicit, or special, condition made the focus of our hearing

7   today; that is, that Mr. Von Behren effective immediately

8   reside in a residential reentry center; to wit, Independence

9   House, for a term of up to 180 days.

10        The defendant objects.  The Court has afforded Mr. Von

11   Behren the rights and process due him in these circumstances,

12   including, but not limited to, the conduct of an evidentiary

13   hearing during which the Court received evidence and argument.

14        Having judicially noticed all relevant adjudicative

15   facts in the file and record of this action, having considered

16   carefully the petition, document 54, and the defendant's

17   concomitant motion, 58, and having considered the evidence

18   adduced during the hearing, together with all reasons stated,

19   arguments advanced, and authorities cited by the parties, I

20   enter the following findings of fact, conclusions of law, and

21   orders, commencing, of course, with my findings and

22   conclusions.

23        On March 31, 2005, this Court sentenced Mr. Von Behren

24   to the Bureau of Prisons for a term of 121 months on his

25   conviction for the crime charged in Count 2 of the operative

1    indictment, the crime of the receipt and distribution of child

2    pornography committed between August 31 through December 11,

3    2003.

4         The term of imprisonment was to be followed by an

5    additional term of supervised release of three years subject to

6    certain mandatory, standard, and explicit, or special,

7    conditions, including the two which appear as paragraphs 1 and

8    2 on page 1 of the petition, most prominent of which was that

9    Mr. Von Behren undergo a sex offender evaluation and,

10   thereafter, receive any treatment, therapy, counseling,

11   testing, or education required in these circumstances.

12        Mr. Von Behren this morning completed his term of

13   imprisonment and was released from the custody of the Bureau of

14   Prisons; thus, by definition, his term of supervised release

15   commences effective forthwith.

16        At issue is modification, not revocation.  At issue is

17   imposition of an additional special condition focusing on

18   temporary residence in Independence House.  However, also

19   related is the sex offender treatment now available or which

20   may be available to Mr. Von Behren in futuro.

21        The Court has jurisdiction to proceed here by

22   modification.  My jurisdiction arises under the familiar, at

23   least to counsel and the Court, 18 U.S.C. Section 3583(e)(2).

24   The petition and its concomitant request for modification, like

25   all of its ilk, implicates 18 U.S.C. Section 3583, including

1  subsection (e)(2), and Federal Rules of Criminal Procedure

2  32.1, including subdivision (c).

3       As required by 18 U.S.C. Section 3583(e), I have

4  considered the factors enumerated in a portion of the more

5  familiar, I suspect, 18 U.S.C. Section 3553 at (a)(1),

6  (a)(2)(B) through (D), and (a)(4) through (6).

7       Based on this evidentiary record as supplemented by

8  relevant argument, I find and conclude that given the history

9  and characteristics of Mr. Von Behren in the context of the

10 nature and circumstances of the underlying offense, receipt and

11 distribution of child pornography, there is implicated a lack

12 of structure, supervision, and treatment, which considerations,

13 in turn, emphasize a need to deter Mr. Von Behren, to protect

14 the public from recidivism, and to provide Mr. Von Behren with

15 much needed treatment for his sake and that of the community.

16      Placement in Independence House, a residential reentry

17 center, or RRC, the proposed special condition, coupled with

18 sex offender treatment, an existing special condition, provides

19 structure, supervision, and treatment which are directly

20 relevant to deterrence, public protection, and treatment.

21      Thus, given the history and characteristics of Mr. Von

22 Behren and the concerns and needs which I just discussed which

23 are directly and reasonably related to the factors at Section

24 3553(a)(1) and 2(B) through (D), placement in an RRC in the

25 circumstances of Mr. Von Behren involves no greater deprivation

1    of liberty than is reasonably necessary for those foregoing

2    statutory considerations and needs and is consistent with all

3    pertinent policy statements issued by the Sentencing

4    Commission.

5    Contrastingly, release of Mr. Von Behren, for example,

6    to a hotel would not address adequately the need for structure

7    and supervision essential to deterrence, public protection, and

8    efficacious treatment.  Thus, on balance, I conclude that the

9    petition should be granted insofar as it requests modification

10   to impose an additional special condition for temporary

11   placement in an RRC.

12   Therefore, it is ordered as follows:

13   One.  That the defendant's motion to limit scope of

14   March 21 hearing, document 58, filed March 19, 2014, is

15   granted.

16   Two.  That the petition for modification of conditions

17   of supervised release, document 54, filed March 14, 2014, is

18   granted, in part, and deferred, in part.  A, that the petition

19   is granted insofar as it requests a modification of conditions

20   of supervised release to impose an additional explicit, or

21   special, condition that Mr. Von Behren be placed in an approved

22   RRC for up to 180 days; B, that the petition is deferred for

23   further hearing insofar as it requests a modification of

24   conditions of supervised release to impose an additional

25   explicit, or special, condition that Mr. Von Behren be subject

1 │ to the search condition which is requested as paragraph 3 to

2 │ the attachment to the petition.

3 │      Three.  That effective forthwith the extant conditions

4 │ of supervised release are modified to impose the following

5 │ additional explicit, special, condition.

6 │      That commencing immediately, Mr. Von Behren shall

7 │ reside in Independence House, an RRC, for up to 180 days.

8 │      Provided further, that Mr. Von Behren shall comply

9 │ with all rules, regulations, orders, directives, or contractual

10 │ provisions, if any, of the RRC.

11 │      And that Mr. Von Behren shall cooperate fully with his

12 │ probation officer to facilitate his immediate placement in

13 │ Independence House.

14 │      Four.  That all other extant mandatory, standard, and

15 │ explicit conditions of supervised release imposed at sentencing

16 │ remain in full force and effect.

17 │      Five.  That by April 11, 2014, the defendant may file

18 │ a motion regarding conditions of supervised release.

19 │      Six.  That by April 25, 2014, the Government and

20 │ probation department shall file responses to the defendant's

21 │ anticipated motion.

22 │      Seven.  That the Court shall hear that portion of the

23 │ petition to modify, document 54, that is deferred, and the

24 │ defendant's anticipated motion to modify on May 13, 2014,

25 │ commencing at 10:00 a.m. mountain daylight time, at which

1   Mr. Von Behren shall appear before the Court in this case

2   without further notice or order from the Court.

3          All done in open court effective forthwith.

4          Further business by the Government?

5          *MS. SPENCER:*  None.  Thank you, Your Honor.

6          *THE COURT:*  By the defense.

7          *MR. VARHOLAK:*  No, Your Honor.  Thank you.

8          *THE COURT:*  Very well.  Counsel, a pleasure as always.

9   Please close the record in this case.  The Court is in recess.

10         Madam Clerk, please declare the recess of the Court.

11         (Court stood in recess at 2:18.)

12                              **INDEX**

13  **Item**                                                    **Page**

14  WITNESSES

15     WALTER VANNI

16         Direct Examination By Ms. Spencer               5

17         Cross-Examination By Mr. Varholak              25

18         Redirect Examination By Ms. Spencer            58

19     SAM PEEBLES

20         Direct Examination By Mr. Varholak             63

21         Cross-Examination By Ms. Spencer               67

22         Redirect Examination By Mr. Varholak           69

23

24

25

1              * * * * *

2          **REPORTER'S CERTIFICATE**

3      I certify that the foregoing is a correct transcript from

4  the record of proceedings in the above-entitled matter.  Dated

5  at Denver, Colorado, this 5th day of March, 2015.

6

7                              *S/Tracy Weir*
                               Tracy Weir
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25