IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 04-CR-00341-REB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BRIAN VON BEHREN,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
(Emergency Hearing on Docket #86)

_____

      Proceedings before the HONORABLE ROBERT E. BLACKBURN,

Judge, United States District Court for the District of

Colorado, occurring at 10:35 a.m., on the 5th day of January,

2015, in Courtroom A1001, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Tracy Weir, 901 19th Street,
Room A258, Denver, Colorado, 80294, (303) 298-1207

**APPEARANCES**

VALERIA SPENCER, Assistant U.S. Attorney, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the plaintiff.

SCOTT VARHOLAK, Assistant Federal Public Defender , 633 17th Street, 10th Floor, Denver, Colorado, 80202, appearing for the defendant.

*   *   *   *   *

**PROCEEDINGS**

(In open court at 10:35.)

*THE COURT:*  Good morning, and thank you.  Please be seated.

This is case 04-cr-00341, again identified as United States of America versus Brian Von Behren, defendant.

The matter is before the Court for hearing and consideration of defendant's emergency motion for order that he not be required to submit to sexual history polygraph on January 12, 2015, document 86, filed on December 23, 2014, to which the Government responded in document 90 on December 31, 2014.

At this time, the Government appears by assistant United States attorney, Valeria Spencer.  Good morning.

*MS. SPENCER:*  Good morning, Your Honor.

*THE COURT:*  The defendant, Mr. Brian Von Behren, is present in person, together with his attorney, Scott Varholak.

1   Gentlemen, good morning.

2          *MR. VARHOLAK:*  Good morning, Your Honor.

3          *THE COURT:*  Walter Vanni, the probation officer, is

4   again present.  Good morning.

5          *MR. VANNI:*  Good morning.

6          *THE COURT:*  First, are there any preliminary matters

7   before we proceed to receive anticipated evidence in this case?

8   Mr. Varholak?

9          *MR. VARHOLAK:*  Yes, Your Honor.  I had, as the Court

10  knows, subpoenaed both the RSA representative and Mr. Jenks.

11  After reading the Government's response and e-mailing more with

12  Ms. Spencer and speaking with Mr. Jenks more, I don't think we

13  have a factual dispute as to how this takes place.  I've

14  released them from subpoena.  Mr. Jenks was supposed to be -- I

15  don't remember where.  He was flying out last night and

16  supposed to be out of down.

17          My investigator is here.  She was almost on all the

18  phone calls I had with everybody.  I don't think there is a

19  factual dispute.

20          To clarify my motion, after --I called up Mr. Jenks

21  again.  I think the big factual dispute was this catch-all

22  question.

23          *THE COURT:*  Right.  Question No. 5.

24          *MR. VARHOLAK:*  Question No. 5.  I asked Mr. Jenks

25  about that because when I first had spoken with him, he said it

1   was a mandatory question that he asked and had to be answered.

2          When I spoke to him again, he said, Well, that is a

3   question I ask.  It is a calibration question.  I'm not

4   interested in the response as far as are they committing

5   criminal acts, but I use it somehow to calibrate the polygraph.

6          He said, I could substitute, instead of that question,

7   three other questions which he explained to me, one of which

8   was, Have you lied to somebody close to you, which, obviously,

9   wouldn't be criminal in nature.  There were two others.  In

10  speaking with him, I felt comfortable with Mr. Von Behren

11  answering that wouldn't be inculpatory.

12         There's that clarification.  The second clarification

13  I submitted with the Government's stipulation, the Exhibit 1,

14  which is the sexual history.

15         *THE COURT:*  You said Exhibit 1.

16         *MR. VARHOLAK:*  Exhibit A.  I'm sorry.  The sexual

17  history disclosure packet.  Essentially what Mr. Jenks

18  explained was, what he does in addition to the four specific

19  questions that we all agree he asks, he has, in this first

20  session the Government has talked about, this sit-down before

21  the polygraph, he has the person go through this sexual history

22  questionnaire and answer it, and then what happens is -- at

23  that point Mr. Von Behren could walk out, meet with me after

24  that.  Then he goes through and asks follow-up questions based

25  upon the answers to this sexual history disclosure.

1          I don't know if I specifically asked this question,

2    but I accept the Government's representation that the follow-up

3    questions are going to, essentially, be the answer -- the

4    questions that are outlined in this sexual history disclosure.

5          For example, the one section E here, to pull one off.

6          THE COURT:  Just a moment.

7          MR. VARHOLAK:  Certainly, Your Honor.  This is page 8.

8          THE COURT:  All right.  Indulge me momentarily.  Thank

9    you.  I'm there.

10         MR. VARHOLAK:  So what he would say is he'd have the

11   person answer this person, sexual contact with anyone four

12   years or more younger than you.  There's a whole series of nine

13   questions.  He would follow up and go through those nine

14   questions.  Those would be the follow-up questions that go with

15   it.  It's the same if you go through each of these.  It's the

16   same thing with that.

17         And then in speaking to him, I understand better what

18   I was referring to as the maintenance questions, I think is

19   what I put there.  That is a separate polygraph examination.  I

20   accept the Government's representation that that area of

21   questioning is not what will happen on January 12th.

22   That's a different polygraph.

23         So I think everybody's on the same page as to how this

24   takes place now, which is he comes in, Mr. Von Behren comes in,

25   he sits down with Mr. Jenks.  Ideally he would have already

1   filled out the sexual history disclosure form, sits down with

2   him, and then Mr. Jenks goes over this with him prepolygraph.

3   Mr. Von Behren can come out and talk to me.  Then they go

4   through the questioning on these.  Again, I think the questions

5   are going to primarily be the follow-ups listed in this.

6        So with that clarification; again, if I'm misstating

7   something, I'm sure Ms. Spencer will jump in.  That's how I

8   understand the whole process to work now, which is slightly

9   different than what I outlined.  Now with further clarification

10  from Mr. Jenks, I think -- I don't think there are any factual

11  disputes remaining.  I think we're down to, essentially, a

12  legal argument.

13       The one last point.  I had mentioned what Mr. Jenks

14  told me, which was, if he refuses one question, that's okay.

15  If he refuses multiple, it's not.  The Government has

16  explained, and I accept this, as it's not the assertion of the

17  Fifth.  There's nothing to test on.  If he's asserting the

18  Fifth Amendment, it's somewhat pointless, this whole polygraph,

19  other than it cost Mr. Von Behren $250.  He will be released

20  from RSA.  I accept it's not because he's saying, I'm taking

21  the Fifth Amendment, but because they claim they're required to

22  do this by SOMB standards, and if he asserts the Fifth, he's

23  not answering.

24       With that clarification, I don't think we have factual

25  disputes.  I think it is a legal dispute.  Thank you.

1          *THE COURT:*  I'm treating this as a preliminary matter,

2     important and relevant as it is.  Response by the Government

3     now to this putative preliminary information.

4          *MS. SPENCER:*  Yes.  Thank you, Your Honor.

5          Mr. Varholak asked me if I would stipulate to the

6     admissibility of the SOMB sexual history disclosure packet

7     marked as Exhibit A.  I stipulate that can come in.

8          *THE COURT:*  Let me do this.  I apologize for

9     interrupting.  What has been presented and marked as Exhibit A

10    for identification, the SOMB, sexual history disclosure packet,

11    is now admitted for the limited and specific purpose of this

12    hearing.

13          You may proceed.

14          *MS. SPENCER:*  Thank you, Your Honor.  What I was going

15    to do is I recollect we've seen this before.  I can't remember

16    if it was admitted at a previous hearing.  I know it was used

17    perhaps during testimony.  It may already be part of the

18    Court's record.  It doesn't hurt to have it twice.

19          That being said, Your Honor, I am concerned with

20    representations that were made today about what Mr. Jenks told

21    Mr. Varholak because that is not the same as what he told me

22    factually.

23          What he told me factually is he asks the four

24    questions, not the five.  He asks the four.  If there is an

25    answer of yes; for instance, Have you had sexual contact with

1    someone under the age of 15 when you were over the age of 18,

2    and the answer is yes, then the follow-up is limited to age of

3    the person, whether they're male or female, how many times, and

4    whether they're family or not family.

5          It is not, as was given in example of page 8 of

6    Exhibit A, the person's name, their relationship, the type of

7    sexual contact, et cetera, et cetera.

8          So I'm concerned because my response was based on what

9    Mr. Jenks had indicated to me the polygraph was, where he said

10   if the client asserts the Fifth Amendment on those specific

11   follow-up questions, except for the number of victims, he can

12   continue with the polygraph.  His point to me was, I don't get

13   into specifics.  I'm not law enforcement.  This is not a law

14   enforcement polygraph.  It is not used for investigator

15   purposes.  It is used for treatment only.

16         For Mr. Jenks, it is immaterial what the name of the

17   victim is.  Although it's helpful for treatment, as I pointed

18   out, the age and gender, he does not need those things to

19   continue on.

20         I'm concerned that our factual representation may not

21   be adequate for purposes of this hearing today.  We're hearing

22   some different things from the same witness.

23         *MR. VARHOLAK:*  I agree he can assert his Fifth

24   Amendment to those questions.  I don't dispute that aspect of

25   it.  Because it was in the Government's response, I want to

1   clarify things that were inconsistent between the two.  I don't

2   dispute what the Government says, that he can assert his Fifth

3   to the follow-up questions in the packet.

4        *MS. SPENCER:*  I'm glad to hear that.  I'm concerned

5   that Mr. Jenks is acting as though he's an investigator and

6   asking the questions on the sex offender disclosure packet.

7   The way the sexual offender disclosure packet is described to

8   me is the polygrapher doesn't even have to use it.  It is

9   filled out in advance and for purposes for the treatment

10  provider more than it is for the polygrapher.  I don't know if

11  that will make a difference for Your Honor in terms of ruling,

12  and we are on a short clock because this polygraph needs to be

13  taken next Monday.

14        That's a concern I have.  I didn't realize, when

15  Mr. Varholak asked if I would stipulate to the admissibility,

16  that that might and could mean agreeing to some facts that go

17  along with it to which I do not agree.

18        *THE COURT:*  Well, what's the answer?  What's the

19  proposal?  A couple of options is the Court receives your

20  factual assertions as they are and reacts legally to them based

21  on your concomitant argument, the Court continues this hearing

22  to a time when we can receive evidence from the polygrapher,

23  perhaps involving a concomitant stay of the polygraph pending

24  the admission or receipt of that evidence, or we do what we can

25  today and attempt to receive the affidavit of the polygrapher

1  between now and the 12th. Those are some of options that

2  present themselves.

3      I'd be interested in your recommendations in

4  circumstances in which you believe that there remain material

5  issues of fact to be determined by the Court.

6      MR. VARHOLAK: Your Honor, I'm fine with any. I don't

7  think we're off factually. I'm not saying he's acting as an

8  investigator or anything other than the follow-up questions --

9  I can read the exact e-mail I sent to Ms. Spencer. This is all

10 I'm asking stipulation to.

11      What I said is, "I'm trying to find a way to call off

12 Jenks. I don't think we have any remaining factual disputes.

13 Jenks told me -- and I think it is referenced in your brief --

14 that he has each individual go through the Colorado SOMB sexual

15 history disclosure packet which is available online. Then he

16 will ask follow-up questions based upon the answers in that

17 packet. Would you be willing to stipulate to the facts and the

18 admission disclosure packet itself? Thanks." Ms. Spencer

19 answered yes.

20      I really don't think we have a factual dispute. I

21 don't think it matters if Jenks is doing this for an

22 investigatory purpose with his idea to turn it over or whether

23 he's doing it -- I'll stipulate he's doing it for the purpose

24 of testing on these questions. I don't think that matters one

25 way or another.

1          I could also -- if it will help, I could get an

2    affidavit from Mr. Jenks.  He's out of town today.  I could try

3    to get one by Wednesday of this week.  I don't think we have a

4    factual dispute.  I'm not claiming that he's an investigator or

5    that he's working for the police.  Nonetheless, the answers to

6    each of these questions are incriminatory.  That's the issue.

7          *THE COURT:*  Well, not to put too fine a point on it,

8    but as I understand your position, it's his failure to answer

9    questions to which he is unable, essentially, to assert his

10   Fifth Amendment privilege.  That's the problem.

11         *MR. VARHOLAK:*  It is in this sense.  If he fails to

12   answer the four key questions and he asserts his Fifth on every

13   single one of those questions, then -- or any one, as the

14   Government says -- then the polygraph essentially can't

15   continue because there's no purpose to it.

16         I think the Government agrees with that.  The

17   follow-up questions, besides the number of victims, the

18   remainder, person's name, relationship to you, et cetera, I

19   agree he can assert the Fifth to that and go through the rest

20   of the polygraph.

21         I think by answering that first question, the one

22   everybody agrees he has to answer, the first four questions, by

23   answering any of those questions with anything other than an

24   assertion of his Fifth Amendment rights, he's incriminating

25   himself.  I don't think it matters -- and I don't think we

1   disagree factually.  We disagree legally.  I don't think it

2   matters whether or not he then says, you know, just to take, I

3   guess, the first -- the first one, the paper that's open here,

4   having had forced violent sexual contact.  The first question

5   on here, the four we agreed on.  After the age of 18, did you

6   engage in sexual activity with anyone under the age of 15.

7   Everybody has agreed he has to answer that question.

8           My point is, once he answers that and says yes, then

9   they answer follow-up questions, the first they say he has to

10  answer.  The number of victims.  22.  Whatever the number is.

11  They say they have to answer that.  I agree after that he can

12  assert his Fifth Amendment right to the remainder.  It is too

13  late by that point.  He's already incriminated himself.  I

14  don't think we have a factual dispute on anything else.  I

15  agree he can assert his Fifth on all the rest of the follow-up

16  questions on the sexual history disclosure packet, but he's

17  already incriminated himself by answering the question.

18          *THE COURT:*  Ms. Spencer, back to you.

19          *MS. SPENCER:*  With that being said, I'm satisfied we

20  can proceed to argument and finish this hearing out.

21          *THE COURT:*  All right.

22          *MS. SPENCER:*  I'll turn it over.

23          *THE COURT:*  Thank you.

24          Mr. Varholak, argument on behalf of Mr. Von Behren.

25          *MS. SPENCER:*  Thank you, Your Honor.

1    *THE COURT:*  You're welcome.

2    *MS. SPENCER:*  There's essentially two levels of

3  incrimination here at each stage of the process.  The first

4  stage, simply going through the sexual history disclosure

5  packet.  If the Court looks at it, every single question on

6  here, at least every main category -- there's a -- page 27 has

7  a sexual contact form that has some types of sexual contact

8  that wouldn't necessarily be criminal, such as -- just looking

9  quickly here, No. 5, rubbed penis/vagina against person's

10  clothing, vagina/penis/breasts/buttocks.  That question could

11  probably be answered without incriminating yourself because you

12  can have consensual sexual contact with someone.

13    Skipping that page 27 for a moment, every other

14  question, every other section of this sexual history disclosure

15  packet -- I guess 26, too, potentially, maybe, but everything

16  else on here is criminal.  If he admits to anything on any of

17  the rest of these questions, he's admitting to a criminal act.

18    So any attorney worth his salt is going to tell

19  Mr. Von Behren, when they ask you to fill this form out in that

20  initial prepolygraph section, you write to every single

21  question, "Based on the advice of counsel, I am asserting my

22  Fifth Amendment right to not answer this question" because

23  every one is criminal.

24    Then he takes a break, comes and talks to me, and he's

25  done, hopefully, what I've told him to do.  He goes back in.

1  The first four questions, again, I'm going to instruct him to

2  assert the Fifth Amendment to each of those because it's

3  admitting to criminal conduct.

4         Any answer that he gives in there is potentially

5  incriminating.  If he says, yes, I did that, obviously that's

6  incriminating.  I'll turn in a moment to Mr. Jenks and the

7  Government's response about the level of detail.

8         Certainly, saying to any of the four questions that

9  he's required to answer, certainly saying, yes, I did that, is

10  admitting to criminal conduct.

11        Let's say he says, no, I didn't do that and, as was

12  briefed in the initials of this, the polygraph is far from the

13  most reliable tester of truth or falsity.  In fact, I just saw

14  an article this morning on NPR that the Government -- not this

15  U.S. attorney's office but a different U.S. attorney's

16  office -- has indicted an individual who was teaching people

17  how to beat a polygraph.  They did a sting operation.  This

18  person has been, I guess, on national television saying these

19  things are unreliable.  He's a former police officer.  The

20  Government sent in undercover agents who said, hey, we want to

21  beat a polygraph.  We're going to lie on this.  How do we do

22  this?  He instructed them how to do it, and now he's under

23  criminal indictment.

24        These things are not that reliable.  They're not.  Say

25  he answers no to question No. 1 and a polygraph examiner,

 1    because he's nervous or whatever, comes back and says, you're

 2    lying.  That's now an incriminating statement.  They're saying

 3    you lied.

 4          So any answer he gives is potentially incriminating,

 5    and the only safe thing he can do to every one of these

 6    questions is to assert the Fifth Amendment, and everybody

 7    agrees that's pointless because then they're not getting

 8    anything and he's not answering the four questions that need to

 9    be answered.

10          So then the Government's response to that is, well, we

11    won't go into enough detail that this will be incriminating.

12    So he's asked after the age of 18 have you had sexual contact

13    with anyone under the age of 15.  He says, whatever.  Again,

14    let's say he says yes to that question.  He then has to answer

15    how many times and he says, whatever.  22 was the number I

16    threw out last time.  And then they ask whatever other

17    questions they're going to ask and he asserts a Fifth Amendment

18    to the remainder of the questions.  On the sexual disclosure

19    history packet, he answers yes to this question, but then on

20    the details he writes in, "On the advice of counsel I'm

21    asserting my Fifth Amendment."

22          Well, that incriminates him, and it incriminates him

23    in the ways that I outlined in my brief, the examples that I

24    gave.

25          The first is one of the questions is family.  Let's

1  say he asserts his Fifth Amendment right to that question.

2  There is not a giant universe of people they have to interview.

3  If he said, yes, I had sexual intercourse with a family member

4  and they ask how many times and he answers that question and

5  then everything else he says no, all an investigator needs to

6  do is turn and question a limited universe of family members.

7       *THE COURT:*  May not he not refuse to answer the

8  question concerning whether the putative victim or victims is

9  or are family members?

10       *MR. VARHOLAK:*  No.  One of the four questions is, Have

11  you had sexual contact with a family member or relative.  He's

12  required to answer that question.

13       So any answer to that -- I don't know how many family

14  members he had -- but it won't be that many they need to ask

15  about.

16       Or let's say they don't.  Let's say -- there's no

17  privilege on any of this.  I think that's important to know.

18  Even if it's not Mr. Jenks' intent to go out to investigate,

19  there's no privilege on this.  Let's say a year down the road a

20  family member comes out and says, Mr. Von Behren molested me

21  when I was, whatever, 12, and he was 20.

22       Now an officer who knows that he's in sex offender

23  treatment goes and subpoenas -- I don't even know if they need

24  to subpoena it because he signed a waiver saying all this

25  information that RSA has is -- I'm turning over to you.  That

1  was in the previous evidentiary hearing.  I don't think they

2  need to subpoena it.  Let's say they do.  They subpoena it.

3  There's no privilege on any of this stuff.  That's been waived.

4  Now in a prosecution for him by somebody who has come forward

5  and said this happened, now this becomes a confession.  It

6  could be admitted into evidence.

7          THE COURT:  An answer to a polygraph examination

8  question is admissible in evidence?

9          MR. VARHOLAK:  I believe both the sexual history

10  disclosure packet he fills out where he answers yes and an

11  answer -- if he's asked by the polygraph examiner, Did you have

12  sex with a family member, and he answers yes, again, this isn't

13  the admissibility of the polygrapher liability.  So this isn't

14  him saying no and them saying, yes, you lied and now will a

15  court allow that into evidence --

16          THE COURT:  It's just a question.

17          MR. VARHOLAK:  It's just a question like a probation

18  officer asking, hey, what criminal activities have you ever

19  engaged in.  That question is admissible into evidence.  I've

20  had a client that I had to go down to Douglas County to testify

21  in a suppression hearing because the probation officer asked

22  them a question about sexual contact with a minor, and he

23  answered that question.  It led to an investigation.  He got

24  indicted down there, and we had a suppression hearing over

25  whether it was a voluntary statement or not.

1          The only reason that the voluntariness came into

2    question was because the probation officer told him, You have

3    to answer this question.  I became a witness because the

4    probation officer, after speaking to the client, called me and

5    said, Hey, I told him he has to answer this and this is what he

6    told me.  So I became a witness in that.

7          But it's absolutely admissible.  It's the answer to --

8    like I say, it is like talking to a probation officer or

9    anybody else.  We're not questioning the reliability of the

10   polygraph at that point.  It's his admission.

11         *THE COURT:*  Is it voluntary in a constitutional sense

12   where it is required and constrained as it is here?

13         *MR. VARHOLAK:*  I would argue, if I were the defense

14   attorney, no, but, boy --

15         *THE COURT:*  But with no guarantee --

16         *MR. VARHOLAK:*  With no guarantee a judge is going to

17   agree with that.  That's why we're litigating this today so

18   that we know the answer to all of that.

19         So I think that whether it's admissible or not, it is

20   certainly incriminating.  So that's the protection of the Fifth

21   Amendment.

22         What the Fifth Amendment said, what the Tenth Circuit

23   says about that -- I guess I didn't make a copy of it.  I can

24   give the Court my copy.  ***Griffin v. Strong***, 983 F.2d 1540.  It

25   is a Tenth Circuit case from 1993.

1          Just to quote it, it says, "It is well established

2    that the Fifth Amendment protects against the admission of

3    incriminating statements of all kinds whether considered to be

4    confessions or not.  No distinction can be drawn between

5    statements which are direct confessions and statements which

6    amount to admissions of part or all of the offense.  The

7    privilege against self-incrimination protects the individual

8    from being compelled to incriminate themself in any matter.  It

9    does not distinguish between degrees of incrimination.  The

10   privilege affords not only extends to answers that would in

11   themselves support a conviction, but likewise embraces those

12   which would furnish a link in the chain of evidence needed to

13   prosecute."

14          That's what those answers are, they're linked in a

15   chain.  Because of that, any attorney representing him will

16   tell him, Don't answer any of these questions.  They're all --

17   they're all potentially incriminating against you.  As the

18   Government notes in its response, that result, he won't be able

19   to complete the polygraph.

20          So what the cases the Court has previously found said

21   there's two exceptions.  The first is he gets to assert his

22   Fifth Amendment.  In reality, he doesn't.  He can assert it,

23   but if he does on every single question, it's a pointless

24   polygraph and going to lead to his termination from RSA because

25   they can't complete the sexual history disclosure of the

 1  polygraph.

 2         The second is *Kastigar* immunity.  Nobody has offered

 3  that in this case nor do I think it is practicable anybody

 4  could offer it.  What the Government is saying is we can't give

 5  *Kastigar* immunity so we'll give, for lack of a better word,

 6  almost incompetent immunity that we hope nobody can put the

 7  pieces together to lead to a prosecution.  Well, that's not

 8  good enough.

 9         *THE COURT:*  Could this Court or any Court enter a

10  lawful order prohibiting, enjoining, the disclosure of the

11  information obtained during the polygraph other than for

12  purposes of treatment?

13         *MR. VARHOLAK:*  I don't know the answer to that.

14         *THE COURT:*  Ethically, why would a Court do that?

15         *MR. VARHOLAK:*  Well, that's a different issue.  I

16  don't know the answer to that.  I don't know.  If the Court

17  were to do that, we would be relying on some other judge down

18  the road in potentially some other jurisdiction, whether that

19  judge would agree that this is properly enjoined.  I honestly

20  don't know the answer to that is the fair response.  Thank you.

21         *THE COURT:*  Now, I may have interrupted your argument.

22  Did I?

23         *MR. VARHOLAK:*  I don't think so.  I think that was

24  everything.  If I could actually look at my notes a moment to

25  make sure.

1      *THE COURT:*  Sure.

2         (Pause in proceedings.)

3         *MR. VARHOLAK:*  I guess the last point I make is in the

4   Government's response, they say, well, it's not entirely clear

5   that him asserting his Fifth to these questions, not being able

6   to complete the polygraph, getting booted out of RSA would lead

7   to revocation proceedings because, ultimately, it would be

8   brought to the Court's attention and the Court would decide

9   whether or not to issue a petition or not.

10        I guess that's true.  That's why we need the answer

11  beforehand.  If the Court's answer is, he can't be violated for

12  asserting his Fifth even if he gets booted out of RSA, that's

13  one thing, and we know that going in.  If we didn't have this

14  hearing, we don't know what the response is.  He's subjecting

15  himself to possible violation and jail time when we don't know

16  what the answer is.  That's why I filed the motion.  That's why

17  we're here before you.

18        *THE COURT:*  As I view it, essentially, this is in the

19  nature of declaratory relief.

20        *MR. VARHOLAK:*  Correct.

21        *THE COURT:*  It's nuanced beyond that because the

22  Government proposes a modest modification of the Court's extant

23  order on this precise topic.  So we have that unusual hybrid

24  blend of proceedings here.

25        *MR. VARHOLAK:*  Correct.  I think it is in part because

 1   when we initially litigated that, I know I didn't fully

 2   understand how the polygraph process works.  My understanding

 3   is the Court didn't fully know and the Government may not have.

 4        Now that we all have an idea how this works, I think

 5   we can see it in the specific light instead of the abstract.

 6        *THE COURT:*  I know I contemplated, and I presume

 7   counsel contemplated, additional litigation as the evidentiary

 8   landscape became clearer as it now is.

 9        *MR. VARHOLAK:*  Correct.  Thank you.

10        *THE COURT:*  Ms. Spencer for the Government.

11        *MS. SPENCER:*  Thank you, Your Honor.

12        *THE COURT:*  You're welcome.

13        *MS. SPENCER:*  Mr. Varholak began his argument talking

14   about the sexual history disclosure packet and talking about

15   how incriminating that was.

16        Be that as it may, that has nothing to do with the

17   hearing in front of Your Honor.  When we look at page 1 of that

18   disclosure packet at No. 9, it instructs --

19        *THE COURT:*  Indulge me, please.

20        *MS. SPENCER:*  Yes.  Page 2.

21        *THE COURT:*  I'm with you.

22        *MS. SPENCER:*  Number 9.

23        *THE COURT:*  I'm there.  Thank you.

24        *MS. SPENCER:*  It instructs the client, "Bring a copy

25   of your sexual history disclosure packet to the polygraph

1 || examination.  Your examiner may not want to read it but may

2 || want to refer to it.  It's better to have it and not need it

3 || than to need it and not have it."

4 || That tells me, in my understanding in speaking with

5 || Amich and Jenks, the polygrapher who Mr. Von Behren has chosen,

6 || they don't use the sexual history disclosure packet in going

7 || through the polygraph.  We can put that to the side.  Whether

8 || it's incriminating or not is not the issue here.  The issue is

9 || the Court's order about the polygraph requirement and how to

10 || carefully craft something so the defendant can still have his

11 || constitutional rights in place and still undergo sex offender

12 || treatment.

13 || *THE COURT:*  Could and should this Court enter a lawful

14 || order enjoining the polygrapher from reading, reviewing, or

15 || using in any way this packet of material, Exhibit A, for

16 || purposes of the polygraph, pretest or otherwise?  Is that

17 || something I could do, should do?

18 || *MS. SPENCER:*  I'm not sure of could.  I would be

19 || hesitant to say you should.  To tie the polygrapher's hands

20 || behind his back if this is something needed, I think is

21 || inappropriate to do.  This is my concern about the factual

22 || landscape and how much it would actually be used in this

23 || specific instance.

24 || My understanding from Mr. Jenks is the polygraph is

25 || done in a more generalized way.  The reason I kept insisting

1    he's not an investigator is because he's not asking for the

2    names of the people and where did this happen and that sort of

3    thing as an investigative polygrapher would be more tied to.

4         I think the polygraph can go forward in this case with

5    the defendant asserting his Fifth Amendment right in ways I

6    will describe and I hope I did in some articulate fashion in my

7    response and still satisfy the SOMB requirement.

8         We do need to be careful to realize the polygraph is a

9    requirement.  There really is no leeway there.  Not just for

10   RSA who is the sex treatment provider in this case, but for any

11   state certified treatment provider there, all under the SOMB

12   requirements promulgated in 1992 and have been updated as the

13   field has become more specific and more definite in what the

14   best treatment options are.

15        One of the things Mr. Varholak started off talking

16   about is the lack of reliability for a polygraph.  That's not

17   germane to the issue.  The polygrapher has to be administered.

18   Whether we like it, that's the way it is.  We know the

19   landscape for the state of the law for admission of polygraphs

20   in court.  That's not the issue either.  That's how SOMB has

21   determined to best verify the information that a client is

22   giving them about their sex offender past, is with the use of a

23   polygraph.  Say what you will about whether you like it or not;

24   it is required.

25        *THE COURT:*  Underlying all that, though, Ms. Spencer,

1   is it not -- well, is the assumption that somehow this federal

2   court is bound by these state requirements because of a unique

3   relationship between the federal probation department and sex

4   offender treatment in the State of Colorado with its

5   concomitant rules and regulations?

6        *MS. SPENCER:*  I think that's exactly right.  So the

7   answer is yes.

8        One of the hypotheticals Mr. Varholak gave was in the

9   polygraph that any question of the first four questions that

10  would be asked would incriminate.  Even if the answer was no.

11  Have you had physical sexual contact with anyone under the age

12  of 15 since you've been over 18, and the individual says no,

13  they are polygraphed on that question and come back either

14  deceptive or inconclusive.

15       Mr. Varholak's hypothetical then engaged a polygrapher

16  telling the client, you lied.  That never occurs.  There's

17  never an accusation.  The polygraph test is done, and then it

18  moves on.  A report is put together and sent to the treatment

19  provider that there may be some deceptive results that came

20  back on the polygrapher's testing.

21       *THE COURT:*  And the ultimate characterization of

22  deceptive is in the eye of the polygrapher.

23       *MS. SPENCER:*  Yes.  That is correct.  So what happened

24  when there is a deceptive polygraph, that goes back to, in our

25  case, to RSA.  They meet with their client and say, you had a

1   deceptive polygraph, be it maintenance, sexual history,

2   whatever.  They have 90 days to retake and overcome those areas

3   of deception and have a clean polygraph, if you will.

4          So the fact a polygraph may come back as deceptive is

5   not going to lead to someone being terminated from sex offender

6   treatment.  It is going to be used as part of the whole

7   treatment milieu.  We need to address this.  You had deceptive

8   results here, and we need to work on that through treatment, do

9   whatever we need to do, and you'll be retaking the polygraph

10  exam.

11          *THE COURT:*  Does the defendant in those precise

12  factual circumstances have the ability to surmount the

13  conclusion of deceptiveness by means other than the next

14  polygraph?

15          *MS. SPENCER:*  Yes.  He can certainly explain why he

16  felt it came across deceptive.  I was exceptionally nervous.  I

17  didn't understand the question.  I think there is a back and

18  forth there.  It is not just, that's it, and you're done for.

19  There is a discussion about that.  I do know the polygrapher

20  can have a discussion with a client as well.

21          *THE COURT:*  I presume a subsequent, a second polygraph

22  could be conducted by a different examiner, a different

23  polygrapher?

24          *MS. SPENCER:*  Yes.  There is a slate of polygraphers

25  the sex offender treatment provider has and, in this case,

 1   Mr. Von Behren chose which one he's using, Amich and Jenks.

 2   You can use someone else.

 3        We have instances for sex offenders who struggle for

 4   years in passing a polygraph and are still within sex offender

 5   treatment.  So this idea that answering no could somehow be

 6   incriminating, I think it is novel than the Fifth Amendment

 7   stretches to absolutely no bounds whatsoever.

 8        THE COURT:  Your argument is, quintessentially, it

 9   further begins a conversation.

10        MS. SPENCER:  Yes.

11        Further, Your Honor --

12        THE COURT:  But at the same time you are not

13   implicitly suggesting that Mr. Von Behren should lie during the

14   course of a polygraph in lieu of asserting his Fifth Amendment

15   rights so that he could claim he underwent the required

16   polygraph that would continue him in sex offender treatment?

17        MS. SPENCER:  Oh, my gosh, no.  I hope I'm not being

18   heard to suggest that as an alternative to the mess we're in.

19        THE COURT:  You're not.

20        MS. SPENCER:  To go on further in my argument,

21   Mr. Varholak insists that all four questions fail.  The

22   assertion of the Fifth Amendment must be provided for all of

23   those, and I'm assuming a yes answer on all of those; that he

24   cannot answer any of those.

25        The question really is a narrower focus as to what is

1    incriminating.  Can you answer yes to one of those four

2    questions and not have to assert your Fifth Amendment right to

3    protect your right against self-incrimination?  The way I argue

4    it is, yes, you can do that without getting into that morass;

5    that it is the follow-up questions which really provides the

6    meat around the bone that would make it incriminating.

7            I was thinking of various hypotheticals outside of

8    this context.  My hypothetical being, I say to someone, I

9    killed a man.  They're a mandatory reporter.  They called the

10   police and say, Valeria Spencer confessed to killing a man.

11   They say, Who did she kill?  The answer is, Well, she didn't

12   say.  When did she commit the murder?  Well, she didn't say.

13   Where did she commit the murder?  Well, she didn't say.  The

14   police would likely say, Well, thank you very much, and hang

15   up.  They have no idea what the jurisdiction is.  They have no

16   idea what the time frame is, and even if there is a murder

17   where there is no statute of limitations, they have absolutely

18   nothing to go with.

19           That's an example of turning on its head the

20   hypotheticals Mr. Varholak used, saying as soon as he admits

21   having physical sexual contact, let me be clear in my language,

22   with somebody under the age of 15, that's suddenly going to put

23   into play this stream of motion that someone is going to report

24   that.  To whom are they going to report when they have nothing

25   specific?

1          *THE COURT:*  Well, as a constitutional matter, though,

2     if the Court could conclude that this could lead to a

3     prosecution, isn't that sufficient for purposes of the Fifth

4     Amendment?

5          *MS. SPENCER:*  I think that it's a little bit more than

6     that.  In looking at the ***Griffin*** case cited by Mr. Varholak,

7     we're talking about a link in the chain of evidence.  It can't

8     be so imaginatory -- is that a word? -- it can't be so

9     imaginative and speculative that it doesn't have any basis that

10    it can be used in any way.

11         *THE COURT:*  Well, the admission to a commission of a

12    homicide is not inherently suspicious.  There is nothing

13    nebulous about that.  It is a question of who got killed by

14    what means and when.  What Mr. Varholak is going to say is

15    he'll take your hypothetical and go, okay.  That admission

16    becomes important because I'm going to make up some further

17    facts in my hypothetical here because Mr. Von Behren was a

18    suspect at one point but the evidence simply was not sufficient

19    for us to go forward, even though we thought we had probable

20    cause to indict or inform.  Now with his admission, we are

21    there.

22         So he's going to tell you that now becomes a relevant

23    link in a chain, be it long or short, that results in a

24    criminal prosecution against our hypothetical -- well, against

25    you.

1      *MS. SPENCER:*  There is one complete failure in that

2   link, and that is my admission has gone anywhere.  I have now

3   admitted to the polygrapher, to extend your hypothetical, that

4   I have killed someone.  He's not a mandatory reporter.  He's

5   not turning it over to anyone.  He's using it for treatment

6   purposes only.  Perhaps in the release it gets to the treatment

7   provider.  I use Mr. Vanni as my expert in asking, when would

8   you have to turn it over, and he says, when we have a name and

9   jurisdiction.  Otherwise, it is not turned over.  The

10  information the treatment provider has and the probation

11  department has is confidential information.

12      Let's say somehow the information gets to the Denver

13  Police Department --

14      *THE COURT:*  I want to test that.  I apologize for

15  interrupting.

16      *MS. SPENCER:*  That's fine.

17      *THE COURT:*  But not really.

18      *MS. SPENCER:*  Go on.  I'm getting my water.

19      *MR. VARHOLAK:*  I'm going to do the same.

20      *THE COURT:*  You take the position that the information

21  is confidential but not inherently confidential.  It's

22  confidential because of an unenforceable, what, pledge or

23  representation by a polygrapher of disclosure only for purposes

24  of treatment?  Otherwise, how do you mean when you say this

25  information, this admission is confidential?

1    MS. SPENCER:  Well, in our example when we're talking

2    about Mr. Jenks doing the sexual history disclosure polygraph,

3    at what point is he going to pick up the phone and call the

4    police about this information?

5    THE COURT:  May he be queried about the information?

6    MS. SPENCER:  I think that that would be a long

7    hearing about whether you could subpoena his documents and he

8    would be forced to turn those over.  That did not happen.

9    So I asked him, I said, you know, How long have you

10   been doing this?  He said, I've been doing this since 1978.

11   I've kept my statistics.  I've done 47,000 polygraphs and not

12   ever, not ever, not once been called by law enforcement about

13   any polygraph I've conducted, even the most heinous, most

14   admissions, never have I been subpoenaed or called upon by law

15   enforcement.  I found that to be probative when we talk about

16   the sheer volume of what he's doing in turns of turning things

17   over, in terms of it turning into an investigation even.

18   That's where my concern is, is it incriminating.  It

19   can't be so speculative and so possible -- maybe in some world

20   we have to tie it to something more specific.  It is that

21   language that it has to be a link in the chain of evidence.

22   Even if it is not admissible evidence, it has to be some link.

23   It simply isn't.

24   The examples Mr. Varholak gave is the opposite side.

25   Let's say someone reaches out to law enforcement and I was

1   molested by Mr. Von Behren and they say, we need to look into

2   that.  They're going to look him up and say, he's on federal

3   probation.  Let's reach out to his probation officer and find

4   out how he will be doing.  I think it will be a short

5   conversation.

6        My understanding is from probation all they can admit

7   to is the public documents.  If it says in the public documents

8   he's under supervision, the answer is yes, he's under

9   supervision.  That's it.  Not where he's receiving his

10  treatment, how he's doing, whether he passed his polygraph last

11  month, et cetera, et cetera.

12       It is a tenuous argument that's being made by

13  Mr. Varholak.  I'm pleased that he gives so much weight and

14  gravitas to law enforcement that they are so on it, that they

15  are searching every possible disclosure and looking for every

16  admission to a polygrapher when that simply is not supported by

17  the evidence in this case.

18       That is why, Your Honor, I have recommended there is a

19  line that can be drawn between those specific questions, the

20  broad questions at the beginning, and the follow-up questions.

21  It is in the follow-up questions where the incrimination may

22  truly arise when you're talking about the past number of

23  victims, what their ages were, whether they're a family member

24  or not, what their gender is.  Those can truly be

25  incriminating, and since those can be not answered, to put them

1  in the negative, the assertion of the Fifth can happen and the

2  polygraph can continue.  They'd both be satisfied in that way.

3          I've included some modification to the Court's order,

4  some language, and actually redacted a little bit more from

5  what I previously have tendered to the Court.  I have seen it

6  in the response as a way to try and carve out a way to get to

7  both of these which I understand the defendant may have some

8  concerns.

9          I think I've answered in my response counsel can be

10  there.  He can ask advice of Mr. Varholak; that it isn't in a

11  vacuum.  He knows what the questions are now.  He knows what

12  the follow-ups are.  They can talk about it at length before he

13  even goes in and get to something real here instead of

14  something so amorphous.

15          *THE COURT:*  You're attempting to extenuate the risk to

16  the point it becomes constitutional de minimis.

17          *MS. SPENCER:*  Yes.  Thank you for being more

18  articulate than I am.  That's what I'm trying to do, is to

19  reduce that.  Similarly, I was trying to reduce the compulsion

20  piece.  Probation has worked long and hard on this issue

21  because this is a such key component to sex offender treatment,

22  the polygraph issue, and assertion of the Fifth, that they have

23  not just concentrated on it in this district but talked about

24  nationwide, and they're clear with me that a termination from

25  sex offender treatment because of the assertion of the Fifth in

1   the polygraph context will not trigger a termination from this

2   probation department to Your Honor in this case.  It simply

3   will not.  They will simply come for guidance about what to do

4   next.  So we won't have that automatic, well, he's going to

5   prison.  That's all that's going to happen.

6          It may be the same result perhaps, but perhaps not.

7   Perhaps we'll be back here and go through it again.  I know

8   Mr. Von Behren has taken a maintenance polygraph already.  This

9   has been done in this case.  He has another maintenance

10  polygraph scheduled as well.  It is a sexual history polygraph

11  that draws near because he has to take it within nine months --

12  is it nine months?

13          *THE COURT:*  Well, within a deadline.

14          *MS. SPENCER:*  Within a deadline, which they have

15  extended at RSA to allow for these things to play out.

16          *THE COURT:*  Our immediate deadline is next Monday.

17          *MS. SPENCER:*  For purposes of taking the polygraph

18  itself.  As I pointed out, the use of the polygraph touches on

19  other conditions as well in treatment, such as the no contact

20  with minors.  There has to be clean polygraphs before there can

21  be the loosening of other restrictions.  It is tied in many

22  other ways to the treatment contract.  It is not just

23  January 12, but may tie to other advances in treatment for

24  Mr. Von Behren.

25          If I may look at my notes, Your Honor.  If you want to

1   come up with other questions while I do that.

2     *THE COURT:*  I've already exhausted the limits of my

3   excogitation.  So you're safe.

4     *MS. SPENCER:*  I'm not going to say I don't believe

5   you.  I fear I'll just be repeating myself, Your Honor.  Thank

6   you.

7     *THE COURT:*  Counsel, thank you.

8     Reply, Mr. Varholak.

9     *MR. VARHOLAK:*  Thank you, Your Honor.

10    *THE COURT:*  You're welcome.

11    *MR. VARHOLAK:*  I'm going to begin where the Government

12  left off.  I think in the end it becomes the critical issue.

13  It gets to this de minimis issue, are we reducing it to a de

14  minimis level.  First, there's nothing in the Constitution that

15  this doesn't exist in the Fifth Amendment, the de minimis

16  exception.

17    *THE COURT:*  It is not that nuance.

18    *MR. VARHOLAK:*  It's not.  I think the Court found that

19  in its order at page 10 as the only paragraph that is

20  completely on this page.  Midway through, the Court held,

21  "Facing questions which asked about sex with minors or other

22  similar categories, anything but a no answer poses a real risk

23  of incrimination."

24    That's what we have here.  That's the four questions

25  here.  Anything but a no answer or asserting a Fifth Amendment

1   poses a risk of incrimination.

2           Running with the Government's example that the Court

3   picked up on the homicide.  Using the Court's -- which is

4   better than the response I had.  Let's say Mr. Von Behren was,

5   indeed, under suspicion and they thought he had murdered

6   somebody previously.  They didn't have enough evidence.  Now,

7   five years later they know, by speaking to the probation

8   officer, that he's on probation for a violent assault, and all

9   the probation officer says is, He's on probation unsupervised.

10  But they know that anybody in the state who's on probation for

11  a violent assault must do a polygraph where they're asked the

12  question, Did you murder anybody.  They're required to answer

13  that question but no more details.

14          I find it hard to believe that the investigator would

15  be so incompetent not to -- maybe probation can't give it.

16  Maybe the polygrapher says he won't.  RSA, they've got a waiver

17  that says, we'll give it over.  Remember, RSA will have this

18  document.

19          I find it hard to believe they wouldn't ask and they

20  won't turn it over.  Subpoena him, and bring him into court for

21  that answer.  Now we have an admission to a homicide.

22          Now, yes, it doesn't say who.  It doesn't say when.

23  It doesn't say which individual, but you better believe that

24  that prosecutor in that homicide case is going to try to get

25  that admission into evidence, and then the defense can stand up

1    and say, well, that's something different.  Okay.  That's not

2    going to work.  That's what we've got here.

3           I don't know whether Mr. Von Behren is under

4    investigation for anything out there.  I don't know the answer

5    to that.  Let's assume he's not.  But let's assume somebody

6    comes forward at some point and turns to the investigator and

7    says, hey, he -- to use the first example the Court used -- had

8    sex with minors.  When I was 12, he was 19.

9           I find it hard to believe that an investigator who

10   runs his records -- he's on federal supervised release and

11   going through sex offender treatment.  If they know anything

12   about RSA, they're not going to subpoena the answers to -- the

13   disclosure document he fills out and everything else.

14        *THE COURT:*  Well, your argument is, regardless of the

15   length of the chain, one link is too many?

16        *MR. VARHOLAK:*  Absolutely.  That's exactly right.

17   That's essentially what this all boils down to.  As a result,

18   knowing what is going to be asked of him in this, I'm going to

19   be instructing him every single question that is asked, You

20   assert your Fifth Amendment right.  You refuse to answer.

21        *THE COURT:*  Even if you were to be convinced

22   hypothetically in another circumstance with another individual

23   that he could answer no; that there would be no need to invoke

24   his right against self-incrimination because no possibility

25   existed?

1          *MR. VARHOLAK:*  Yes, Your Honor.  Because I can't be

2     100% sure ever that there's not some sort of criminal activity

3     that had taken place.  Let's take the individual who has done

4     something.  Any of these questions, I'm going to instruct them

5     not to answer.  Otherwise, what we've got is -- let's say

6     again -- let's say it is the first question.  Had sex with a

7     minor when you were 19, whatever.  If I tell him, Take the

8     Fifth on that but don't on any of the others, we've just given

9     a big road map to anybody looking at this into what they should

10    be looking into it.  It has to be not answered.  It doesn't

11    matter because if there's any question he answers no to, the

12    polygraph is done.  He's not completed.  We all agree on the

13    first four questions.  Not on all, but on the first four

14    questions.  If he asserts the Fifth to any of those, the

15    polygraph is done.

16          *THE COURT:*  I heard you say if he answered no.

17          *MR. VARHOLAK:*  I'm sorry.  Asserted the Fifth.  I must

18    have misspoke.

19          Just a couple very minor responses.  One, on this

20    issue that the Court had asked the Government about, which is

21    this further conversation.  If he answers no on a question and

22    that comes back deceptive, there will be some further

23    conversation.  Again, I can't be there for that.  I can be on

24    the outside in between the initial questions and the beginning

25    of the polygraph, but I can't be there once we start going off

1  chart into the other questions.

2  　　　　*THE COURT:*  Actually, I'm one step removed from that.

3  I'm talking about what ability, if any, does a person in

4  Mr. Von Behren's circumstance have to dispute or surmount the

5  reported opinion of the polygrapher that one or more of his

6  answers was deceptive?  So I'm talking -- we're post polygraph

7  in those circumstances.

8  　　　　*MR. VARHOLAK:*  I don't know the answer to that.  In

9  fairness, it would be he had some.  If they filed a petition

10 saying he got booted out because he lied, we'd have a hearing

11 on that, and my guess is I could come in here and challenge

12 that.  The problem is as soon as we get a deceptive answer, any

13 attorney would say, Don't answer any more questions on this.

14 You have to assert your Fifth.  We can't get into this debate

15 back and forth as to whether you lied or not.

16 　　　　I think the final point I've got on all of this, final

17 two points; again, the one, as the Court brought up, there is

18 no guarantee of confidentiality on this.  It is just not

19 protected.  Two, I understand this is a SOMB standard that they

20 do this polygraph.  There's two responses to that.  First,

21 we're in federal court.  We're not bound by the SOMB standards,

22 and if RSA, because they're SOMB certified or somebody else

23 believes they're SOMB certified, believes they're treating a

24 federal probationer under a standard that's not SOMB would get

25 them booted out of SOMB or lose their certification.  I'm not

1   sure of the answer to that.  If they believe, hey, if we treat

2   Mr. Von Behren, even though he's not state, and we don't make

3   him go through this polygraph, then we lose our SOMB

4   certification and we're not going to risk that.  Well, then,

5   federal probation needs to find somebody maybe who is not SOMB

6   certified to give this treatment within the constitutional

7   rules that this Court has set.

8           Second, as everybody else, if it's unconstitutional,

9   if it's state ordered, it doesn't matter.  The state can't

10  order him to do something that's unconstitutional.  That's what

11  this is.  Thank you.

12          THE COURT:  Thank you.

13          Mr. Vanni has risen to a point to capture the

14  attention of the Court.  Mr. Vanni, what's on your mind?

15  Counsel, please listen carefully because, if appropriate, I'll

16  give you an opportunity to be heard in response.

17          MR. VANNI:  If I may, I wanted to clarify --

18          THE COURT:  I want you to come to the podium to use

19  the microphone, please, and thank you.

20          MR. VANNI:  Your Honor, if I may, I wanted to clarify

21  a question you had and a point Mr. Varholak brought up.  In

22  discussing this link in the chain as far as what the

23  polygrapher has to disclose, Amich and Jenks and others say

24  they sign a release of information.

25          Mr. Von Behren chooses who that information is going

1    to be released to.  Mr. Jenks cannot release any information to

2    anybody who calls him on the phone and says, is Mr. Von Behren

3    there taking a polygraph.  So, in other words, if law

4    enforcement did call him, he can't even say he's ever heard of

5    this person or he's been in his office.

6          So I wanted to clarify the release of information

7    piece.

8          *THE COURT:*  Well, it does and it doesn't.  Here's how

9    it doesn't.  Because if the information is subpoenaed, there's

10   nothing to suggest it's privileged.

11         *MR. VANNI:*  Absolutely.

12         *THE COURT:*  You understand that's a very common means

13   of the production of information in a legal matter, especially

14   a criminal matter?

15         *MR. VANNI:*  Absolutely.  I wanted to clarify the

16   information and the ultimate waiver he's signing says that.

17   The waiver specifically is for the mandatory reporting piece.

18   If they do have a name, if they do have a jurisdiction, if

19   there was a duty to warn, if you will, they have an

20   identifiable victim, then he waives that right, and they pick

21   up the phone because the information they have is enough to

22   contact law enforcement with the jurisdiction and the name.

23         They don't have a waiver without a release to release

24   any information to anybody calling again.  If law enforcement

25   calls RSA again, it has to be, We don't know who he is.  He's

1  not at our facility.  It has to be, as you said, something

2  ordered by a judge that information is subpoenaed, but there

3  are releases of information that does protect his information.

4  That's the only clarification I wanted to give the Court, was

5  the release of information and waiver he signed at RSA that

6  does not apply as broad as it was described.

7      *THE COURT:*  All right.  Thank you.

8      Do the statements of Mr. Vanni precipitate further

9  response by either party?  Let me begin with the defense, whose

10  motion this is.

11      *MR. VARHOLAK:*  Thank you, Your Honor.  Only briefly

12  two points.  The waiver is in with -- it has been introduced in

13  a previous hearing.

14      I understand what Mr. Vanni is saying.  I think the

15  plain language of it is certainly a lot broader than that.  I

16  would not want to be in a position as a defense attorney

17  arguing this is privileged in some way.  Two, as the Court

18  questioned and Mr. Vanni candidly admitted, a subpoena doesn't

19  protect against any of that.  Thank you.

20      *THE COURT:*  Ms. Spencer.

21      *MS. SPENCER:*  No.  Thank you, Your Honor.

22      *THE COURT:*  Counsel, a pleasure as always.  The issues

23  raised by and inherent to the motion for declaratory relief and

24  the concomitant request for modification of the extant court

25  order are joined.  I'll write on it, hopefully between now and

1    that important deadline of January 12.

2              Very well.  Further business to come before the Court

3    in this matter by the Government?

4              *MS. SPENCER:*  No, Your Honor.

5              *THE COURT:*  Or by the defense?

6              *MR. VARHOLAK:*  Only, Your Honor -- I appreciate the

7    Court trying to rule on it between now and then.  Given the

8    complexity of this, in the event the Court can't get an order

9    out, I would ask the Court to stay that polygraph.

10             *THE COURT:*  If I can't get to it, you can anticipate a

11   stay until I can.  That's the only fair and lawful thing to do

12   in these circumstances.

13             *MR. VARHOLAK:*  Thank you.  Appreciate it.

14             *THE COURT:*  Please close the record in this matter.

15   The Court returns to recess.

16             Madam Clerk.

17             (Court stood in recess at 11:38.)

18                        * * * * *

19                   **REPORTER'S CERTIFICATE**

20        I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.  Dated

22   at Denver, Colorado, this 9th day of March, 2015.

23

24                              *S/Tracy Weir*
                                Tracy Weir
25